IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| CHAD MCCUNE AND CARMEN MCCUNE, et al., | § § § | |
| PLAINTIFFS, | § § | |
| V. | § § | Case No. 5:2009cv00107 |
| GRACO CHILDREN'S PRODUCTS, INC., et al., | § § | |
| DEFENDANTS. | § § | |

## FIRST AMENDED COMPLAINT

Plaintiffs Chad and Carmen McCune, individually, and as next friends of J.M., a minor, and Stephen D. Howe, as J.M.'s guardian ad litem, for their claims and causes of action against the Defendants, state and allege as follows.

## PARTIES

1.      Plaintiff Chad McCune is an adult, a resident of Collin County, Texas, and is the natural father of J.M.

2.      Plaintiff Carmen McCune is an adult, a resident of Collin County, Texas, and is the natural mother of J.M.

3.      Stephen D. Howen, Esq. is the duly appointed Guardian Ad Litem of the minor Plaintiff, J.M.

4.      J.M. is the minor son of Chad and Carmen McCune and was born on September 17, 2002.

5.      Defendant Graco Children's Products, Inc. ("Graco") was, at all relevant times, a foreign corporation organized and existing according to the laws of Delaware with its principal

1

place of business in Pennsylvania.  At all relevant times, Graco regularly did business in Texas, has committed tortious acts in Texas and its products, including the child safety seat involved in this case (the "TurboBooster"), are regularly sold and used by consumers in Texas.  Graco has, therefore, submitted itself to the jurisdiction of this Court.

6.     Defendant Wal-Mart Stores of Texas, L.L.C. ("Wal-Mart") was, at all relevant times, a foreign corporation organized and existing according to the laws of Delaware with its principal offices located in Arkansas.  At all relevant times, Wal-Mart has been conducting business in Texas, and it has, therefore, submitted itself to the jurisdiction of this Court.

7.      The "TurboBooster" child safety seat that is the subject of this litigation was sold by Wal-Mart as a booster safety seat for the intended use and benefit of J.M.  The seat was purchased by J.M.'s grandmother, Tina McCune, within the Eastern District of Texas for the specific use and benefit of Chad and Carmen McCune, as well as J.M.

## JURISDICTION AND VENUE

8.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332.  Plaintiffs and Defendants to this action are of diverse citizenship.  The amount in controversy exceeds $75,000 exclusive of interests and costs.

9.     Venue is proper in this Court.  Plaintiffs are residents of Collin County, Texas which is within this judicial district, and many of the acts and/or occurrences giving rise to the injuries of Plaintiffs occurred in the state of Texas within this judicial district.

## PROCEDURAL AND FACTUAL BACKGROUND

10.     Plaintiff J.M.'s grandmother, Tina McCune, purchased a "TurboBooster" safety seat for the specific use and benefit of all Plaintiffs, including J.M, on or about December 10, 2006 at a Wal-Mart store within the judicial district of the Eastern District of Texas.

2

11.     The subject TurboBooster safety seat is identified as Model Number 8491RGB, Serial Number JJ0402050720415, Date of Manufacture April 2, 2005.

12.     The TurboBooster safety seat was designed, tested, manufactured, packaged, labeled and marketed by Graco.  Graco is a "manufacturer" of the safety seat as defined in Chapter 82.001(4) of the Texas Civil Practices and Remedies Code.

13.     On or about July 29, 2007, J.M. was, according to the information provided by Defendants, the proper size and weight to use the TurboBooster – he was four (4) years old and weighed approximately forty (40) pounds.  On that date, J.M. was a right rear seat passenger in a 2006 Ford Explorer.  J.M. was using his "TurboBooster" in a reasonably anticipated, expected and foreseeable manner when the Explorer was involved in a frontal collision.

14.     The subject TurboBooster safety seat was in the same condition just prior to the collision as it was in when it was sold by Defendants.

15.     J.M.'s occupant space inside the Explorer was preserved and intact throughout and after the collision – it was more than adequate to allow for an occupant of J.M.'s size to safely ride down the crash forces present in the collision without sustaining serious injury had J.M. been restrained in a properly designed child safety seat.

16.     The TurboBooster was defective and unreasonably dangerous in that it was not adequately designed, tested, manufactured, packaged, labled or marketed to minimize the risk of injury or death or to provide safe and effective restraint to children.  By way of example and without limitation, the safety seat was defective and unreasonably dangerous in the following ways:

      a.  The safety seat failed to prevent shoulder rollout, belt slippage and slack, and/or submarining;

    b.   The safety seat failed to provide adequate upper torso and pelvic restraint and/or to adequately distribute crash loads;

    c.   The safety seat failed structurally in several ways in the collision, including the failure of the base retention system, the failure of mechanical fastening devices designed to keep the left side arm rest attached to the base, and a complete separation of the left side armrest from the seat;

    d.   The safety seat failed to comply with the minimum federal standard, FMVSS 213, in at least two ways – first, it structurally failed in this collision (and in other accidents and tests), and second, it was labeled as being appropriate for children who were too small to safely use it;

    e.   The testing performed by Graco on the safety seat was woefully inadequate and insufficient to provide a reasonable assurance that the seat complied with the applicable federal standard or would provide safety to young children in foreseeable collisions or crashes;

    f.   The testing that Graco did perform or otherwise know of made it clear that the design of the TurboBooster was flawed and that a loss of restraint was inevitable in foreseeable crashes – yet Graco did nothing to investigate these test failures, determine their cause and eliminate the cause of the failures;

    g.   The design of the safety seat failed to incorporate any margin of safety to allow for factors such as, for example, tolerances, variances, environmental effects and foreseeable loading conditions.

