UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| CHAD MCCUNE AND CARMEN MCCUNE, | § | |
| AS NEXT FRIEND OF JM, A MINOR, | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | Case No. 5:09-cv-107 |
| | § | JURY DEMANDED |
| GRACO CHILDREN'S PRODUCTS, INC. | § | |
| | § | |
| DEFENDANT. | § | |

## THIRD AMENDED COMPLAINT

Plaintiffs Chad and Carmen McCune, as next friends of J.M., a minor, for their claims and causes of action against the Defendant, state and allege as follows:

## PARTIES

1.     Plaintiff Chad McCune is an adult, a resident of Collin County, Texas, is the natural father of J.M and brings this suit as next friend of J.M.

2.     Plaintiff Carmen McCune is an adult, a resident of Collin County, Texas, is the natural mother of J.M and brings this suit as next friend of J.M.

3.     J.M. is the minor son of Chad and Carmen McCune and was born on September 17, 2002.

4.     Defendant Graco Children's Products, Inc. ("Graco") was, at all relevant times, a foreign corporation organized and existing according to the laws of Delaware with its principal place of business in Pennsylvania.  At all relevant times, Graco regularly did business in Texas, has committed tortious acts in Texas and its products, including the child safety seat involved in this case (the "TurboBooster"), are regularly sold and used by consumers in Texas.  Graco has,

therefore, submitted itself to the jurisdiction of this Court.

5.      The "TurboBooster" child safety seat that is the subject of this litigation was sold by Wal-Mart as a booster safety seat for the intended use and benefit of J.M.  The seat was purchased by J.M.'s grandmother, Tina McCune, within the Eastern District of Texas for the specific use and benefit of Chad and Carmen McCune, as well as J.M.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332.  Plaintiffs and Defendant to this action are of diverse citizenship.  The amount in controversy exceeds $75,000 exclusive of interests and costs.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## PROCEDURAL AND FACTUAL BACKGROUND

7.      J.M.'s grandmother, Tina McCune, purchased a "TurboBooster" safety seat for the specific use and benefit of all Plaintiffs, including J.M, on or about December 10, 2006 at a Wal-Mart store within the judicial district of the Eastern District of Texas.

8.      The subject TurboBooster safety seat is identified as Model Number 8491RGB, Serial Number JJ0402050720415, Date of Manufacture April 2, 2005.

9.      The TurboBooster safety seat was designed, tested, molded, manufactured, packaged, labeled and marketed by Graco.  Graco is a "manufacturer" of the safety seat as defined in Chapter 82.001(4) of the Texas Civil Practices and Remedies Code.

10.      On or about July 29, 2007, J.M. was, according to the information provided by Defendant, the proper size and weight to use the TurboBooster – he was four (4) years old and weighed approximately forty (40) pounds.  On that date, J.M. was a right rear seat passenger in a 2006 Ford Explorer.  J.M. was using his "TurboBooster" in a reasonably anticipated, expected and foreseeable manner when the Explorer was involved in what was essentially a frontal

collision.

11.     The subject TurboBooster safety seat was in the same condition just prior to and at the time of the collision as when it was sold by Defendant.

12.     J.M.'s occupant space inside the Explorer was preserved and intact throughout and after the collision – it was more than adequate to allow for an occupant of J.M.'s size to safely ride down the crash forces present in the collision without sustaining serious injury had J.M. been restrained in a properly designed child safety seat.

13.     The TurboBooster was defective and unreasonably dangerous in that it was not adequately designed, tested, molded, manufactured, packaged, labeled or marketed to minimize the risk of injury or death or to provide safe and effective restraint to children.  By way of example and without limitation, the safety seat was defective and unreasonably dangerous in the following ways:

     a.  The safety seat failed to prevent – and actually fostered – shoulder rollout, belt slippage and slack, and/or submarining;

     b.  The safety seat failed to provide adequate upper torso and pelvic restraint and/or to adequately distribute crash loads;

     c.  The safety seat failed structurally in several ways in the collision, including the failure of the base retention system, the failure of mechanical fastening devices designed to keep the left side arm rest attached to the base, and a complete separation of the left side armrest from the seat;

     d.  The safety seat failed to comply with the minimum federal standard, FMVSS 213, in at least two ways – first, it structurally failed in this collision (and in other accidents and tests), and second, it was labeled as being appropriate for children who were too small to safely use it;

     e.  The testing performed by Graco on the safety seat was woefully inadequate and insufficient to provide a reasonable assurance that the seat complied with the applicable federal standard or that it would provide safety to young children in foreseeable collisions or crashes;

     f.   The testing that Graco did perform or otherwise know of made it clear that the design of the TurboBooster was flawed, that the seat violated Graco's own internal design standards and other standards that define a minimum level of safety, and that a loss of restraint was inevitable in foreseeable crashes – yet Graco did nothing to investigate these test failures, determine their causes and eliminate the causes of the failures;

     g.   The design of the safety seat failed to incorporate any margin of safety to allow for factors such as, for example, tolerances, variances, environmental effects and foreseeable loading conditions.

