IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| CHAD MCCUNE, et al., | § | |
| | § | |
|     PLAINTIFFS, | § | |
| | § | |
| V. | § | Case No 5:2009cv00107 |
| | § | |
| GRACO CHILDREN'S PRODUCTS, INC., | § | |
| | § | |
|     DEFENDANT. | § | |

**DEFENDANT GRACO CHILDREN'S PRODUCTS INC.'S
MOTION TO EXCLUDE CERTAIN OPINIONS OF
<u>GARY WHITMAN AND WAYNE K. ROSS, M.D.</u>**

Defendant Graco Children's Products Inc. ("Graco") respectfully requests that this Court enter an Order pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, to exclude certain opinions of Plaintiffs' experts Gary Whitman and Wayne K. Ross, M.D. from being presented to the jury in this case. In support of its Motion, Graco states as follows:

**<u>INTRODUCTION</u>**

**I.     <u>The Accident and Plaintiffs' Theory of Defect</u>.**

This case relates to a July 29, 2007 accident in which Plaintiff Carmen McCune drove her Ford Explorer SportTrac truck into the back of a John Deere tractor. Mrs. McCune was traveling at speeds in excess of 70 miles per hour, apparently while sending and receiving text messages on her cell phone, at the time the collision occurred. Her four-year old son, J.M., was allegedly restrained in a Graco backless TurboBooster child restraint in the right rear seating position, and received severe injuries in this accident.

Plaintiffs commenced this suit on July 29, 2009, alleging that J.M.'s injuries resulted from design and manufacturing defects in the TurboBooster. Plaintiffs' theory in chief is that the separation of one of the armrests from the base of the TurboBooster during the crash was the producing cause of J.M.'s injuries, and that the armrest separation in an accident constitutes a defect in this product.

## II.     The TurboBooster Armrest.

The Graco TurboBooster, when used in the backless mode, consists of a plastic base on which the child sits. *See* Exh. A, TurboBooster Owners Manual, p. 33. Once seated on the TurboBooster, the child is restrained by the vehicle's lap shoulder belt – the TurboBooster does not contain its own harness or belt system. *Id.*, pp. 31-33. Two armrests on either side of the child provide, as their name suggests, places for the child to rest his/her arms. *Id.*, pp. 9-10. The armrests also act as a guide to show the caregiver where to route the lap and shoulder belts on the child. *Id.*, pp. 33. Thus, the TurboBooster acts as a pre-crash positioner of the child in the vehicle's lap shoulder belt system, boosting the child up into a position similar to that of an adult using the same lap/shoulder belt. Once a collision begins, the vehicle's seat belts, when properly positioned on the child, act to hold the child in place during an accident. There is no contention in this case that the vehicle seat belts failed in any way in the subject accident.

## III.    Mr. Whitman's and Dr. Ross' Opinions with Respect to the Armrest.

Plaintiffs disclosed Gary Whitman as the expert who will opine that the TurboBooster is defective because the armrest can separate from the base during a motor vehicle collision. *See* Exh. B, Whitman Report ("Whitman Rpt."), pp. 18-22, p. 41, ¶ D. Mr. Whitman intends to opine that such a separation occurred in the subject accident, and that this was a producing cause of J.M.'s injuries because the separation of the armrest allows a child's shoulder to roll out of the

Case 5:09-cv-00107-DF   Document 90   Filed 05/20/11   Page 3 of 12

vehicle's shoulder belt in a crash.  *Id.*  Mr. Whitman holds a bachelor's degree in mechanical engineering and, though he has never actually worked on the design or manufacture of a child booster seat such as the TurboBooster, he professes to have expertise in such products based on his history of investigating accidents involving child car seats.  Exh. C, Whitman Dep. Tr., Vol. II, p. 140: 13-16.  He also states that he has run numerous sled and crash tests to evaluate the performance of those products.  Exh. D, Whitman Dep. Tr. Vol. I, p. 63: 6-64:24; Whitman Rpt., p. 3.

Plaintiffs contend that at some point during Mrs. McCune's head-on collision, the shoulder belt J.M. was wearing rapidly repositioned from his shoulder down to his abdomen, which allowed his upper body to rotate, or roll, out of his shoulder belt.  Exh. E, Report of Wayne K. Ross, M.D. ("Ross Rpt.") p. 23.  According to Dr. Ross, J.M.'s injuries were the result of his excessive forward flexion due to J.M. rolling out of the shoulder belt.  *Id.*

Mr. Whitman intends to offer the following opinion:

> Had [J.M.'s] left armrest not failed in this crash, his shoulder belt would have rollout would have been much less significant...

