IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | |
|---|---|
| CHAD MCCUNE, et al. § | |
| § | |
| PLAINTIFFS, § | |
| § | |
| V. § | Case No 5:2009cv00107 |
| § | |
| GRACO CHILDREN'S PRODUCTS INC., § | |
| § | |
| DEFENDANT. § | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT
GRACO CHILDREN'S PRODUCTS INC.'S MOTION TO EXCLUDE
<u>CERTAIN OPINIONS OF GARY WHITMAN AND WAYNE ROSS, M.D.</u>**

Plaintiffs respectfully ask the Court for an Order denying defendant Graco's motion to exclude certain opinions offered by experts Gary Whitman and Wayne Ross, M.D. Specifically, Graco asks the Court to preclude Mr. Whitman and Dr. Ross from offering certain opinions regarding the failure of the armrest on J.M.'s TurboBooster, how that failure affected his movement during the crash (his kinematics) and the performance of his seat belt and lastly, how that failure and J.M.'s resultant kinematics caused or contributed to cause his injuries.

Graco's motion is not merely without merit; indeed, it strains credulity. Mr. Whitman and Dr. Ross are eminently well-qualified experts whose opinions are predicated upon their application and use of the scientific method, the very same methodology they employ whether they are working on a litigation matter or a non-litigation matter. Graco is quibbling with their conclusions, not their methodologies. All of the opinions and conclusions offered by Mr. Whitman and Dr. Ross, including the opinions critiqued by Graco in its motion, are relevant, reliable and clearly pass muster under F.R.E. 702, *Daubert v. Merrill Dow Pharm.,* 509 U.S. 79, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Graco's motion should be denied.

# I. Pertinent Background Facts

This case arises out of an automobile accident that occurred on July 29th, 2007, on a four lane highway. Plaintiffs' vehicle, a 2005 Ford SportTrac, ran into the rear of a tractor that moved off the shoulder of the road onto the highway. J.M., then four years old, was a passenger in plaintiffs' vehicle and was catastrophically injured in the accident.[1] Plaintiffs contend that J.M.'s child safety seat, a Graco TurboBooster, structurally failed in the accident and that this failure, among others, caused his injuries. Everyone other than J.M. who was involved in the accident has recovered without permanent problems. J.M. is a quadriplegic.

Two of the experts plaintiffs hired to help them prosecute this case are Mr. Whitman and Dr. Ross. For the Court's convenience, Mr. Whitman's CV, Rule 26 reports and deposition are provided herewith as *Exhibits A* (CV), *B* (report), *C* (supplemental report), *D* (deposition volume 1) and *E* (deposition volume 2). Similar materials for Dr. Ross are provided herewith as *Exhibit F* (CV), *G* (report) and *H* (deposition).

## A. Mr. Whitman and His Opinions Attacked by Graco

Mr. Whitman is an engineer and a highly qualified expert in the field of seats and restraint systems. *See Exhibit A* and *Exhibit B*, pp. 2-5. He spent 15 years, *inter alia,* designing, assessing and testing seating and restraint systems at the Naval Air Warcraft Center before he ever began working in forensic matters. *Id.* Since then, and in addition to his work in cases like this, he has been retained by and collaborated with the federal government (NHTSA) on child occupant protection issues.[2] Mr. Whitman has worked with the American Academy of Child

---

[1] Graco gratuitously adds in its brief that J.M.'s mother was "apparently" speeding and texting when the wreck happened. Graco adds the "apparently" to avoid running afoul of Fed.R.Civ.P. 11. There isn't any evidence to support Graco's efforts at assassinating the character of J.M.'s mother.

[2] This stands in stark contrast to Graco's liability "expert," Dr. Van Arsdell, who has never been retained outside of litigation to do non-litigation work for the government. For example, Graco's motion mentions the "biofidelity" of child crash test dummies. The government didn't hire any of Graco's "experts" to run testing to assess child dummy biofidelity. Rather, the government hired Mr. Whitman. Which reveals all one needs to know about which party has retained "real world" experts and which has retained "litigation" experts.