17.    Because of the safety seat's defective and unreasonably dangerous condition, the TurboBooster failed to properly restrain J.M., the safety seat broke and failed, and J.M.'s body was not restrained in the crash.  J.M. was permanently and seriously injured as a proximate result of these failures and is now a quadriplegic who is on a ventilator for extended periods of time.

18.    Safer alternative designs existed at the time of the safety seat's design, manufacture, at the time of its sale and at the time of the accident, any one of which would, in reasonable probability, have prevented the injuries to J.M.  These alternative designs were both economically and technologically feasible at all relevant times by the application of existing scientific knowledge.

19.     In addition to the defects outlined above, Defendants also failed to provide adequate warnings and information regarding the unreasonably dangerous design of the TurboBooster safety seat.  In this regard, and prior to the date of the accident at issue in this case, various governmental and non-governmental safety organizations in North America with significant expertise in child transportation safety issues recommended against using booster seats for children who had not yet outgrown seats with integrated harnesses and, further, identified the dangers and risks of using these products.   Some of the information and recommendations that were available and actually known to Graco, and that were or should have been known by Wal-Mart, included the following:

a.     In 1974, Dr. Richard Stalnaker published an SAE paper entitled "Tests of Current and Experimental Child Restraints Systems."  Dr. Stalnaker stated in this journal article that "The single most important measure of the injury protection afforded by a restraint system . . . is the extent to which it limits head excursion in all directions."

b.     In 1989, the American Academy of Pediatrics issued "1989 AAP Car Safety Guidelines." The guidelines recommended keeping a child in a seat with integral harnesses "for as long as possible."

c.     In January, 1989, NHTSA published a "Consumer Information" brochure. The brochure stated that caregivers should "keep children in convertible or toddler seats as long as they will fit."

d.     The Fall, 1989 Safe Ride News contained an insert entitled "Common Questions about Child Safety Seats." In answer to the question, "when should my child begin using a booster seat," it stated that a booster seat should only be used when a child has outgrown a seat with integral harnesses, i.e at around 40-43 pounds.  It warned that "a booster seat provides less protection than a full-size CSS due to the lack of side wings and shoulder harness, which protect the upper body and head."

e.     In 1990, the AAP issued its "1990 AAP Car Safety Guidelines." The AAP recommended keeping a child in a seat with integral harnesses "for as long as possible."

f.     Also in 1990, the DOT and NHTSA issued their "Shopping Guide For Child and Infant Safety Seats."   The government recommended keeping a child in a seat

5

with integral harnesses "as long as they will fit." These same recommendations and warnings were provided again by NHTSA in a May, 1990 "Buckle-Up America" campaign brochure.

g.      In March, 1992, NHTSA published the "Child Passenger Safety Resource Manual." Numerous comments were made in the Manual regarding the proper use of booster seats, including the statement that "booster seats are intended to be used as a transition to safety belts by older children who have outgrown convertible seats" and that "parents should be advised to keep their children in a convertible seat as long as they will fit . . . ."

h.      In the Spring, 1994 Safe Ride News newsletter, the AAP stated in the "Belts, Boosters and Kids" section that parents needed to keep their children in seats with integrated harnesses "as a long as it fits" and that "a restraint with shoulder straps and a shell is usually more protective than a booster seat."

i.      In May, 1996, the AAP published a Policy Statement in Pediatrics, Volume 97, Number 5. "A convertible safety seat should be used as long as the child fits well (e.g., ears below the top of the back of the seat and shoulders below the seat strap slots)." It also stated that "a booster seat should be used when the child has outgrown a convertible safety seat but is too small to fit properly in a vehicle safety belt."

j.      In the summer of 1996, "NHTSA Facts" was published by NHTSA. The "Size and Weight Guide" warned that children should be kept "in convertible or toddler seats as long as they will fit."

k.      In the Fall, 1996 edition of Safe Ride News, the authors stated: "Do not push your child out of a safety seat too soon. A restraint with two shoulder straps and a shell is generally more protective than a booster seat . . . .  A child should use a convertible or toddler seat as long as it fits, which means until the (i) upper weight limit is reached, usually 40 lbs., (ii) shoulders are above the strap slots, and (iii) ears are above the back of the restraint."

l.      In August, 1997, the American College of Emergency Physicians warned that "it is best to keep kids in the forward facing car seat for as long as they fit comfortably in it.

m.      In July, 1998, NHTSA issued "A Parent's Guide To Booster Seats." NHTSA warned that "for maximum protection, keep a child in a forward-facing child safety seat with full harness as long as the child fits in this seat."

n.      In February, 2000, NHTSA published its "Standardized Child Passenger Safety Training Program" course book. The book defined a "best practice" as "recommendations that provide the safest way to travel for children of certain

6

ages, size and physical tolerance." In the section on booster seats, it gives several "best practices":

Children should "use seat with full internal harness until they reach the manufacturer's recommendation for upper size limits."