14.    Because of the safety seat's defective and unreasonably dangerous condition, the TurboBooster failed to properly restrain J.M., the safety seat broke and failed, and J.M.'s body was not restrained in the crash.  J.M. was permanently and seriously injured as a proximate result of these failures and is now a quadriplegic who is on a ventilator for extended periods of time.

15.    Safer alternative designs existed at the time of the safety seat's design, manufacture, at the time of its sale and at the time of the accident, any one of which would, in reasonable probability, have prevented the injuries to J.M.  These alternative designs were both economically and technologically feasible at all relevant times by the application of existing scientific knowledge.

16.    In addition to the defects outlined above, Defendant also failed to provide adequate warnings and information regarding the unreasonably dangerous design of the TurboBooster safety seat.  In this regard, and prior to the date of the accident at issue in this case, various governmental and non-governmental safety organizations in North America with significant expertise in child transportation safety issues recommended against using booster seats for children who had not yet outgrown seats with integrated harnesses and, further, identified the dangers and risks of using these products.  Some of the information and recommendations that were available and actually known to Graco:

**THIRD AMENDED COMPLAINT** – Page 4

a.   In 1974, Dr. Richard Stalnaker published an SAE paper entitled "Tests of Current and Experimental Child Restraints Systems." Dr. Stalnaker stated in this journal article that "The single most important measure of the injury protection afforded by a restraint system . . . is the extent to which it limits head excursion in all directions."

b.   In 1989, the American Academy of Pediatrics issued "1989 AAP Car Safety Guidelines." The guidelines recommended keeping a child in a seat with integral harnesses "for as long as possible."

c.   In January, 1989, NHTSA published a "Consumer Information" brochure. The brochure stated that caregivers should "keep children in convertible or toddler seats as long as they will fit."

d.   The Fall, 1989 Safe Ride News contained an insert entitled "Common Questions about Child Safety Seats." In answer to the question, "when should my child begin using a booster seat," it stated that a booster seat should only be used when a child has outgrown a seat with integral harnesses, i.e at around 40-43 pounds. It warned that "a booster seat provides less protection than a full-size CSS due to the lack of side wings and shoulder harness, which protect the upper body and head."

e.   In 1990, the AAP issued its "1990 AAP Car Safety Guidelines." The AAP recommended keeping a child in a seat with integral harnesses "for as long as possible."

f.   Also in 1990, the DOT and NHTSA issued their "Shopping Guide For Child and Infant Safety Seats." The government recommended keeping a child in a seat with integral harnesses "as long as they will fit." These same recommendations and warnings were provided again by NHTSA in a May, 1990 "Buckle-Up America" campaign brochure.

g.   In March, 1992, NHTSA published the "Child Passenger Safety Resource Manual." Numerous comments were made in the Manual regarding the proper use of booster seats, including the statement that "booster seats are intended to be used as a transition to safety belts by older children who have outgrown convertible seats" and that "parents should be advised to keep their children in a convertible seat as long as they will fit . . . ."

h.   In the Spring, 1994 Safe Ride News newsletter, the AAP stated in the "Belts, Boosters and Kids" section that parents needed to keep their children in seats with integrated harnesses "as a long as it fits" and that "a restraint with shoulder straps and a shell is usually more protective than a booster seat."

i.   In May, 1996, the AAP published a Policy Statement in Pediatrics, Volume 97, Number 5. "A convertible safety seat should be used as long as the child fits well

(e.g., ears below the top of the back of the seat and shoulders below the seat strap slots)." It also stated that "a booster seat should be used when the child has outgrown a convertible safety seat but is too small to fit properly in a vehicle safety belt."

j.    In the summer of 1996, "NHTSA Facts" was published by NHTSA. The "Size and Weight Guide" warned that children should be kept "in convertible or toddler seats as long as they will fit."