Exh. E, Whitman Rpt., p. 42, ¶ O.

Like Mr. Whitman, Dr. Ross intends to opine that the armrest separation causes a child to roll out of the vehicle's shoulder belt:

> During [J.M.'s] forward flexing movement, the left armrest would break off and he would rotate out of the belt, flexing forward during this process.
>
> . . . .
>
> During [J.M.'s] movements, the torso belt would reconfigure across his abdomen and around the right forearm.
>
> . . . .

-3-

> Had the armrest not failed to provide lateral restraint in this accident, [J.M.] would have benefited from the ride down of the shoulder belt and this would have prevented his spinal cord injuries.

Exh. E, Ross Rpt., pp. 24-25, ¶¶ 3, 4. 6.

Both Mr. Whitman and Dr. Ross should be excluded from offering this and any other opinions regarding any design or manufacture defects in the TurboBooster armrest because they admittedly have no basis to connect the separation of the armrest in a crash to the alleged repositioning of J.M.'s shoulder belt over his abdomen, which plaintiffs contend was the cause of J.M.'s injuries.

## ARGUMENT

I.  **Standard of Review of These Experts' Opinions.**

Plaintiffs have the burden of proving, by a preponderance of the evidence, that their proffered expert testimony is admissible. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). Federal Rule of Evidence 702 and the principles set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and *Kumho Tire Co., Ltd. v. Carmichael* govern the admissibility of expert testimony. Fed. R. Evid. 702; *Daubert*, 509 U.S. 579 (1993); *Kumho Tire*, 526 U.S. 137 (1999). Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The trial court must serve as a "gatekeeper" and determine at the outset whether the principles and methodology underlying the proffered testimony are valid. *Gen. Elec. Co. v.*

*Joiner*, 522 U.S. 136, 142 (1997); *accord Daubert,* 509 U.S. at 597.  As part of this gatekeeping function, the trial court must determine whether the proffered opinions are reliable and relevant to "assist the trier of fact."  Fed. R. Evid. 702; *accord, Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) ("the court must ensure the expert uses reliable methods to reach his opinions, and those opinions must be relevant to the facts of the case").

The relevancy-reliability standard can be understood in two parts.  First, the reliability prong requires that all expert testimony demonstrate that it is based on specialized knowledge.  The "knowledge" required by the rule must be more than a subjective belief or unsupported speculation.  *Daubert*, 509 U.S. at 590.  Instead, expert testimony is admissible only if it is supported by appropriate validation, "*i.e.*, 'good grounds,' based on what is known."  *Id*.  A non-exhaustive list of factors courts consider in determining the reliability of expert testimony includes:  1) whether the expert's theory has been tested; 2) whether the expert's theory has been subjected to peer review and publication; 3) the rate of error and standards associated with the expert's methodology; and 4) whether the theory is "generally accepted" within the relevant scientific community.  *Id.* at 593-94.  Of these factors, the first one – whether the theory or conclusion can be and has been tested – is the "most significant *Daubert* factor."  *Garcia v. BRK Brands, Inc.*, 266 F. Supp. 2d 566, 576 (S.D. Tex. 2003) (*citing*, *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996)); *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) (failure to test theory of causation justified exclusion of expert testimony); *Smith v. Cangieter*, 462 F.3d 920, 924 (8th Cir. 2006) (expert's failure to offer results of any testing to demonstrate that his theory was accurate rendered his opinions inadmissible).

Second, Rule 702 ensures relevancy by requiring that the testimony assist the trier of fact in understanding or determining a fact at issue in the case.  This requirement demands a "fit"

between the testimony offered and a fact issue in the case. *Daubert*, 509 U.S. at 591; *Moore v. Ashland Chem. Inc.,* 151 F.3d at 276. Expert testimony that is unrelated to an issue for the fact finder is necessarily unhelpful. *Id.*

**II.  Mr. Whitman's Opinion That the Separation of the Armrest Caused J.M. to Roll Out of His Shoulder Belt Lacks Any Scientific Methodology or Basis.**

To arrive at his opinion that an armrest separation on the TurboBooster caused the repositioning of J.M.'s shoulder belt to his abdomen, Mr. Whitman performed no testing to substantiate or refute his theory whatsoever. Exh. C, Whitman Dep., Vol. II, pp. 145:21-146:2. Indeed, Mr. Whitman contends that no such testing could be performed because the crash test dummies for such testing are not sufficiently biofidelic, or lifelike, to demonstrate what would happen to an actual child in an accident like the one J.M. experienced. Exh. D, Whitman Dep., Vol. I, pp. 71:18-72:9.