2

Injury Prevention, the American Academy of Pediatrics, and the Children's Hospital of Philadelphia – again, all on important issues pertaining to child safety seats and child occupant protection. *Id.* He has authored numerous peer-reviewed papers pertaining to occupant restraint and child safety seat related issues and he holds two patents dealing with automobile seats and restraints. *Id.* The same year that Graco's liability expert (Van Arsdell) received his doctorate and went to work full time as a litigation engineer, Mr. Whitman was awarded the Pennsylvania Governor's Highway Safety Award for Occupant Protection in recognition of his lifetime of work in the field of occupant protection.[3]

    Mr. Whitman initially authored a fifty-one page report in this case. (*Exhibit B*). The general discussion at pages 14-30 of his report is good context for the Court, but the opinions attacked by Graco are at pages 33-34 (¶Q) and pages 42-43 (Opinion O). *Id.* Notwithstanding Graco's misrepresentations to the contrary, Mr. Whitman's opinions at issue are predicated upon uncontroverted eyewitness testimony, Graco's own testing, and his reliance on the opinions of Dr. Ross. *Id.* After receiving and reviewing certain testing done by the Graco's litigation experts for this case, Mr. Whitman issued a supplemental report. (*Exhibit C*).

    Graco invests a lot of time and effort in its motion talking about the biofidelity of crash test dummies. "Biofidelity" refers to the ability, or inability, of a crash test dummy to replicate how humans respond to forces and accelerations in crashes. *See Exhibit B*, pg. 3.[4] Mr. Whitman's tests have revealed that the Hybrid III Three-Year-Old dummy is capable of illustrating general kinematics (movement of the body), but is not sufficiently biofidelic to

---

[3] By 1997, the year Van Arsdell received his last degree and embarked on a career in litigation, Mr. Whitman had already spent nineteen years working as a "real world" expert in seats and restraint systems and further, had begun to translate that "real world" expertise into some forensic work. *Id.* The same year (1997) Van Arsdell left academia to become a professional witness, Mr. Whitman was lead author for an important peer reviewed paper pertaining to child safety seats that was presented at a special international Child Occupant Protection Seminar.

[4] The Court is referred to the first bullet point at the top of the page, where Mr. Whitman discusses the study of child test dummy biofidelity he was in charge of for the federal government.

recreate a crash or accurately predict injuries in a specific crash. *Id.*, pgs. 4 and 40. Due to the lack of biofidelity of crash test dummies, the actual kinematics of children involved in real crashes is far worse than what is seen in crash test videos. *Id.,* pg. 42, ¶ H. Stiffness of the crash test dummies decreases the potential of "rollout" in crash tests. *See Exhibit C*, pg. 10, ¶ 5.

### B. Dr. Ross and His Opinions Attacked by Graco

Dr. Ross is perhaps the most qualified witness in this case. Dr. Ross is a medical doctor who works as a forensic pathologist and neuropathologist. *See Exhibit F*.[5] He is double board certified in anatomic and forensic pathology. *Id.* He has investigated nearly a thousand cases in which people suffered fatal injuries in car wrecks, including over 34 cases in which people suffered similar injuries to those suffered by J.M. *See Exhibit G*, pg. 1. Dr. Ross is not limited to working in cases in which people suffer fatal injuries. Indeed, he routinely consults with police and district attorneys regarding people who have suffered non-fatal injuries, investigating and explaining how and why they were injured. *Id.* Dr. Ross has special expertise in cases involving children who have suffered head/neck injuries. *Id.*

Plaintiffs retained Dr. Ross to do what he does in criminal cases; specifically, to figure out how and why J.M. suffered his injuries in the wreck at issue in this case. Dr. Ross employed the scientific method. *Id.* at 5. He proposed five hypothetical arguments in his search for the cause of J.M.'s injuries. *Id.* He then addressed each hypothetical. *Id.,* pgs. 12-24. He investigated how it was possible that J.M., who was restrained in his TurboBooster by the vehicle's three point belt, had injuries from his shoulder belt across his abdomen and right arm, and an injury from his lap belt across his pelvis. *Id.* at 10. For the Court's edification, here is a post-accident photograph of these injuries:

---

[5] The Court is likely familiar with the fields of pathology and forensic pathology. Neuropathology is a subspecialty of pathology that focuses on injuries to the brain and spinal cord. Dr. Ross did a rare fellowship in neuropathology to gain unique expertise with respect to neurological injuries, like the injury J.M. suffered in this case. *Id.*