"**<u>Best practice recommends that a child stay in a forward-facing seat with a full harness until the top weight or height limit of the forward facing seat.</u>**" (emphasis in original).

"Best practice' recommendation is for children to use seat with full internal harness until they reach the manufacturer's recommendations for upper size limits."

o.    In March, 2000, CHOP (Children's Hospital of Philadelphia) issued a Partner's For Child Passenger Safety report. In the conclusion, the report states that "restraining children according to best practice is crucial to preventing head, brain and other devastating injuries."

p.    In June, 2000, NHTSA published "A Parent's Guide To Booster Seats."  In this guide, NHTSA warned that children should not be moved into booster seats until they have "outgrown a convertible seat" and that "for maximum protection, keep a child in a forward-facing child safety seat with full harness as long as the child fits in the seat."

q.    On July 6, 2000, "Does My Child Need A Booster Seat" was published by SafetyBeltSafe, and it stated: "Children should ride in safety seats with a complete harness system as long as possible."

r.    In April, 2001, CHOP's Partner's For Child Passenger Safety issued recommendations that "Current safety recommendation from the AAP and The NHTSA" is that "children should ride in a car seat with a full harness until the seat is completely outgrown based on manufacturer height and weight limits."

s.    On April 23, 2001, the Association for the Advancement of Automotive Medicine published a paper entitled "Booster Seats for Children" that contained "scientifically based recommendations." Specific recommendations were made that, "based on current knowledge, the most effective progression of occupant restraint is . . . forward facing child restraints up to 40 pounds or more depending on the product limit."

t.    In 2002, the AAP stated in its car seat guide entitled "Car Safety Seats: A Guide for Families, 2002" that children should stay in seats with integrated harnesses until he reaches "the top weight allowed." The AAP also stated that "Children should remain in a convertible, forward facing or combination seat with a full

7

harness until they reach the top weight or height allowed by the seat."

u. In March, 2002, the AAP issued a formal "Policy Statement" that was published in Pediatrics under the title "Selecting and Using the Most Appropriate Car Safety Seats for Growing Children – Guidelines for Counseling Parents." In the article, the AAP stated that a forward facing seat should be used until the child outgrows it.

v. In December, 2002, CHOP issued "best practice" recommendations stating that "Forward facing seats should be used until your child reaches the maximum weight or height limit for the seat or until his ears reach the top of the child safety seat. When this happens, your child is ready for a belt-positioning booster seat."

w. In 2003, the AAP stated in its car seat guide entitled "Car Safety Seats: A Guide for Families, 2003" that "Children should remain in a convertible, forward facing or combination seat with a full harness until they reach the top weight or height allowed by the seat."

x. In 2003, CHOP published its "Interim Report." In discussing injuries, CHOP noted as a "recommendation" that

"Minimizing forward head movement and acceleration would decrease injury risk.  The potential for head contact with the rear of the front seat and other interior vehicle structures should be considered."

The CHOP further defined "Appropriate restraint" as "use forward facing child safety seat until child has completely outgrown the manufacturer's maximum height and weight limits for the seat – usually 40-65 pounds."

y. In 2004, the AAP stated in its car seat guide entitled "Car Safety Seats: A Guide for Families, 2004" that children should stay in seats with integral harnesses until they reach "the top weight or height allowed." The AAP also stated that "Children should remain in a convertible, forward facing or combination seat with a full harness until they reach the top weight or height allowed by the seat."

z. In 2005, the AAP stated in its car seat guide entitled "Car Safety Seats: A Guide for Families, 2005," that children should "stay in a car safety seat with a harness for as long as possible and then ride in a belt positioning booster seat."

aa. In May, 2005, CHOP issued CPS Issue Report (#2).  It contained "current research on safe seating for children" and recommended a forward facing seat with harness "until your child is too tall or heavy for the seat."

bb. In early 2005, at least two NCAP tests were run in which Graco TurboBooster safety seats failed in a manner similar to that experienced by J.M.'s seat in the

8

collision at issue; other tests run by Graco or on its behalf also revealed similar failures.

20.     All of the information contained in paragraph 19 was actually known to Graco, and was or should have been known to Wal-Mart, prior to the time J.M.'s "TurboBooster" was sold.  Nevertheless, when Graco and Wal-Mart sold the "TurboBooster," they failed to provide any of this information to the public or to the users and consumers of the safety seat, and they failed to warn the public and the users and consumers of the safety seat about the inherent dangers in using the seat with children who would be better protected in seats with full harnesses.