k.    In the Fall, 1996 edition of Safe Ride News, the authors stated: "Do not push your child out of a safety seat too soon. A restraint with two shoulder straps and a shell is generally more protective than a booster seat . . . . A child should use a convertible or toddler seat as long as it fits, which means until the (i) upper weight limit is reached, usually 40 lbs., (ii) shoulders are above the strap slots, and (iii) ears are above the back of the restraint."

l.    In August, 1997, the American College of Emergency Physicians warned that "it is best to keep kids in the forward facing car seat for as long as they fit comfortably in it."

m.    In July, 1998, NHTSA issued "A Parent's Guide To Booster Seats." NHTSA warned that "for maximum protection, keep a child in a forward-facing child safety seat with full harness as long as the child fits in this seat."

n.    In February, 2000, NHTSA published its "Standardized Child Passenger Safety Training Program" course book. The book defined a "best practice" as "recommendations that provide the safest way to travel for children of certain ages, size and physical tolerance." In the section on booster seats, it gives several "best practices":

Children should "use seat with full internal harness until they reach the manufacturer's recommendation for upper size limits."

"**Best practice recommends that a child stay in a forward-facing seat with a full harness until the top weight or height limit of the forward facing seat.**" (emphasis in original).

"Best practice' recommendation is for children to use seat with full internal harness until they reach the manufacturer's recommendations for upper size limits."

o.    In March, 2000, CHOP (Children's Hospital of Philadelphia) issued a Partner's For Child Passenger Safety report. In the conclusion, the report states that "restraining children according to best practice is crucial to preventing head, brain and other devastating injuries."

p.      In June, 2000, NHTSA published "A Parent's Guide To Booster Seats."  In this guide, NHTSA warned that children should not be moved into booster seats until they have "outgrown a convertible seat" and that "for maximum protection, keep a child in a forward-facing child safety seat with full harness as long as the child fits in the seat."

q.      On July 6, 2000, "Does My Child Need A Booster Seat" was published by SafetyBeltSafe, and it stated: "Children should ride in safety seats with a complete harness system as long as possible."

r.      In April, 2001, CHOP's Partner's For Child Passenger Safety issued recommendations that "Current safety recommendation from the AAP and The NHTSA" is that "children should ride in a car seat with a full harness until the seat is completely outgrown based on manufacturer height and weight limits."

s.      On April 23, 2001, the Association for the Advancement of Automotive Medicine published a paper entitled "Booster Seats for Children" that contained "scientifically based recommendations." Specific recommendations were made that, "based on current knowledge, the most effective progression of occupant restraint is . . . forward facing child restraints up to 40 pounds or more depending on the product limit."

t.      In 2002, the AAP stated in its car seat guide entitled "Car Safety Seats: A Guide for Families, 2002" that children should stay in seats with integrated harnesses until he reaches "the top weight allowed." The AAP also stated that "Children should remain in a convertible, forward facing or combination seat with a full harness until they reach the top weight or height allowed by the seat."

u.      In March, 2002, the AAP issued a formal "Policy Statement" that was published in Pediatrics under the title "Selecting and Using the Most Appropriate Car Safety Seats for Growing Children – Guidelines for Counseling Parents." In the article, the AAP stated that a forward facing seat should be used until the child outgrows it.

v.      In December, 2002, CHOP issued "best practice" recommendations stating that "Forward facing seats should be used until your child reaches the maximum weight or height limit for the seat or until his ears reach the top of the child safety seat. When this happens, your child is ready for a belt-positioning booster seat."

w.      In 2003, the AAP stated in its car seat guide entitled "Car Safety Seats: A Guide for Families, 2003" that "Children should remain in a convertible, forward facing or combination seat with a full harness until they reach the top weight or height allowed by the seat."

x.      In 2003, CHOP published its "Interim Report." In discussing injuries, CHOP noted as a "recommendation" that:

"Minimizing forward head movement and acceleration would decrease injury risk.  The potential for head contact with the rear of the front seat and other interior vehicle structures should be considered."

The CHOP further defined "Appropriate restraint" as "use forward facing child safety seat until child has completely outgrown the manufacturer's maximum height and weight limits for the seat – usually 40-65 pounds."

y.      In 2004, the AAP stated in its car seat guide entitled "Car Safety Seats: A Guide for Families, 2004" that children should stay in seats with integral harnesses until they reach "the top weight or height allowed." The AAP also stated that "Children should remain in a convertible, forward facing or combination seat with a full harness until they reach the top weight or height allowed by the seat."

z.      In 2005, the AAP stated in its car seat guide entitled "Car Safety Seats: A Guide for Families, 2005," that children should "stay in a car safety seat with a harness for as long as possible and then ride in a belt positioning booster seat."