Notwithstanding his views that sled testing cannot support his opinions, Mr. Whitman nevertheless relies on sled testing Graco performed, or was performed at Graco's request by outside testing labs, with the very types of aforementioned dummies Mr. Whitman says do not accurately represent a real child. Mr. Whitman reviewed all of that testing, which consisted of more than 300 sled runs involving the backless TurboBooster spanning several years. He noted every test in which an armrest separated from the seat base. Exh. D, Whitman Dep., Vol. I, pp. 35:22-36:14. However, Mr. Whitman admits that the dummy did not roll out of the shoulder belt in any of these tests. *Id.,* p. 44:17-22. Accordingly, none of those tests involved instances where the dummy's upper body flexed far enough forward to produce injuries like those suffered by J.M.

Nowhere in Mr. Whitman's 43-page report does he cite any testing or other evidence that establishes any relationship between the armrest separation and repositioning of the shoulder

-6-

belt. Though Mr. Whitman opines that armrest separation can lead to greater lateral movement of the pelvic region, which in turn he says "substantially increases the potential for rollout of the shoulder belt," Mr. Whitman could point to no test, whether performed by Graco or anyone else, which shows that this potential in fact exists. Exh. C, Whitman Dep., Vol. II, pp. 116:12-117:8. Further, even in the testing of the TurboBooster that he cites specifically as demonstrating an armrest detachment, (and in which the back is utilized, unlike the manner in which the subject TurboBooster was being used by J.M.), the dummy's shoulder does not roll out of the shoulder belt. *See*, Exh. B, Whitman Rpt., p. 25, fig. 25. Because Mr. Whitman performed no testing of his own to demonstrate that armrest separation leads to the shoulder belt to reposition over a child's abdomen, there is no scientific basis for him to opine that the armrest separation was a producing cause of J.M.'s injuries. Therefore, Mr. Whitman's opinion on this issue is nothing more than rank speculation. Further, there is no relevancy to his opinion that the armrest is defective. With no correlation between the armrest separating and the injury producing movements of J.M. in this accident, there is no "fit" between Mr. Whitman's opinion and the alleged cause of injury at issue in this case. *Moore,* 151 F.3d at 276.

    The reality is that the sled testing Mr. Whitman identifies as involving armrest separations actually <u>disproves</u> his theory. Examination of the videos of these tests demonstrates that the shoulder belt moves, if at all, upward on the crash dummy's chest, rather than downward toward his arm and lower torso. Collected in Exh. F is a compilation of high speed video recordings of each test Mr. Whitman identified where armrest separation occurred.[1] Each video clearly demonstrates that if the shoulder belt moves at all when the armrest separates, it migrates upward on the dummy's torso, toward the neck, and not in the other direction, toward sliding off

---

[1] Graco, contemporaneously with the filing of this motion, has filed an unopposed motion for leave to file a DVD containing videos of these tests.

the shoulder. The very tests Mr. Whitman uses as the foundation for his opinion contradict, rather than support, his view of the role the armrest played in this case.

### III.   Dr. Ross' Opinions Concerning the Armrest Similarly Lack Any Scientific Basis.

Like Mr. Whitman, Dr. Ross' opinion that the armrest separation was a substantial contributing factor to J.M.'s injuries lacks sufficient scientific reliability. Specifically, Dr. Ross intends to offer the opinion that had the armrest remained attached to the base, much if not all of the shoulder roll out he believes occurred would have been prevented. Exh. E, Ross Rpt., p. 24, ¶3 and p. 25, ¶6. Like Mr. Whitman, Dr. Ross performed no testing of his own to prove his theory, Exh. G, Ross Dep., p. 22:17-19, nor is he aware of any expert testifying for plaintiffs running any such testing specifically for this case. *Id.*, p. 22:20-23.

Having done none of his own work to test and validate his opinion, Dr. Ross also relies on sled testing performed by Graco. Dr. Ross points to two sled tests in which he states the dummy's movements are similar to that which would produce J.M.'s cervical spine injury. *See,* Exh. E, Ross Rpt., pp 21-22. While Dr. Ross, in his report, states that the armrests on the TurboBooster in these tests "popped out," he later acknowledged in his deposition that the armrests in fact remained attached, or that he didn't actually know if they detached in these tests. Notably, neither of these tests were identified by Mr. Whitman as involving armrest separations. Further, none of these tests were performed under conditions similar to those present in the subject collision.