In reaching his opinions in this case, Dr. Ross looked at different restraint scenarios with a child surrogate restrained in an exemplar TurboBooster in a exemplar vehicle. *Id.,* pgs. 12-24. And he studied Graco's own testing. He found general dummy kinematics similar to what he would expect led to J.M.'s injuries, specifically rollout and repositioning of the shoulder harness. *Id.* Here are pictures from Graco's own testing that demonstrate the rollout phenomenon and the resulting head contact that broke J.M.'s neck:



5



*Id.* at pp. 19-24. As can be seen, the shoulder belt in the above photograph is a perfect match to the shoulder belt injuries seen in J.M.'s post-accident hospital photograph. A virtually identical match occurs in a Graco test (#7062206) where the inboard armrest flexes dramatically and changes position nearly 3", failing to manage the crash loads just as J.M.'s armrest did – this too was relied upon by Dr. Ross:



Dummy rolls out from under shoulder belt – note location of shoulder belt is in the ***precise*** location of J.M.'s post-crash injury photograph

This test, with no oblique angle and a stiff dummy, shows exactly what happened to J.M. in the crash at issue – adding the oblique angle from the subject crash, and with a real child involved

instead of a dummy, establishes with near certainty that the failure of the armrest to manage crash loads creates a very hazardous condition for a child. Yet Graco's contention is that plaintiffs' experts cannot rely on this test, and others like it, under *Daubert*. Graco is wrong.

## II. Argument

Federal Rule of Evidence 702 requires that any expert be qualified to testify by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Specifically, Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if
>
> (1) the testimony is based upon sufficient facts or data,
>
> (2) the testimony is the product of reliable principles and methods, and
>
> (3) the witness has applied the principles and methods reliably to the facts of the case.

Expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* It is the trial judge's responsibility to determine, at the outset, whether the expert is proposing to testify to expert knowledge and whether such testimony will assist the trier of fact to understand or determine a fact in issue. *Id.; Daubert,* 509 U.S. at 592. The trial judge acts as a gatekeeper by requiring a valid connection to the pertinent inquiry and assessing "whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline." *Id.; Kumho,* 526 U.S. at 149.

To constitute expert knowledge that will "assist the trier of fact," the proposed testimony must be both relevant and reliable. *E.I. duPont de Nemours & Co., Inc. v. Robinson,* 923 S.W.2d 549, 556 (Tex. 1996). The trial judge's role is to make the initial determination of whether an expert's opinion is relevant and whether the methods and research upon which it is based are reliable. *Id.* at 558. Relevant testimony is that which is "sufficiently tied to the facts of the case

that it will aid the jury in resolving a factual dispute." *Id.* at 556 (quotation omitted). "In addition to being relevant, the underlying scientific technique or principle must be reliable. Scientific evidence which is not grounded 'in the methods and procedures of science' is no more than 'subjective belief or unsupported speculation.' " *Id.* at 557 (quoting *Daubert,* 509 U.S. at 590).

### A. Mr. Whitman

Graco parses and misrepresents Mr. Whitman's testimony throughout its brief. For example, Graco claims Mr. Whitman had done "no testing" to support his opinions in this case. Plaintiffs encourage the Court to read Mr. Whitman's testimony, in which he states that he didn't do any testing because *Graco's own testing supported his opinions*. *Exhibit E*, pg. 144, L. 16 - pg. 146, L. 7.

Graco further claims Mr. Whitman testified that no testing to substantiate his "rollout" opinion could be performed because of the lack of biofidelity of the crash test dummies. That misrepresents Mr. Whitman's testimony. Read in context, Mr. Whitman testified that he would expect more rollout with a child than with a dummy but that there is no way to quantify the difference because there is no relevant cadaver testing of children. *Exhibit D*, pg. 71, L. 7 - pg. 73, L. 2.

Notwithstanding Graco's gamesmanship, the reality is that there is no significant "rollout" in the frontal testing it performed (though there was some) because of the nature of the test and the stiffness of the body of the test dummy. The wreck in this case was not a pure frontal. It was an oblique impact to the left front of the subject vehicle of -5 to -15 degrees. *See Exhibit B*, pg. 7 and *Exhibit G*, pg. 5. So what does Mr. Whitman actually say about rollout?