21.     Graco and Wal-Mart failed to provide any of the information contained in paragraph 19 above to Tina McCune at any time prior to or after the purchase of the "TurboBooster," and they failed to warn or provide information to Tina McCune, or to J.M.'s parents, of the dangers inherent in using the "TurboBooster" with children in J.M.'s height and weight range. Had any of this information been provided, Tina McCune would not have purchased the "TurboBooster" for Chad and Carmen McCune and for J.M., and J.M.'s parents would never have used it with J.M.  Defendants' failures in this regard resulted in defects in the TurboBooster's labeling, marketing, instructions, warnings and other informational materials, including but not limited to the following:

a.     The TurboBooster failed to provide adequate warnings, instructions and information regarding the use of the seat with children in certain weight and height ranges, and on how to select a safety seat that would provide reasonable and adequate protection to children in foreseeable crashes based on a child's height and weight.

b.     The advertising, marketing, sales, point of sale, and other related and similar information that was on the box containing the TurboBooster, in the box, on the seat itself and at the point of sale failed to provide adequate warnings, instructions and information regarding the use of the seat with children in certain weight and

height ranges and on how to select a safety seat that would provide reasonable and adequate protection to children in foreseeable crashes based on a child's height and weight.

c.      The warnings and instructions that were provided with and on the TurboBooster were incomplete, inaccurate, concealed the limitations of the seat, failed to provide appropriate and accurate information regarding the minimum height and weight of children who could safely occupy the seat, failed to convey the risks associated with the use of the seat by children who did not weigh enough or were not tall enough to safely use the seat, and otherwise failed to convey information necessary to the safe use of the seat.

d.      The advertising, marketing, sales, point of sale, and other related and similar information that was on the box containing the TurboBooster, in the box, on the seat itself and at the point of sale were incomplete, inaccurate, concealed the limitations of the seat, failed to provide appropriate and accurate information regarding the minimum height and weight of children who could safely occupy the seat, failed to convey the risks associated with the use of the seat by children who did not weigh enough or were not tall enough to safely use the seat, and otherwise failed to convey information necessary to the safe use of the seat.

22.     Prior to July 29, 2007, Graco had actual knowledge that its "TurboBooster" safety

seats were failing in tests, that the failures would result in the degradation or absence of restraint

and that children who experienced these kinds of failures would be at substantially increased risk

of death or serious injury in the event of a collision.

23.     Prior to July 29, 2007, Graco and Wal-Mart sold a "TurboBooster" safety booster

seat to Tina McCune.  Tina McCune was induced to purchase the safety seat, and Chad and Tina

McCune were induced to use it with J.M., because of numerous express and implied promises,

representations, assurances and/or affirmations that were given to them by Graco and Wal-Mart,

including but not limited to the following:

a.      They believed that Graco and Wal-Mart were trustworthy companies with expertise in the design, testing, manufacturing, labeling and use of child safety seats, that they could confide in and rely upon these companies when selecting and using a safety seat for J.M., and that if any information critical to the safe use of the product was known to these companies, it would be provided;

10

    b.        They believed the safety booster seat was a safety seat and that it would provide safety to J.M. in automobile crashes;

    c.        They believed the safety booster seat would provide effective restraint for J.M. in foreseeable automobile crashes;

    d.        They believed the safety booster seat was suitable, safe and appropriate for children in J.M.'s weight and height range;

    e.        They believed that Graco and Wal-Mart knew or had reason to know of, the particular purpose for which they intended to use the safety booster seat, and they relied on the Defendants' skill, expertise, testing, evaluation and judgment to select, advertise, and furnish a safety booster seat that would be suitable for use by J.M.

24.      Prior to July 29, 2007, Graco and Wal-Mart concealed and otherwise failed to disclose to Tina McCune, and to each of the Plaintiffs, numerous facts, including but not limited to the following:

    a.        That they *knew* the "TurboBooster" would not provide effective restraint for children weighing at or near 40 pounds in automobile crashes and that seats with much safer restraint configurations were available and preferable;

    b.        That they *knew* that testing had shown structural deficiencies in the seat that had resulted in the loss of restraint and that the loss of restraint could cause serious injuries that would have been prevented by the use of non-defective safety seats;

    c.        That they *knew* that the TurboBooster performed poorly in testing, even when it did not break apart, and that shoulder rollout, belt slippage and slack, and/or submarining were likely results of certain foreseeable collisions;

    d.        That they *knew* since as early as 1989 that various governmental and non-governmental safety organizations in North America with significant expertise in child transportation safety issues recommended against using a booster seat for a child who had not yet outgrown safety seats that contained integrated harness systems, all as more fully set forth above;

    e.        That they *knew* the "TurboBooster" would not adequately protect a child who could not yet utilize an automobile's seatbelt system during a collision and that it could actually enhance injuries to such children in that its design permitted and encouraged (i) excessive upper torso movement and head excursion, (ii) head impact with the interior of the automobile, (iii) spinal cord injuries, and (iv) partial ejection of the child from the seat.