aa.     In May, 2005, CHOP issued CPS Issue Report (#2).  It contained "current research on safe seating for children" and recommended a forward facing seat with harness "until your child is too tall or heavy for the seat."

bb.     By early 2005, and unquestionably by the date of the accident, multiple tests had been run by Graco or on its behalf in which TurboBooster safety seats failed in a manner similar to that experienced by J.M.'s seat in the collision at issue; dozens of other tests run by Graco or on its behalf also revealed similar failures as well as a general loss of restraint even when no structural failure occurred.  Graco knew about these failures, knew that it had not determined why these failures were occurring, knew that a "fix" was necessary, and knew that parents and caregivers would never know about these failures unless it disclosed the information.

17.     All of the information contained in paragraph 17 was actually known to Graco, prior to the time J.M.'s "TurboBooster" was sold and by the date of the accident.  Nevertheless, when Graco sold the "TurboBooster," it failed to provide any of this information to the public or to the users and consumers of the safety seat, and it failed to warn the public and the users and consumers of the safety seat about the inherent dangers in using the seat with children who

would be better protected in seats with full harnesses.

18.     Graco failed to provide any of the information contained in paragraph 17 above to Tina McCune or J.M.'s parents at any time prior to or after the purchase of the "TurboBooster," and it failed to warn or provide information to Tina McCune, or to J.M.'s parents, of the dangers inherent in using the "TurboBooster" with children in J.M.'s height and weight range. Had any of this information been provided, Tina McCune would not have purchased the "TurboBooster" for Chad and Carmen McCune and for J.M., and J.M.'s parents would never have used it with J.M.   Defendant's failures in this regard resulted in defects in the TurboBooster's labeling, marketing, instructions, warnings and other informational materials, including but not limited to the following:

  a.     The TurboBooster failed to provide adequate warnings, instructions and information regarding the use of the seat with children in certain weight and height ranges, and on how to select a safety seat that would provide reasonable and adequate protection to children in foreseeable crashes based on a child's height and weight.

  b.     The advertising, marketing, sales, point of sale, and other related and similar information that was on the box containing the TurboBooster, in the box, on the seat itself and at the point of sale failed to provide adequate warnings, instructions and information regarding the use of the seat with children in certain weight and height ranges and on how to select a safety seat that would provide reasonable and adequate protection to children in foreseeable crashes based on a child's height and weight.

  c.     The warnings and instructions that were provided with and on the TurboBooster were incomplete, inaccurate, concealed the limitations of the seat, failed to disclose the seat's propensity to structurally fail in collisions, failed to disclose or advise about the known risk of shoulder rollout and other loss of restraint, failed to provide appropriate and accurate information regarding the minimum height and weight of children who could safely occupy the seat, failed to convey the risks associated with the use of the seat by children who did not weigh enough or were not tall enough to safely use the seat, and otherwise failed to convey information necessary to the safe use of the seat.

d.   The advertising, marketing, sales, point of sale, and other related and similar information that was on the box containing the TurboBooster, in the box, on the seat itself and at the point of sale were incomplete, inaccurate, concealed the limitations of the seat, failed to provide appropriate and accurate information regarding the minimum height and weight of children who could safely occupy the seat, failed to convey the risks associated with the use of the seat by children who did not weigh enough or were not tall enough to safely use the seat, and otherwise failed to convey information necessary to the safe use of the seat.

19.    Prior to July 29, 2007, Graco had actual knowledge that its "TurboBooster" safety seats were failing in tests, that loss of restraint was occurring, that the failures would result in the degradation or absence of restraint and that children who experienced these kinds of failures would be at substantially increased risk of death or serious injury in the event of a collision.

20.    Prior to July 29, 2007, Graco sold a "TurboBooster" safety booster seat to Tina McCune.  Tina McCune was induced to purchase the safety seat, and Chad and Carmen McCune were induced to use it with J.M., because of numerous express and implied promises, representations, assurances and/or affirmations that were given to them by Graco, including but not limited to the following:

a.   They believed that Graco was a trustworthy company with expertise in the design, testing, manufacturing, labeling and use of child safety seats, that they could confide in and rely upon these companies when selecting and using a safety seat for J.M., and that if any information critical or material to the selection and safe use of the product was known to these companies, it would be provided;

b.   They believed the safety booster seat was a safety seat and that it would provide safety to J.M. in automobile crashes;

c.   They believed the safety booster seat would provide effective, optimal restraint for J.M. in foreseeable automobile crashes;

d.   They believed the safety booster seat was suitable, safe and appropriate for children in J.M.'s weight and height range;

e.   They believed that Graco knew or had reason to know of the particular purpose for which they intended to use the safety booster seat, and they relied on the Defendants' skill, expertise, testing, evaluation and judgment to furnish a safety

booster seat that would be suitable for use by J.M.