For instance, tests GC0215 and GC0216 (referenced on pages 20 and 21 of Dr. Ross' Report) were performed with a dummy representing a 50th percentile weight ten-year old child that weighs over 80 pounds. J.M. was less than half that age, and weighed just over 40 pounds, at the time of this collision. *See,* Exh. H (Test Reports for GC0215 and GC0216). Further, these

tests were performed in 2002 (almost five years before this accident) on prototype versions of the TurboBooster. *Id.* And, the post-test photographs of the seats tested clearly show that the armrests remained attached.[2] *Id.* at pp. 8, 15.

With respect to the only other testing Dr. Ross references in his report on page 21 (Test numbers 07062206 and 07062208), Dr. Ross also admits that the armrests do not separate from the base in either of these tests. Exh. G, Ross Dep. pp. 114:21-115:18. The post-test photographs of the seats tested in these runs confirm that the armrests remained attached to the base. *See,* Exh. I. The post-test photographs of the seats tested in these runs confirm that the armrests remained attached to the base. *See,* Exh. I. Further, these tests also were not performed in order to simulate what happened to J.M. in the subject accident, as tests 07062206 and 07062208 were also performed <u>before</u> this accident occurred.

Because Dr. Ross performed no testing of his own to substantiate his opinion that there is any relationship between the armrest separating from the base and the shoulder belt moving downward to the child's abdomen, his opinion that the armrest separation caused J.M.'s shoulder belt to reposition onto his abdomen should be stricken.

## **CONCLUSION**

Simply put, there is no fact, test, analysis or methodology offered by Mr. Whitman or Dr. Ross to substantiate their opinions that the separation of the armrest from the base of the TurboBooster caused J.M. to roll out of the shoulder belt he was allegedly wearing at the time of this collision. In fact, the only testing these experts identified where the armrest actually detached shows that the shoulder belt remains on the shoulder, and in some instances actually

---

[2] Dr. Ross testified that he didn't even known whether the armrests in GC0215 and GC0216 detached or not. Exh. G, Ross Dep., pp. 94:25-95:6.

moved in the opposite direction upward on the chest. Neither expert employed any scientific methodology or analysis whatsoever in support of their opinion. Thus, there is no basis for the opinion that the separation of the armrest had the effect of causing the shoulder belt on J.M. to reposition from his shoulder to his abdomen. As such, this opinion amounts to nothing more than the mere speculation or *ipse dixit* of the expert. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) ("But nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *Guile v. United States,* 422 F.3d 221, 227 (5th Cir. 2005) ("A claim cannot stand or fall on the mere *ipse dixit* of a credentialed witness."); *Viterbro v. Dow Chem. Co.,* 826 F.2d 420, 422 (5th Cir. 1987) ("[i]f an opinion is fundamentally unsupported, then it offers no expert assistance to the jury."). Accordingly, Mr. Whitman and Dr. Ross' opinion that a separation of the armrest in a crash constitutes a defect that brought about J.M.'s injuries lacks the requisite reliability and relevancy to be admissible. Therefore, the opinion that the armrest separation produced J.M.'s injuries must be excluded.

For the reasons stated above, Graco respectfully requests that this Court grant its motion to preclude plaintiffs' experts Gary Whitman and Wayne K. Ross, M.D. from testifying at the trial of this matter regarding any opinions concerning separation of the armrest on the Graco TurboBooster and for any other relief this Court deems just and reasonable.

        Respectfully submitted,

        /s/ Heidi Oertle
        Heidi Oertle

        Joseph J. Krasovec, III
        Heidi K. Oertle
        Schiff Hardin LLP
        233 S. Wacker, Suite 6600
        Chicago, Illinois 60606
        312-258-5500
        312-258-5600 facsimile

        John B. Greer III
        Texas Bar No. 08420000
        Greer & Miller
        3512 Texas Boulevard
        Texarkana, Texas 75503
        (903) 791-9300
        (903) 791-9301 facsimile

        ATTORNEYS FOR DEFENDANT
        GRACO CHILDREN'S PRODUCTS INC.

-12-

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on May 20, 2011, she filed the foregoing document on all counsel of record via ECF.

                                                /s/ Heidi Oertle
                                                Heidi Oertle

## **CERTIFICATE OF CONFERENCE**

The undersigned certifies that Counsel have complied with Local Rule CV 7(h) in that national counsel for Graco Children's Products Inc., Joseph Krasovec, met and conferred with counsel for plaintiffs, R. Douglas Gentile, telephonically on May 17, 2011, and that counsel for plaintiffs will not agree to the relief sought in this motion.

                                                /s/ Heidi Oertle
                                                Heidi Oertle