> Q.  But you don't know that because you haven't run a test to that; right?
>
> A.  *Well, I know that that's true with adults. Physics is physics. And I already know that with the Graco Turbo Booster that you can get rollout with the Graco TurboBooster in a perfect frontal. And so I know from adult testing that as it's becoming more oblique away from the shoulder belt the propensity for rollout will*

>  *be greater.  So I know that this becoming more oblique is going to promote rollout.*

*See Exhibit E*, pg. 35, L. 15 - pg. 36, L. 1.  That this rollout occurred in J.M.'s accident is not only supported by Graco's tests with the TurboBooster, it is also supported by the fact witness testimony – testimony that Graco completely ignores. *Exhibit B*, pgs. 34-35.

Moreover, Mr. Whitman is entitled to rely on Graco's testing.  Indeed, there is no requirement that an expert "personally perceive the subject of his analysis." *NutraSweet Co. v. X-L Engineering Co.,* 227 F.3d 776, 790 (7th Cir.2000). The practice of employing experience to analyze data assembled by others is neither illicit nor unusual. *Phillips v. Raymond Corp.,* 364 F.Supp.2d 730, 743 (N.D.Ill.2005).  Opinions drawn from observation and personal experience are not excluded by the *Daubert* analysis. *See Kumho,* 526 U.S. at 156 ("But no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

Finally, there is nothing illicit or improper about Mr. Whitman relying on the opinions of Dr. Ross.  "[W]hen an expert relies on the opinion of another, such reliance goes to the weight, not to the admissibility of the expert's opinion." *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.,* 240 F.3d 1, 9 (1st Cir.2001) (upholding admission of expert testimony on whether marine fire had electrical origin over similar objections, including that one expert had impermissibly relied on observations and report of another).  Accordingly, expert opinion which relies upon the information or opinion of others is acceptable, provided it is the sort of opinion reasonably relied on by experts in the relevant area of expertise. *See Dura Automotive Sys. Of Indiana, Inc. v. CTS Corp.,* 285 F.3d 609, 612-614 (7th Cir.2002).  In sum, there is more than a sufficient factual basis to deem Mr. Whitman's opinions regarding the armrest failure and J.M.'s "rollout" both relevant and reliable for purposes of *Daubert*.  Graco's motion should be denied as to Mr. Whitman.

## B. Dr. Ross

Graco's argument pertaining to Dr. Ross is heavy on attorney spin, but woefully bereft of real facts or legal citations. For example, Graco complains that Dr. Ross didn't do any independent testing of his own, nor is he aware of any testing done by plaintiffs' experts for this case. This is true, but it omits a great deal of relevant testimony that provides context to this issue. *See Exhibit H*, pg. 22, L. 17 - pg. 25, L. 22.

Dr. Ross didn't do any testing for this case because Graco had already done testing. *Id.*[6] There was no reason to do additional testing because, to the extent it can, that testing plainly supports the opinions of Dr. Ross. *Id.* Unfortunately though, the nature of the current crash test dummies and the absence of cadaver testing with children does not allow anyone, including Dr. Ross, to run testing that will replicate what happened to J.M. in the wreck. *Id.*[7] And therein lies the sophistry of Graco's motion. What Mr. Whitman and Dr. Ross (repeatedly) explained is that the crash test dummies are rigid and do not twist and stretch like a human body:

> *Of course, [J.M.] had a so much more pliable chest. His chest and abdomen are like a pretzel, in a way, soft as a pretzel, if I can use that as an analogy or metaphor. Especially in comparison to a six year old dummy.*

*Id.*, pg. 29, L. 2-5. So Graco's critique of Dr. Ross (and Mr. Whitman) is that, while plenty of testing was done that does support their opinions, the additional testing that Graco says should have been done – testing *that is not scientifically possible at the present time* – was not done to support their opinions and, therefore, their opinions should be precluded. That argument defies logic.

---

[6] It is interesting to note that the implication in defendant's argument is that its own testing is not a reliable basis for expert witness opinion testimony. Yet its own experts rely on that same testing, and Graco relies on it to support its Motion for Summary Judgment.