25.     At all relevant times, neither Tina McCune nor J.M.'s parents had any knowledge, actual or constructive, of any of the facts alleged above.  At the same time, Defendants knew or had reason to know that these and other similarly situated persons lacked such knowledge and that they would not realize the dangerous propensities of the TurboBooster, particularly in the face of attention grabbing point of purchase information that conveyed the message that the TurboBooster provided safety and was unquestionably suitable for children such as J.M.

26.     None of the information, statements or recommendations set forth above were on, with or near the TurboBooster safety booster seats that were on sale in the Wal-Mart store where the TurboBooster was purchased.

27.     On or about September 14, 1999, the Administrator of NHTSA, Ricardo Martinez, M.D., sent a letter to Graco which stated, among other things, the following:

a.     As a key protective device for our Nation's children, child restraints must be designed and constructed with the highest levels of safety in mind.

b.     Our review of NHTSA's compliance test results during the past few years indicates that many restraints have been engineered to barely comply with some of the most safety-critical requirements of the standard, rather than being designed with larger compliance margins.

c.     With the safety of our Nation's children at issue, mere compliance with the minimum requirements of the standard is not enough; minimum standards should not be the most in safety design that manufacturers provide.

d.     When products are engineered with narrow compliance margins, the level of safety risk increases, even if the product is in technical compliance with the minimum standard.

e.     I am urging each manufacturer of child restraints to ensure that these restraints perform well beyond the minimum requirements of our standard.  American families expect, and deserve, no less.

f.     It is up to the manufacturers of these critically important safety devices to take on the responsibility of maximizing child safety in all respects.

28.     Graco received and read the letter from Ricardo Martinez, M.D. referred to in the preceding paragraph.

29.     Despite the passage of about eight (8) years between the time Graco received and read the letter from Ricardo Martinez, M.D. referred to above (on or about September 14, 1999) and J.M.'s accident (July 29, 2007), Graco did nothing whatsoever to change either the design or labeling of the TurboBooster to ensure that it performed well beyond the minimum requirements of the standard, nor did it do anything to ensure that the seat had been designed and constructed with the highest levels of safety in mind or to maximize child safety in all respects.  Furthermore, Graco did nothing to pass on to consumers what it knew about the dangers of using a booster seat as a "restraint" for a child weighing at or near 40 pounds or of the design defects in the TurboBooster and, in fact, it actively concealed this information.

## Count I: Strict Liability

30.     Plaintiffs incorporate and reallege the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

31.     Defendants were, at all relevant times, engaged in the business of labeling, packaging, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce the TurboBooster at issue in this lawsuit.   In addition, Graco was in the business of researching, developing, designing, testing, producing, assembling and manufacturing TurboBooster safety seats.   These transactions were essentially commercial in nature.

32.     Tina McCune, on behalf of J.M. and for the direct benefit and use of the Plaintiffs, purchased and/or otherwise properly acquired the TurboBooster.

33.     The TurboBooster at issue herein reached Plaintiffs and J.M., the ultimate users and consumers of the product, without any substantial change in its condition from the time it was sold by the Defendants.

34.     The TurboBooster, when it reached Plaintiffs and J.M., was in a condition that was unreasonably dangerous to the ultimate user or consumer, taking into consideration the utility of the seat and the risks involved in its use.  The TurboBooster was dangerous to an extent beyond that which would be contemplated by the ordinary user or consumer who purchased it with the ordinary knowledge common to the community as to the product's characteristics.

35.     The TurboBooster was defective and unsafe for its intended purposes at the time of its design, testing, manufacture, marketing and sale by Defendants. The product was defectively designed, defectively tested, defectively manufactured, defectively labeled, defectively marketed, and unreasonably dangerous to Plaintiffs in that the design, testing, manufacture, labeling and marketing of the safety seat made it unsafe and dangerous for numerous reasons, including but not limited to the reasons set forth above.

36.     At the time the subject TurboBooster left the possession of Defendants, there were safer alternative designs to that used in the subject TurboBooster, any one of which would have significantly improved the safety seat's crashworthiness and thereby prevented or significantly reduced the risk of injury that resulted in Plaintiffs' damages without substantially impairing the safety seat's utility.  These alternative designs were both economically and technologically feasible by the application of existing or reasonably achievable scientific knowledge at the time the subject TurboBooster left the control of Defendants.

37.     Plaintiffs' injuries were a direct and proximate result of, and were produced by, the product's defective and unreasonably dangerous condition as more fully described above.

14

38.     As a direct and proximate result of these Defendants' designing, testing, manufacturing, labeling, packaging, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce the TurboBooster at issue in this lawsuit, J.M. suffered severe and disabling injuries.

39.     Plaintiffs further allege that such defects in the design, testing, manufacture, labeling, use instructions and marketing of the TurboBooster, singularly or in combination, were a producing cause of Plaintiffs' injuries and damages.

40.     Plaintiff J.M. has suffered severe physical, emotional and financial injuries that will be permanent.  Plaintiff J.M.'s mental and physical conditions will continue to deteriorate, and in all reasonable probability, will cause him to suffer the consequences and ill effects of those injuries for the balance of his natural life.