21.     Prior to July 29, 2007, Graco concealed and otherwise failed to disclose to Tina

McCune, and to each of the Plaintiffs, numerous facts, including but not limited to the following:

a.      That they *knew* the "TurboBooster" would not provide effective restraint for children weighing at or near 40 pounds in automobile crashes and that seats with much safer restraint configurations were available and preferable;

b.      That they *knew* that testing had shown structural deficiencies in the seat that had resulted in the loss of restraint and that the loss of restraint could cause serious injuries that would have been prevented by the use of non-defective safety seats;

c.      That they *knew* that the TurboBooster performed poorly in testing, had repeatedly failed to comply with Graco's internal standards and needed to be "fixed," even when it did not break apart or suffer structural failure, and that shoulder rollout, belt slippage and slack, and/or submarining were likely results of certain foreseeable collisions;

d.      That they *knew* since as early as 1989 that various governmental and non-governmental safety organizations in North America with significant expertise in child transportation safety issues recommended against using a booster seat for a child who had not yet outgrown safety seats that contained integrated harness systems, all as more fully set forth above;

e.      That they *knew* the "TurboBooster" would not adequately protect a child who could not yet utilize an automobile's seatbelt system during a collision and that it could actually enhance injuries to such children in that its design permitted and encouraged (i) excessive upper torso movement and head excursion, (ii) head impact with the interior of the automobile, (iii) spinal cord injuries, and (iv) partial ejection of the child from the seat.

22.     At all relevant times, neither Tina McCune nor J.M.'s parents had any knowledge,

actual or constructive, of any of the facts alleged above.  At the same time, Defendant knew or

had reason to know that these and other similarly situated persons lacked such knowledge and

that they would not realize the dangerous propensities of the TurboBooster, particularly in the

face of attention grabbing point of purchase information that conveyed the message that the

TurboBooster provided safety and was unquestionably suitable for children such as J.M.

23.     On or about September 14, 1999, the Administrator of NHTSA, Ricardo

Martinez, M.D., sent a letter to Graco which stated, among other things, the following:

a.      As a key protective device for our Nation's children, child restraints must be designed and constructed with the highest levels of safety in mind.

b.      Our review of NHTSA's compliance test results during the past few years indicates that many restraints have been engineered to barely comply with some of the most safety-critical requirements of the standard, rather than being designed with larger compliance margins.

c.      With the safety of our Nation's children at issue, mere compliance with the minimum requirements of the standard is not enough; minimum standards should not be the most in safety design that manufacturers provide.

d.      When products are engineered with narrow compliance margins, the level of safety risk increases, even if the product is in technical compliance with the minimum standard.

e.      I am urging each manufacturer of child restraints to ensure that these restraints perform well beyond the minimum requirements of our standard.  American families expect, and deserve, no less.

f.      It is up to the manufacturers of these critically important safety devices to take on the responsibility of maximizing child safety in all respects.

24.     Graco received and read the letter from Ricardo Martinez, M.D. referred to in the

preceding paragraph.


25.     Despite the passage of about eight (8) years between the time Graco received and

read the letter from Ricardo Martinez, M.D. referred to above (on or about September 14, 1999)

and J.M.'s accident (July 29, 2007), Graco did nothing whatsoever to change either the design or

labeling of the TurboBooster to ensure that it performed well beyond the minimum requirements

of the standard, nor did it do anything to ensure that the seat had been designed and constructed

with the highest levels of safety in mind or to maximize child safety in all respects.   In fact, Graco did the opposite and, among other things, rushed the seat into production without adequate testing and with full knowledge that the seat was continuing to suffer structural failures and loss of restraint in tests, and had several other problems that needed to be "fixed."   These problems continued, and were still not "fixed" by the time of J.M.'s accident.   Despite its knowledge, Graco did nothing to pass on to consumers what it knew about the failures of the TurboBooster, of the dangers of using a booster seat as a "restraint" for a child weighing at or near 40 pounds, or of the design defects in the TurboBooster and, in fact, it actively concealed all of this information.

## Count I: Strict Liability

26.     Plaintiffs incorporate and reallege the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

27.     Defendant was, at all relevant times, engaged in the business of labeling, packaging, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce the TurboBooster at issue in this lawsuit.    In addition, Graco was in the business of researching, developing, designing, testing, molding, producing, assembling and manufacturing TurboBooster safety seats.   These transactions were essentially commercial in nature.