[7] Dr. Ross clearly testified that this problem with crash test dummy technology does not and did not prevent him from testing his opinion. *Id.*. pg. 25, L. 2-10. More on that *infra.*

Even more illogical are Graco's arguments regarding the sled tests Dr. Ross discusses in his report. This discussion occurs in a portion of the report in which Dr. Ross investigates and debunks whether it was possible that J.M. had his shoulder belt under his right arm when the wreck happened. *See Exhibit G*, pgs. 19-22.[8] Dr. Ross discusses the sled tests generally and then focuses on tests 215 and 216. *Id.* Graco conveniently failed to provide the Court with the testimony of Dr. Ross in this regard:

> Q. You rely on this test for the proposition that (J.M.) can roll out of the shoulder belt, correct?
>
> A. I considered it, yes.
>
> Q. And you believe in this test that the armrest came off of the Turbo Booster?
>
> A. I don't know if the armrest came off in this test or not. But to the extent that this shows the kinematics of what we believe illustrates happened to (J.M.). Yes, I believe it supports my opinion. And is testing that was done by Graco that we considered, yes.

*See Exhibit H,* pg. 94, L. 22 - pg. 95, L. 6. In fact, Graco is simply playing a semantics game when it argues that none of the testing on which Dr. Ross relies involved an armrest detachment. Again, here is the testimony of Dr. Ross that Graco failed to provide to the Court:

> Q. Now, you also refer to test number 07062206 and 07062208?
>
> A. Right.
>
> Q. Okay. You say that the armrest pops off early in the test. That's not true, is it?
>
> A. I think that's true, yes.
>
> Q. The armrest separates from the base?
>
> A. It looks like it pops off. I mean it doesn't come totally out. I believe, if you look at it, it definitely pops up, pops off. And it doesn't say totally in there. And I believe there is a three inch separation as documented in the document there.
>
> Q. You looked at the crash test video, correct?

---

[8] It bears noting that Graco's experts agree with Dr. Ross that J.M. did not have his shoulder belt under his arm.

>    *A.   Yes.*
>
>    *Q.   In your view, that armrest comes off?*
>
>    *A.   Well, not completely. But in my view, it definitely displaces upward. In that sense, it pops off. If you look at the static aftermath of the photos, it shows that the armrest is twisted pretty significantly and the observer documents three inches of separation. There is some documentation that talks about three inches of separation. So in that sense, it pops off. But it doesn't totally come out, no.*
>
>    *          *          *
>
>    *Q.   Is this the only test where you saw this flexing and the shoulder roll out?*
>
>    *A.   I think that's the only one where I see both combined. In others, I've seen, you know, the armrest just pop off from whatever test. I don't know that I've documented them here. But this one shows the combined effects of the rollout and the armrest popping off or dislodging.*

*Id.,* pg. 114, L. 16 - pg. 115, L. 18; pg. 116, L. 1-8. If Graco wishes to waste the jury's time with a silly semantics game, that is certainly its prerogative. But quibbling over what constitutes a separation does not create a *Daubert* issue.[9]

Graco's penultimate argument is that the opinion of Dr. Ross that the flexing or separation of the armrest of J.M.'s TurboBooster allowed his shoulder belt to relocate on his abdomen should be stricken because he performed no testing "of his own" to support this opinion. *See* Graco's motion, p. 9. This ignores the fact that the opinion of Dr. Ross in this regard is predicated upon uncontroverted eyewitness testimony, Graco's own testing and the scientific analysis performed by Dr. Ross of J.M.'s injuries (and his non-injuries). *See Exhibit G*, pg. 12-24. Of course, there is no requirement under *Daubert* that Dr. Ross perform his own independent testing to support his opinions. Indeed, Graco cites no authority in support of its argument. Dr. Ross is entitled to rely on Graco's own testing. *See, e.g., NutraSweet Co.* and

---

[9] The Court is respectfully referred to *Exhibit H*, pg. 143, L. 11 through pg. 148, L. 21. In the interest of judicial economy, plaintiffs will not reproduce the entirety of that testimony in this brief, but Dr. Ross clearly explains his reliance on the Graco testing, the relevance thereof, the problems with trying to test to "recreate" what happened to J.M. and how he scientifically analyzed the evidence and injuries to reach and test his opinions. Which, parenthetically, is what he does each and every day as a forensic pathologist, irrespective of whether he is testifying in a civil or criminal case.