41.     More specifically, Plaintiffs are entitled to the recovery of damages in this case, including but not limited to the following:

a.  The physical pain and mental anguish experienced by J.M. in the past associated with his severe injuries;

b.  The physical pain and mental anguish experienced by J.M. which will, in all reasonably probability, continue in the future;

c.  The loss of mental and intellectual function, which has occurred in the past, associated with J.M.'s injuries;

d.  The loss of mental and intellectual function, which will, in all reasonable probability, continue in the future;

e.  The physical impairment experienced by J.M. in the past;

f.   The physical impairment which will, in all reasonable probability, continue in the future;

g.   The loss or reduction in earning capacity which, in reasonable probability, J.M. will sustain in the future;

h.   The reasonable and necessary medical expenses that, in reasonable probability, will be sustained in the future after J.M. reaches the age of eighteen; and

i.   The reasonable and necessary funds for special education associated with J.M.'s injuries that will, in reasonable probability, be necessary after he reaches the age of eighteen.

42.   Plaintiffs Chad and Carmen McCune are entitled to recover damages in this case, including but not limited to the following:

a.   Reasonable and necessary medical expenses incurred by J.M. in the past that were incurred for necessary care and treatment of the injuries resulting from the collision complained of, were reasonable and were the usual and customary charges made for such services in the communities in which the services were rendered;

b.   Reasonable and necessary medical expenses which, in reasonable probability, will be incurred by J.M. in the future until he reaches the age of eighteen;

c.   Reasonable and necessary, and increased, costs of education for J.M. incurred in the past associated with his injuries;

     d.  Reasonable and necessary, and increased, costs of education for J.M. that, in reasonable probability, will be incurred in the future until he reaches the age of eighteen.

43.    The conduct of these Defendants, as set forth herein, was so outrageous and improper as to constitute willful, wanton and reckless disregard for the safety of J.M.

44.    The Defendants showed a reckless disregard for the public safety due to their acts and omissions as set forth in this Complaint. The Defendants knew, or should have known, that there was a substantial and unnecessary risk of injury to those who used their product and they failed to either determine the seriousness of the danger or reduce the risk to an acceptable minimal level.  By way of example and without limitation, long prior to April 2, 2005 (the build date for the subject TurboBooster), Graco was objectively and subjectively aware that (i) the safety seat had structurally failed in tests and allowed excessive head excursion and shoulder rollout; (ii) it had failed to properly investigate the reasons for the structural failures and could not explain the failures; (iii) because it failed to understand the reasons for the failures, it made no design changes to eliminate the hazards to children that were created by structural failures; (iv) it had done nothing to eliminate shoulder belt slippage and rollout even when the safety seats did not structurally fail, despite knowing that slippage and rollout resulted in excessive head excursion and the potential for catastrophic injuries; (v) it had marketed the TurboBooster to children who unquestionably should have been in harnessed seats when it knew that parents and other caregivers trusted the Graco name and would purchase the seat in reliance on Graco's recommendations – recommendations which deliberately concealed what Graco knew about the risks and hazards associated with the premature graduation of children to belt-positioning boosters like the TurboBooster; (vi) it had ignored and would continue to ignore the strong

17

urging from the Administrator of NHTSA that safety seats should be designed with the highest levels of safety in mind, that the minimum government standards should not be the most in safety design that manufacturers provide, and that it is up to the manufacturers to take on the responsibility of maximizing child safety in all respects; and (vii) it knew that technologically and economically feasible alternative designs were available that were far superior to the design Graco used with the TurboBooster, designs that Graco had access to - yet it chose to ignore these alternative designs in their entirety in the design of the TurboBooster.  These omissions by Graco, when viewed objectively from Graco's standpoint at the time it built the TurboBooster at issue, involved an extreme degree of risk to the Plaintiffs and young children considering both the probability and magnitude of the potential harm.  Moreover, Graco had actual subjective awareness of the risks involved, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of the Plaintiffs. These acts and omissions constitute gross negligence and malice (as defined in Chapter 41, Section 41.001(7)(B), Tex. Civ. Prac. & Rem. Code) and entitle Plaintiffs to the recovery of exemplary damages.

## Count II: Negligence

45.     Plaintiffs incorporate and reallege the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

46.     Defendants had a duty to exercise reasonable care in designing, testing, developing, manufacturing, labeling, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce the TurboBooster at issue in this lawsuit.

47.     Defendants failed to exercise reasonable care in designing, testing, developing, manufacturing, labeling, packaging, supplying, marketing, selling, advertising, warning and

18

otherwise distributing and placing in the stream of commerce the TurboBooster at issue in this lawsuit given the seat's defective and unreasonably dangerous conditions as described above.

48.     Defendants had a duty, once they learned of any potential problems with the TurboBooster, to perform an adequate inquiry and to ensure that other TurboBoosters were not designed, tested, developed, manufactured, labeled, packaged, supplied, marketed, sold, advertised, contained warnings or otherwise distributed and placed in the stream of commerce in the same way.