28.     Tina McCune, on behalf of J.M. and for the direct benefit and use of the Plaintiffs, purchased the TurboBooster.

29.     The TurboBooster reached Plaintiffs and J.M., the ultimate users and consumers of the product, without any substantial change in its condition from the time it was sold by the Defendant.

**THIRD AMENDED COMPLAINT** – Page 13

30.     The TurboBooster, when it reached Plaintiffs and J.M., was in a condition that was unreasonably dangerous to the ultimate user or consumer, taking into consideration the utility of the seat and the risks involved in its use.  The TurboBooster was dangerous to an extent beyond that which would be contemplated by the ordinary user or consumer who purchased it with the ordinary knowledge common to the community as to the product's characteristics.

31.     The TurboBooster was defective and unsafe for its intended purposes at the time of its design, testing, molding, manufacture, marketing and sale by Defendant. The product was defectively designed, defectively tested, defectively manufactured, defectively labeled, defectively marketed, and unreasonably dangerous to Plaintiffs in that the design, testing, manufacture, labeling and marketing of the safety seat made it unsafe and dangerous for numerous reasons, including but not limited to the reasons set forth above.

32.     At the time the subject TurboBooster left the possession of Defendant, there were safer alternative designs to that used in the subject TurboBooster, any one of which would have significantly improved the safety seat's crashworthiness and thereby prevented or significantly reduced the risk of injury that resulted in Plaintiffs' damages, without substantially impairing the safety seat's utility.   These alternative designs were both economically and technologically feasible by the application of existing or reasonably achievable scientific knowledge at the time the subject TurboBooster left the control of Defendant.

33.     Plaintiffs' injuries were a direct and proximate result of, and were produced by, the product's defective and unreasonably dangerous condition as more fully described above. Absent the defects in the TurboBooster, J.M. would not have sustained any permanent injuries in the accident.

34.     As a direct and proximate result of the Defendant's designing, testing, molding, manufacturing, labeling, packaging, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce the TurboBooster at issue in this lawsuit, J.M. suffered severe and disabling injuries.

35.     Plaintiffs further allege that such defects in the design, testing, manufacture, labeling, use instructions and marketing of the TurboBooster, singularly or in combination, were a producing cause of Plaintiffs' injuries and damages.

36.     J.M. has suffered severe physical, emotional and financial injuries that will be permanent. J.M.'s mental and physical conditions will continue to deteriorate, and in all reasonable probability, will cause him to suffer the consequences and ill effects of those injuries for the balance of his natural life.

37.     More specifically, Plaintiffs are entitled to the recovery of damages in this case, including but not limited to the following:

    a.  The physical pain and mental anguish experienced by J.M. in the past associated with his severe injuries;

    b.  The physical pain and mental anguish experienced by J.M. which will, in all reasonable probability, continue in the future;

    c.  The loss of mental and intellectual function, which has occurred in the past, associated with J.M.'s injuries;

    d.  The loss of mental and intellectual function, which will, in all reasonable probability, continue in the future;

    e.  The physical impairment experienced by J.M. in the past;

f.   The physical impairment which will, in all reasonable probability, continue in the future;

g.   The loss or reduction in earning capacity which, in reasonable probability, J.M. will sustain in the future;

h.   The reasonable and necessary medical expenses that, in reasonable probability, will be sustained in the future after J.M. reaches the age of eighteen;

i.   The reasonable and necessary funds for special education associated with J.M.'s injuries that will, in reasonable probability, be necessary after he reaches the age of eighteen;

j.   Reasonable and necessary medical expenses incurred by J.M. in the past that were incurred for necessary care and treatment of the injuries resulting from the collision complained of, all of which were reasonable and were the usual and customary charges made for such services in the communities in which the services were rendered;

k.   Reasonable and necessary medical expenses which, in reasonable probability, will be incurred by J.M. in the future until he reaches the age of eighteen;

l.   Reasonable and necessary, and increased, costs of education for J.M. incurred in the past associated with his injuries; and

m.   Reasonable and necessary, and increased, costs of education for J.M. that, in reasonable probability, will be incurred in the future until he reaches the age of eighteen.

38.     The conduct of the Defendant, as set forth herein, was so outrageous and improper as to constitute willful, wanton and reckless disregard for the safety of J.M.