*Phillips, supra; see also Kumho,* 526 U.S. at 156 ("But no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

Furthermore, it is nonsensical to argue that a forensic pathologist must perform specific testing intended to recreate an event to support his opinions and conclusions. Under Graco's logic, Dr. Ross cannot opine that someone suffered an injury when she was struck in the head by a baseball bat unless Dr. Ross tested his hypothesis by striking someone in the head with a baseball bat. Obviously, that is an absurd proposition. Forensic pathologists reach their opinions and conclusions by using their education, training and experience to analyze the evidence and injuries. That is precisely what Dr. Ross has done in this case.

*Smith v. BMW North America, Inc.,* 308 F.3d 913 (8th Cir. 2002) is instructive. *Smith* was a vehicular product liability case. The plaintiff's theory was that, had her air bag deployed, she would not have been injured. The district court granted summary judgment in favor of the defendant after excluding plaintiff's experts, including a forensic pathologist. *Id.* at 915. The district court excluded plaintiff's forensic pathologist causation opinions, primarily because he lacked expertise in biomechanical analysis. *Id.* at 919.[10] On appeal, the Eighth Circuit held that the exclusion of the forensic pathologist's causation opinions was reversible error. *Id.* at 919-20. The court reasoned that, irrespective of whether he was an expert in biomechanics, the forensic pathologist had the medical knowledge, education, training and experience to opine as to how and why the plaintiff was injured and also, to opine that a properly functioning air bag would have prevented injury. *Id.*

This case presents an even more compelling justification for admission of the causation opinions offered by Dr. Ross. As a forensic pathologist and neuropathologist, Dr. Ross has the education, training and experience to offer medical opinions as to how and why J.M. was

---

[10] By comparison, Dr. Ross is an expert in biomechanics, so much so that he regularly teaches biomechanics to other engineers, other health care providers and law enforcement. *See* Exhibit F.

injured. Moreover, Dr. Ross is an expert in the field of biomechanics. Clearly, Graco's motion must fail as to Dr. Ross. His opinions are relevant and reliable.[11]

### III. Conclusion

The issues raised by Graco pertaining to Mr. Whitman and Dr. Ross are simply matters for cross examination. This Court said it best in *Hadley v. Wadley Regional Medical Center,* 2006 WL 5111114, *3 (E.D.Tex. 2006):

> "the rejection of expert testimony is the exception rather than the rule." *See* Fed.R.Evid. 702, Adv. Comm. Notes (2000). *Daubert* did not work an overriding change in federal evidence law, and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *See id., quoting United States v. 14.38 Acres of Land, More or Less, Situated in Leflore County, Mississippi,* 80 F.3d 1074, 1078 (5th Cir.1996). As *Daubert* itself recognized, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

The opinions of Mr. Whitman and Dr. Ross implicated by Graco's motion are hardly "shaky." Indeed, they are predicated on a rigorous application of the scientific method and an extraordinarily thorough review and examination of all the evidence. Mr. Whitman and Dr. Ross are extremely well-qualified experts. The opinions they intend to offer at trial, including, but not limited to the opinions Graco seeks to exclude, are relevant and reliable. The issues raised by Graco in its motion, if anything, simply go to the weight of those opinions, an issue to be measured by the jury through cross-examination. Graco's motion should be denied.

Respectfully submitted,

/s/ R. Douglas Gentile
Evan A. Douthit (admitted pro hac vice)
R. Douglas Gentile (admitted pro hac vice)
Douthit Frets Rouse Gentile & Rhodes, LLC
903 E. 104th Street, Suite 610
Kansas City, Missouri 64131
(816) 941-7600
(816) 941-6666 Facsimile

---

[11] *See Rager v. General Electric Company,* 2010 WL 5393857, **3-6 (M.D.Pa. 2010) (holding that the methodology of Dr. Ross was reliable for purposes of *Daubert*).

Alan S. Loewinsohn
Loewinsohn Flegle Deary, L.L.P.
12377 Merit Drive, Suite 900
Dallas, Texas 75251-2224
(214) 572-1700
(214) 572-1717 Facsimile

Darby Doan
Haltom & Doan
6500 Summerhill Road, Suite 100
Texarkana, Texas 75503
(903) 255-1000
(903) 255-0800 Facsimile

ATTORNEYS FOR PLAINTIFFS

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 6th day of June, 2011, a true and correct copy of the foregoing has been served via ECF filing all counsel of record.

/s/ R. Douglas Gentile
Counsel for Plaintiffs