49.     Defendants had a duty, once they learned of any potential problems with the TurboBooster, to adequately notify users and consumers of the hazards and risks associated with the TurboBooster.

50.     Defendants knew, or should have known, that the defects associated with the TurboBooster created an unreasonable risk of bodily harm to anyone using the product.

51.     Despite the fact that Defendants knew, or should have known, that the TurboBooster could cause serious and life threatening injuries to anyone who used it, Defendants took inadequate steps to notify consumers of this danger and to prevent the safety seat from being used by children like J.M.

52.     Defendants knew, or should have known, that it was foreseeable that children, such as J.M., would suffer injuries as a result of Defendants' failures to exercise ordinary care as set forth herein.

53.     Defendants' acts and omissions as described above constitute negligence, as that term is defined in the law, which proximately caused injuries to Plaintiffs, as well as other injuries and damages set forth herein.

54.     Defendants' acts and omissions as described above also constitute gross

negligence, as that term is defined in the law, which proximately caused the injuries to Plaintiffs, as well as other injuries and damages set forth herein.

55.     The negligence of these Defendants was a contributing cause of the injuries of Plaintiffs.

56.     The negligent conduct of these Defendants was a proximate cause of the injuries of Plaintiffs.

## Count III:  Unfair and Deceptive Acts

57.     Plaintiffs incorporate and reallege the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

58.     Plaintiffs are consumers under the Texas Deceptive Trade Practices Act "DTPA" because Plaintiffs are individuals who acquired goods from another person that were purchased by that other person specifically for Plaintiffs' use and benefit.

59.     Defendants are corporations that can be sued under the DTPA.

60.     Defendants violated the DTPA when they collectively, or individually:

     a.     Engaged in false, misleading or deceptive acts in the course of selling the TurboBooster.   More specifically, Defendants advertised, warranted, promised and assured Plaintiffs, through the goodwill and generally trustworthiness nature of their businesses, and through the advertising, marketing, labeling, point of sale materials and other written information in and on the TurboBooster, that, among other things, (i) the safety seat would provide safety and restraint to children in foreseeable collisions; (ii) the TurboBooster was in fact a "safety seat" and that it would in fact provide safety to children in foreseeable collisions; (iii) all information that a caregiver or parent would need to make a reasonable, informed and intelligent decision about purchasing the safety seat – a product sold and purchased for the _sole_ purpose of providing crash protection to children in automobile accidents – had in fact provided by Defendants; (iv) crucially important information and recommendations regarding the size and weight of children who could safely use the TurboBooster would not be concealed from Plaintiffs, would not be withheld from Plaintiffs and would, in fact, be fully disclosed to Plaintiffs; and (v) the TurboBooster

had characteristics and benefits – that it would provide safety to children in foreseeable automobile collisions – when they knew full well that for children in certain height and weight ranges, there were much better and safer alternatives available that would, in fact, provide such characteristics and benefits.

b.      Defendants had this and other information available to them at the time the TurboBooster was sold, yet Defendants consciously and deliberately concealed this information from Plaintiffs and from Tina McCune, knowing full well that their concealment of this information would induce Tina McCune to purchase the TurboBooster and would induce Plaintiffs to allow the TurboBooster to be used with J.M.  Had the information set forth above been provided or otherwise disclosed by Defendants, Tina McCune would not have purchased the TurboBooster and Plaintiffs would never have allowed it to be used with J.M.

c.      The information that was concealed as set forth herein was in fact being concealed, deliberately, so that Defendants could sell the TurboBooster to consumers like the McCunes – a product they didn't need, wasn't safe, wouldn't provide restraint and was otherwise defective, all for the sole purpose of making more money for Defendants.

61.      Defendants engaged in unconscionable actions, or a course of action, that, to Plaintiffs' detriment, took advantage of the lack of knowledge, ability, experience or capacity of Plaintiffs and Tina McCune to a grossly unfair degree.  Specifically, Defendants knew full well that the name "Graco," which capitalized on the use of slogans like "Baby and Infant Products From the Heart," was accepted by consumers as a well-known and established company that provided good quality, safe, suitable and otherwise adequate products for parents to buy for their children and that information regarding the safe use of its baby products, especially those that supposedly provided safety, would be disclosed, and Defendants knew that consumers trusted the name "Graco."   Knowing this, Graco made the conscious, deliberate marketing decision to misrepresent the level of safety that the TurboBooster could provide to children in certain weight ranges and concealed a massive amount of information that made it very clear that, at least for children in certain height and weight ranges, products other than the TurboBooster could and

would provide the safety that the TurboBooster lacked in foreseeable automobile collisions. Defendants took advantage of Graco's name and trustworthy reputation and deliberately used that reputation to its advantage in the sale of the TurboBooster at issue in this case.