39.     The Defendant showed a reckless disregard for the public safety due to its acts and omissions as set forth in this Complaint. The Defendant knew, or should have known, that there was a substantial and unnecessary risk of injury to the children who used its product and it failed to either determine the seriousness of the danger or reduce the risk to an acceptable minimal level.  By way of example and without limitation, long prior to July 29, 2007 (the accident date), Graco was objectively and subjectively aware that (i) the safety seat had structurally failed in dozens of tests and that, even when it did not fail, it allowed excessive head excursion, the loss of optimal shoulder belt restraint, and shoulder rollout; (ii) it had failed to properly investigate the reasons for the structural failures or the loss of restraint and could not explain these failures; (iii) because it failed to understand the reasons for the failures, it made inadequate and poorly conceived design changes in its efforts to eliminate the hazards to children that were created by the structural failures and the seat's inherently defective design; (iv) it had done nothing to eliminate shoulder belt slippage and rollout even when the safety seats did not structurally fail, despite knowing that slippage and rollout resulted in excessive head excursion and the potential for catastrophic injuries; (v) it had marketed the TurboBooster to children who unquestionably should have been in harnessed seats when it knew that parents and other caregivers trusted the Graco name and would purchase the seat in reliance on Graco's recommendations – recommendations which deliberately concealed what Graco knew about the risks and hazards associated with the premature graduation of children to belt-positioning boosters like the TurboBooster; (vi) it had ignored and would continue to ignore the strong urging from the Administrator of NHTSA that safety seats should be designed with the highest

**THIRD AMENDED COMPLAINT** – Page 17

levels of safety in mind, that the minimum government standards should not be the most in safety design that manufacturers provide, and that it is up to the manufacturers to take on the responsibility of maximizing child safety in all respects; and (vii) it knew that technologically and economically feasible alternative designs were available that were far superior to the design Graco used with the TurboBooster, designs that Graco had access to – yet it chose to ignore these alternative designs in their entirety in the design of the TurboBooster.   These omissions by Graco, when viewed objectively from Graco's standpoint at the time it built and sold the TurboBooster at issue, and at the time of the accident, involved an extreme degree of risk to the Plaintiffs and young children considering both the probability and magnitude of the potential harm.   Moreover, Graco had actual subjective awareness of the risks involved, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of the Plaintiffs. These acts and omissions constitute gross negligence and malice (as defined in Chapter 41, Section 41.001(7)(B), Tex. Civ. Prac. & Rem. Code) and entitle Plaintiffs to the recovery of exemplary damages.

## **Count II: Negligence**

40.     Plaintiffs incorporate and reallege the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

41.     Defendant had a duty to exercise reasonable care in designing, testing, molding, developing, manufacturing, labeling, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce the TurboBooster at issue in this lawsuit.

42.     Defendant failed to exercise reasonable care in designing, testing, molding, developing, manufacturing, labeling, packaging, supplying, marketing, selling, advertising,

warning and otherwise distributing and placing in the stream of commerce the TurboBooster at issue in this lawsuit given the seat's defective and unreasonably dangerous conditions as described above.

43.     Defendant had a duty, once they learned of any potential problems with the TurboBooster, to perform an adequate inquiry and to ensure that other TurboBoosters, including J.M.'s, were not designed, tested, molded, developed, manufactured, labeled, packaged, supplied, marketed, sold, advertised, contained warnings or were otherwise distributed and placed in the stream of commerce in the same way.

44.     Defendant had a duty, once they learned of any potential problems with the TurboBooster, to adequately notify users and consumers of the hazards and risks associated with the TurboBooster.

45.     Defendant knew, or should have known, that the defects associated with the TurboBooster created an unreasonable risk of bodily harm to anyone using the product.

46.     Despite the fact that Defendant knew, or should have known, that the TurboBooster could cause serious and life threatening injuries to anyone who used it, Defendant took inadequate steps to notify consumers of this danger and to prevent the safety seat from being used by children like J.M.

47.     Defendant knew, or should have known, that it was foreseeable that children, such as J.M., would suffer injuries as a result of Defendant's failures to exercise ordinary care as set forth herein.

48.     Defendant's acts and omissions as described above constitute negligence, as that term is defined in the law, which proximately caused injuries to Plaintiffs, as well as other injuries and damages set forth herein.

49.     Defendant's acts and omissions as described above also constitute gross negligence, as that term is defined in the law, which proximately caused the injuries to Plaintiffs, as well as other injuries and damages set forth herein.