62.     Defendants breached express and implied warranties with respect to the TurboBooster.  More specifically, Defendants warranted that the TurboBooster (i) was fit for the ordinary purposes for which it was to be used, (ii) was fit and suitable for the particular purpose for which it was sold, (iii) was adequately contained, packaged and labeled, and (iv) conformed to the promises or affirmations of fact made on the seat, the labeling, the instructions, the box and other literature that accompanied the seat when it was sold.  When it was sold by Defendants, the TurboBooster and its associated packaging, labeling and advertising materials contained numerous affirmations of fact or promises which related to the seat. These affirmations and promises had the natural tendency to induce a buyer to purchase the seat and did, in fact, induce Tina McCune to purchase the seat and further induced Plaintiffs to use the seat with J.M. Thus, the affirmations and promises became part of the basis of the bargain, creating an express warranty that the seat would conform to the affirmations and promises made. The seat did not, however, comply with any of these warranties and failed to conform to the affirmations and promises made by Defendants in that it was sold in violation of the DTPA as more fully set forth above.

63.     It was impracticable for Plaintiffs to give Defendants written notice under Texas Business & Commerce Code § 17.505(a) because Plaintiffs needed to file suit in order to prevent the potential expiration of the statute of limitations on certain of Plaintiffs' claims.

64.     Defendants' wrongful conduct, individually or collectively, was a producing cause of Plaintiffs' injuries as more fully set forth above.

65.     Plaintiffs seek the recovery of unliquidated damages within the jurisdictional limits of this Court, as well as all statutory damages to which they are entitled.

66.     Defendants also acted knowingly and intentionally in their conduct and actions with the specific intent that Plaintiffs act in detrimental reliance on Defendants' falsity or deception, or in the detrimental ignorance of Defendants' unfairness.  Accordingly, Plaintiffs are entitled to recover treble damages under Texas Business & Commerce Code § 17.50(b)(1).

67.     Plaintiffs also seek their reasonable and necessary attorneys fees and costs in prosecuting this suit under the Texas Business & Commerce Code § 17.50(d).

68.     All conditions precedent to Plaintiffs' claims for relief have been performed or have occurred or Plaintiffs are excused from performance under the circumstances.

### Count IV: Breach of Express and Implied Warranty

69.     Plaintiffs incorporate and reallege the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

70.     The TurboBooster was subject to an implied warranty of merchantability and an implied warranty of fitness for a particular purpose when it was sold by Graco and Wal-Mart, including but not limited to warranties that it (i) was fit for the ordinary purposes for which it was to be used, (ii) was fit and suitable for the particular purpose for which it was sold, (iii) was adequately designed, tested, assembled, manufactured, contained, packaged and labeled, and (iv) conformed to the promises or affirmations of fact made on the seat, the labeling, the instructions, the box and other literature that accompanied the seat when it was sold.

71.     When it was sold by Graco and Wal-Mart, the TurboBooster and its associated packaging, labeling and advertising materials contained numerous affirmations of fact or promises which related to the seat. These affirmations and promises had the natural tendency to

23

induce a buyer to purchase the seat and did, in fact, induce Tina McCune to purchase the seat and further induced Tina McCune and Plaintiffs to use the seat with J.M. Thus, the affirmations and promises became part of the basis of the bargain, creating an express warranty that the seat would conform to the affirmations and promises made.

72.     The TurboBooster did not comply with any of these warranties and failed to conform to the affirmations and promises made by Graco and Wal-Mart.

73.     At the time of the accident, the TurboBooster was being put to the use for which it was sold by Graco and Wal-Mart.

74.     Plaintiffs' injuries and losses as set forth above were proximately caused by the use of the TurboBooster and the breaches of the expressed and implied warranties set forth above.

75.     Plaintiffs' injuries and losses as set forth above are the kind of losses and damages that were contemplated or foreseeable to Graco and Wal-Mart at the time the seat was sold.

76.     The filing of this lawsuit is seasonable notice of the breaches of warranty alleged herein.

Plaintiffs reserve the right to supplement or amend any of their claims for relief herein

## INTEREST

77.     Plaintiffs request pre- and post-judgment interest on their damages, as allowed by law, at the maximum legal rate, until paid.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,


/s/ R. Douglas Gentile
Evan A. Douthit        (admitted pro hac vice)
R. Douglas Gentile     (admitted pro hac vice)
Christopher J. Stucky  (admitted pro hac vice)
Douthit Frets Rouse Gentile & Rhodes, LLC
903 E. 104th Street, Suite 610
Kansas City, Missouri 64131
(816) 941-7600
(816)941-6666 Facsimile

Alan S. Loewinsohn
Michael B. Hopkins
Loewinsohn Flegle Deary, L.L.P.
12377 Merit Drive, Suite 900
Dallas, Texas 75251-2224
(214) 572-1700
(214) 572-1717 Facsimile

Darby Doan
Haltom & Doan
6500 Summerhill Road, Suite 100
Texarkana, Texas 75503
(903) 255-1000
(903) 255-0800 Facsimile

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of March, 2010, a true and correct copy of the foregoing has been served via ECF filing all counsel of record.


/s/ R. Douglas Gentile
Counsel for Plaintiffs