50.     The negligence of the Defendant was a contributing cause of the injuries of Plaintiffs.

51.     The negligent conduct of the Defendant was a proximate cause of the injuries of Plaintiffs.

52.     Defendant's wrongful conduct, individually or collectively, was a producing cause of Plaintiffs' injuries as more fully set forth above.

## Count III: Breach of Express and Implied Warranty

53.     Plaintiffs incorporate and reallege the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

54.     The TurboBooster was subject to an implied warranty of merchantability and an implied warranty of fitness for a particular purpose when it was sold by Graco, including but not limited to warranties that it (i) was fit for the ordinary purposes for which it was to be used, (ii) was fit and suitable for the particular purpose for which it was sold, (iii) was adequately designed, tested, molded, assembled, manufactured, contained, packaged and labeled, and (iv) conformed to the promises or affirmations of fact made on the seat, the labeling, the instructions, the box and other literature that accompanied the seat when it was sold.

55.     When it was sold by Graco, the TurboBooster and its associated packaging, labeling and advertising materials contained numerous affirmations of fact or promises which related to the seat. These affirmations and promises had the natural tendency to induce a buyer to purchase the seat and did, in fact, induce Tina McCune to purchase the seat and further induced

**THIRD AMENDED COMPLAINT** – Page 20

Tina McCune and Plaintiffs to use the seat with J.M. Thus, the affirmations and promises became part of the basis of the bargain, creating an express warranty that the seat would conform to the affirmations and promises made.

56.     The TurboBooster did not comply with any of these warranties and failed to conform to the affirmations and promises made by Graco.

57.     At the time of the accident, the TurboBooster was being put to the use for which it was sold by Graco.

58.     Plaintiffs' injuries and losses as set forth above were proximately caused by the use of the TurboBooster and the breaches of the expressed and implied warranties set forth above.

59.     Plaintiffs' injuries and losses as set forth above are the kind of losses and damages that were contemplated or foreseeable to Graco at the time the seat was sold.

60.     Defendant's wrongful conduct, individually or collectively, was a producing cause of Plaintiffs' injuries as more fully set forth above.

61.     The filing of this lawsuit is seasonable notice of the breaches of warranty alleged herein.  Plaintiffs reserve the right to supplement or amend any of their claims for relief herein.

## PRAYER FOR RELIEF

62.     Plaintiffs seek judgment against Defendant for damages as set forth above in the complaint.

63.     Plaintiffs ask for judgment against Defendant for:

a.   Actual damages in the past and reasonably likely to be incurred in the future;

b.   Punitive or exemplary damages in a fair and reasonable amount;

    c.   Pre-judgment and post judgment interest on their damages, as allowed by law, at the maximum legal rate, until paid;

    d.   Costs of Suit; and

    e.   All other relief the Court deems proper.

64.    As detailed above, Plaintiffs seek the recovery of unliquidated damages within the jurisdictional limits of this Court, as well as all statutory damages to which they are entitled.

## JURY DEMAND

65.    Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 1, 2010                    Respectfully submitted,


                                          /s/ Morgan D. Vaughan _____ _____
                                          Darby V. Doan
                                          State Bar No: 00793622
                                          Morgan D. Vaughan
                                          State Bar No.: 24060769
                                          Haltom & Doan
                                          6500 Summerhill Road, Suite 100
                                          Texarkana, Texas 75503
                                          (903) 255-1000
                                          (903) 255-0800 Facsimile
                                          E: ddoan@haltomdoan.com
                                          E: mvaughan@haltomdoan.com


                                          Evan A. Douthit      (admitted pro hac vice)
                                          R. Douglas Gentile   (admitted pro hac vice)
                                          Christopher J. Stucky (admitted pro hac vice)
                                          Douthit Frets Rouse Gentile & Rhodes, LLC
                                          903 E. 104th Street, Suite 610
                                          Kansas City, Missouri 64131
                                          (816) 941-7600
                                          (816)941-6666 Facsimile


                                          Alan S. Loewinsohn
                                          Michael B. Hopkins
                                          Loewinsohn Flegle Deary, L.L.P.
                                          12377 Merit Drive, Suite 900
                                          Dallas, Texas 75251-2224
                                          (214) 572-1700
                                          (214) 572-1717 Facsimile

                                          ATTORNEYS FOR PLAINTIFFS

                        **CERTIFICATE OF SERVICE**

        I HEREBY CERTIFY that on the 1st day of October, 2010, a true and correct copy of the
foregoing has been served via ECF filing all counsel of record.


                                          /s/ Morgan D. Vaughan_____
                                          Counsel for Plaintiffs



**THIRD AMENDED COMPLAINT** – Page 23