IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| CHAD MCCUNE, et al. | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | Case No 5:2009cv00107 |
| | § | |
| GRACO CHILDREN'S PRODUCTS INC., | § | |
| | § | |
| DEFENDANT. | § | |

**PLAINTIFFS' RESPONSE TO GRACO'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND ITS "STATEMENT OF UNDISPUTED MATERIAL FACTS"**

Pursuant to Fed.R.Civ.P. 56 and Local Rule CV-56(b), plaintiffs submit the following
response to Graco's Motion for Partial Summary Judgment (Dkt. No. 86) and its "Statement of
Undisputed Material Facts" (Dkt. No. 87). For the reasons set forth below, Graco's motion
should be denied.

## I.  Background And Summary Of Response

On July 29, 2007, four year old J.M. was the right rear seat passenger in a Ford SportTrac
that was being driven by his mother, Carmen McCune.  J.M.'s older sister Sarah was seated in
the left rear seat.  Everyone was wearing their seat belts, and J.M. was seated in his Graco
"TurboBooster" child safety seat.  The family was traveling to Henderson, Texas, after visiting
Carmen's family in Arkansas.  While southbound on Highway 65 near Damascus, Arkansas, a
farm tractor driving on the shoulder of the highway moved into the "slow" lane. Carmen did not
see the tractor until it was too late and struck it from behind.[1]

---

[1] Graco claims that Carmen was on her cell phone at the time of the collision.  There is no evidence in the record to
support this; in fact, the evidence actually proves she was not on the phone when the collision occurred.

The impact was not severe.  In fact, Carmen opened her own door after the crash and climbed out with only a broken ankle.  Sarah sustained some moderate internal injuries (caused by her seat belt), but she quickly recovered.  The tractor operator was essentially uninjured, despite being thrown from his tractor.  J.M. was not so fortunate.  During the course of the accident, the TurboBooster's left armrest tore out of the seat's base.  When the armrest broke, J.M.'s pelvis, abdomen and torso began to rotate and he rolled out from under his shoulder belt. Because he no longer had upper torso restraint, J.M. jackknifed over his safety belts and struck his head on his knees, breaking his neck.  He is a ventilator dependent quadriplegic.

The TurboBooster is a "belt-positioning booster." It has adjustable armrests on either side that are "snapped" into the base; a single screw is inserted through each armrest to keep the armrest secure. The automobile's lap belt runs under the armrests; the shoulder belt goes across the child's chest and under the inboard armrest.    A child of J.M.'s size, seated in a TurboBooster, looks like this:



When a crash occurs, the child initially moves into and "loads" the shoulder belt; the shoulder belt then pulls "up" on the inboard armrest, loading it with crash forces.  To manage the loads and ensure the shoulder belt stays where it is supposed to, the armrest must remain

attached to the base; in fact, under the applicable federal regulation (FMVSS 213), the armrest cannot change position at all, nor can it become separated from the base.[2]   Unfortunately, Graco knew, even before the TurboBooster went into production, that the armrests were not robust enough to manage crash loads and were not only changing position, but were consistently being torn out of the base during tests.   Documents produced during this case, and the depositions of Graco's engineers, establish a truly remarkable story of corporate misconduct in the handling of this problem.   A very brief summary of the evidence, from Graco's own engineers and documents, establishes the following:

- In March 2002, Graco managers request approval from company executives to begin planning for production of the TurboBooster.  Typically, it takes a "couple months" to get this approval. (*Exhibit J*, pg. 8, L. 23 – pg. 9, L. 10).  For the TurboBooster, it takes just one <u>*day*</u> – an all time Graco "record." (*Exhibit J*, pg. 19, L. 12 – pg. 20, L. 7). This "record" approval time is motivated by commitments Graco has to supply the seat to Toys R Us and Wal-Mart; Graco's senior executives and managers, including Gary Blanchette (the manager of Graco's entire car seat division), are hungry to start generating a whopping 394% profit margin on the TurboBooster as they try to capture as much as 50% of a $260 million dollar market. (*Exhibit J*, pg. 14, L. 14 – pg. 15, L. 1; pg. 16, L. 6 – 17; pg. 21, L. 23 – pg. 22, L. 22).

- In April, 2002, Graco conducts its first sled tests with the seat.  The armrest changes position (a test failure) in six of ten tests.  Graco's car seat manager, Blanchette, admits that the company knew the armrest issue was a "problem" that required a "design fix." (*Exhibit J*, pg. 31, L. 3-9). Other engineers document that the problem

---

[2] FMVSS 213 is a <u>*minimum*</u> performance standard.  49 U.S.C. § 30102(a)(9).  The specific standards that prohibit an adjustable part from moving and the separation of a load bearing part are 49 C.F.R. § 571.213, S5.1.1(a) and (b).

"needs to be resolved," and they decide to add a "screw" to retain the armrest. (*Exhibit H*, Tests 1 - 6; *Exhibit B*, pg. 278, L. 16 – pg. 280, L. 1).

- Shortly after the first round of test failures, and before production begins, Graco prepares an Owner's Manual that contains the following warning: "**NEVER USE THIS BOOSTER SEAT** without the armrests attached to the base." Use without the armrests "INCREASES THE RISK OF SERIOUS INJURY OR DEATH . . . IN AN ACCIDENT." (*Exhibit G*, 5/02 Edition) (Caps and bold in original).

- Without knowing if the screw will solve the problem, production begins in June, 2002. Graco starts production "at risk," hoping that the new screw will prevent "even one" compliance test failure. (*Exhibit J*, pg. 35, L. 17 – pg. 37, L. 22).

- In August, 2002, testing with the new retention screw reveals that the screw does not work – the armrest is still failing to maintain structural integrity. (*Exhibit H*, Test 7). Production nevertheless continues unabated. (*Exhibit M*, Interrogatory No. 6).

- In September, 2002, there is another test failure – this time it is actually an FMVSS 213 "compliance" test. (*Exhibit H*, Test 8). Graco's chief compliance engineer reiterates that "we need to fix it." (*Exhibit B*, pg. 316, L. 2 – pg. 318, L. 4). Although Blanchette's position is that the seats should not be shipped if there is "even one" compliance test failure (*Exhibit J*, pg. 37, L. 13-22), production continues at full speed. In fact, Graco decides to build *more* molds to actually *increase* production; it puts the mold building projects ahead of fixing the armrest. According to Graco senior child seat engineer Dan Brunick, fixing the armrest defect is Graco's "lowest priority." (*Exhibit I*, pg. 36, L. 2 – pg. 41, L. 7).

- Despite changing to a second, "different screw" in late 2002 (See Graco's "fact" no. 6), armrests continue to fail in sled tests.  (*Exhibit H*, Tests 9 – 12).  Finally, in April, 2005, Graco engineers realize the plastic that the screw digs into (the screw "boss") needs to be more robust; according to Graco engineer Shiva Menon, this change will improve the "load bearing capability" of the armrest so "the distribution of the load is better." (*Exhibit F*, pg. 58, L. 21 – pg. 59, L. 13). The "screw boss" is therefore made wider and longer – but not thicker.  (*Exhibit B*, pg. 150, L. 5 – 21; pg. 184, L. 2 – pg. 185, L. 21).  Production continues unabated, and the design change to the screw boss will not actually be implemented until July, more than three months after the change was first discussed.  (*Exhibit F*, pg. 63, L. 8 -   pg. 64, L. 3).  J.M.'s seat, made on April 2, 2005, does not get the benefit of this design change – it is manufactured with the original design and is assembled with a "first generation" armrest.[3]

-  In October, 2005, a lawsuit is filed against Graco in federal court in Oklahoma after a child is ejected from a TurboBooster and killed when his armrest detaches. (*Exhibit E*, pgs. 28-29).  In the case, Graco's Rule 30(b)(6) witness (a very senior compliance engineer named David Galambos) testifies that Graco had experienced only two (2) armrest failures in its sled testing.  (*Exhibit K*, pg. 21, L. 18 – 22). This testimony is false. The real number of complete armrest separation failures as of the date of his deposition (2/23/07) is at least *fourteen (Exhibit H)*.  Incredibly, four (4) of those failures occur just a few days before Galambos gives his deposition.  Later, NHTSA

---

[3] Not only was J.M.'s armrest a "first generation" component, the screw boss on his actual seat – which was specified to be .040 thick – was only .028 thick – way out of specification and a full 30% weaker than it was supposed to be.  Graco never examined J.M.'s seat, or any seat for that matter, to even check to see if the thickness of the boss was to specification.  It was simply not something Graco's Quality Control department cared about. (*Exhibit E*, pgs. 30-31 (paragraph "L")).

sends a request for information to Graco about the Oklahoma lawsuit; Galambos and Graco both conceal the test failures from NHTSA.[4]

- On July 24, 2006 – still a full year before J.M.'s accident – there is another armrest pull-out failure (*Exhibit H*, Test 15). After reviewing the test results, Graco engineer LaPlante documents that the armrest failures "could be a "technical non-compliance" with FMVSS 213 and that production should not go forward "until this is resolved." (*Exhibit A*, pg. 64, L. 13 – 20; pg. 66, L. 19 – 24). A few days later, on August 1, 2006, LaPlante recommends thickening the screw boss by nearly 400%. (*Exhibit A*, pg. 64, L. 3 – 12). Other engineers at Graco, however, believed the problem should _not_ be resolved because: (i) "continuing production is very important," (ii) Wal-Mart had just placed a "huge order" for TurboBoosters, and (iii) solving the problem would require a "long time study!!!" (*Exhibit D*, pg. 198, L. 1 – pg. 207, L. 24) (exclamation points in original). In the face of these "competing" viewpoints, Graco management opts to reject LaPlante's recommendation to stop production. (*Exhibit M*, Interrogatory No. 6). The "huge order" to Wal-Mart is filled. A few months later, J.M.'s grandmother buys J.M.'s seat – from Wal-Mart.

- In April of 2007, more than eight months later and after no less than twenty-two (22) _more_ armrest test failures (seven of which are identified by Graco as "compliance" tests), Graco finally adopts LaPlante's recommended design change by thickening the screw boss. (*Exhibit D*, pg. 211, L. 3 – 16; *Exhibit H*, Tests 16-37). Unfortunately, Graco does nothing to get first generation seats like J.M.'s out of the stream of

---

[4] Galambos has testified in other litigation, as a Rule 30(b)(6) witness for Graco, that Graco "has an obligation to respond (to NHTSA) when we are aware of things" and that if Graco knows of a test failure that potentially raises either a "compliance or safety issue," then it has a "duty to tell the government" about it. (*Exhibit L*, pg. 94, L. 22 – pg. 95, L. 11; pg. 98, L. 1-6). Despite this testimony, Graco buried the information regarding the TurboBooster test failures and then mislead the government about what it knew.

commerce or to give consumers (or NHTSA) any warning about the defects in the armrests manufactured up to that point.  In fact, Graco's senior compliance engineer would eventually concede he kept the test failures concealed from NHTSA because he "didn't want to argue the point" with NHTSA. (*Exhibit A*, pg. 84, L. 3-23).  Just three months later, J.M. is rendered a quadriplegic when his armrest rips off of his TurboBooster.

This is but a fraction of the evidence plaintiffs will present at trial on these issues.  Yet even with just this brief overview, it is difficult to imagine a more astonishing picture of corporate greed, of corporate managers deliberately rejecting needed and recommended design changes so they can "earn" a 394% profit margin, of a company that quite literally cares nothing about the children whose lives have been entrusted to Graco.  It is in the face of this evidence that Graco seeks summary judgment.  The motion should be denied.

## II.  Response To Graco's Statement Of The Issues

Local Rule 56(a) required Graco to provide a statement of issues to be decided by the Court.  Graco failed to comply with the Rule.  Plaintiffs believe the issues to be decided are as follows:

1.  Is there a fact issue on Graco's liability for punitive damages?

2.  Is there a fact issue on plaintiffs' claims as they relate to causation?

As will be seen below, both of these issues should be answered in the affirmative.[5]

## III.  Response To Graco's "Statement Of Undisputed Facts"

**Facts 1 – 3**: Undisputed.

---

[5] Plaintiffs agree to dismiss their claims for express and implied warranty and for "marketing defect" as defined in Graco's summary judgment motion.  Thus the issues presented only relate to punitive damages and causation.

**Fact 4**:   Disputed.   While the TurboBooster does not "contain" a "harness or belt system," it does provide actual "restraint" to a child.  But it is more than just a "restraint." Graco engineer LaPlante admits that the TurboBooster is in fact a "restraint system." (*Exhibit A*, pg. 33, L. 6-8). Graco engineer Crane (who was also an inventor of the TurboBooster) admits that the TurboBooster was designed "to keep a child safe" in an accident, to "keep a child as safe as possible and minimize the danger to a child in an accident," and to "provide maximum protection in a crash scenario." (*Exhibit B*, pg. 88, L. 11 – pg. 91, L. 6).  "Accidents happen," and that is why Graco is in the business of designing and selling car seats like the TurboBooster. (*Exhibit B*, pg. 97, L. 10 – pg. 98, L. 5).  Crane conceded that there is nothing more important for a car seat to do than "provide protection in a crash." (*Exhibit B*, pg. 100, L. 18 – pg. 101, L. 9).  And it must be "strong enough to withstand" crash forces.  (*Exhibit B*, pg. 101, L. 10-19). Crane clearly has acknowledged that the armrests are much more than just a place "for the child to rest his arms" or a "guide to show the caregiver where to route the lap and shoulder belts" – in fact, the Graco Owner's Manual for the TurboBooster expressly states that the armrests _must_ be on the seat to avoid injury to a child occupant:

> **WARNING: FAILURE TO PROPERLY USE THIS BOOSTER SEAT INCREASES THE RISK OF SERIOUS INJURY OR DEATH . . . IN A CRASH.**
> *   *   *
> **NEVER USE THIS BOOSTER SEAT** without the armrests attached to the base.

(*Exhibit G*, pgs. 6-8) (caps and bold in original) (1/03 Version).[6]  The same essential warning is also found in the May, 2002 manual, drafted after the first round of test failures and before production of the TurboBooster began.  (*Exhibit G*, 5/02 Version).

---

[6] Graco removed the pages containing these warnings from the TurboBooster manual that it supplied to the Court as its Exhibit 1.

Further recognizing that the armrests are far more critical to the crash performance of the TurboBooster than Graco's "Fact" number 4 would suggest, Graco senior engineer Menon admits that the armrests on the TurboBooster are a "structural element" of the seat (*Exhibit F*, pg. 91, L. 11-14) that have "load bearing" responsibility (*Exhibit F*, pg. 58, L. 21 – pg. 59, L. 13); engineer LaPlante admits that the armrests "take a lot of load" in a crash and can be pulled out by crash forces. (*Exhibit A*, pg. 34, L. 14 – pg. 36, L. 22). Engineer Crane admits that in a crash, there is "load on the armrest." (*Exhibit B*, pg. 164, L. 6-20). Crane also admits that, where lateral forces are involved, the child himself will load into the armrest. (*Exhibit B*, pg. 176, L. 10 – pg. 177, L. 18). Graco engineer Zadrozny admits that the armrests "take a lot of load." (*Exhibit C*, pg. 89, L. 11-14). Graco engineer Langmaid admits that the armrests "take a lot of load." (*Exhibit D*, pg. 109, L. 1-11). The armrests physically "contain" a child's pelvis in a crash; if that containment is lost because the armrest comes off, a child can "roll out" from under the shoulder belt. (*Exhibit E*, pg. 25).

**Fact 5:** Disputed. Graco's Exhibit 2 establishes, on its face, that "injury values" in 114 of the 314 tests identified therein were *not even measured*.[7] Thus Graco's own exhibit controverts its "undisputed fact" that "in every one of those tests, the injury values measured were well below" what FMVSS 213 allows. Moreover, the test "Summary" provided to the Court by Graco as Exhibit 2 actually *excluded* eleven tests where the armrests changed position or became separated from the seat during the test. (Compare Graco's Exhibit 2 with plaintiffs' *Exhibit H*).[8] The fact is that, as seen in plaintiffs' *Exhibit H*, there were 38 instances where

---

[7] The title of Graco's Exhibit 2 states that it contains crash test reports up through June 29, 2007. The last 8 tests in the exhibit are from 2009.

[8] As Graco did with its Exhibit 2, plaintiffs' *Exhibit H* is attached hereto and offered pursuant to Fed.R.Evid. 1006.

armrests either separated or changed position in Graco tests prior to the date of the McCune accident.   Graco's representation that "only nine tests . . . exhibited an armrest separation" is similarly disputed – as seen in *Exhibit H*, the real number of tests "exhibiting" an "armrest separation" prior to July 29, 2007 is actually twenty-one (21).

Plaintiffs further dispute Graco's "fact" on the grounds that, of the 38 tests where armrests either changed position or ripped out (*Exhibit H*), no less than sixteen (16) had *no injury criteria at all reported*.   (Graco's Exhibit 2, tests numbered 132, 200, 213, 215, 231, 232, 234-236, 238, 245, 250, 253-256).   How Graco can represent to the Court as an "undisputed fact" that injury values were "well below the federal requirement" in "every one of those tests" – when its own exhibit conclusively proves otherwise – is inexplicable.

Graco also asserts that NHTSA ran seven tests on the TurboBooster and "found injury values well below the federal standard on each test" – the test reports Graco relies upon for this "fact" are attached as Exhibits 3-9 to Graco's motion.   Yet *none* of these Exhibits contain any "injury values" at all, let alone data establishing that the "injury values" were "well below" the minimum required by FMVSS 213.   Nor does Graco supply the data underlying any dynamic testing that was supposedly done.   Whether Graco can supply this information is unknown; what is known is that Exhibits 3-9 do not in any way support the "undisputed fact" asserted by Graco.

Plaintiffs also dispute Graco's suggestion that a certain number of test "failures" is somehow necessary to establish a defect or impose the obligation to notify consumers or NHTSA about a defect.   The fact is that Graco has admitted in other child safety seat cases that if it has knowledge of even *one* test failure that reflects either a "compliance or safety issue," then Graco has a duty to bring that test failure to the attention of NHTSA. (*Exhibit L*, pg. 98, L. 1-6).   And in this case, Graco engineer and car seat division manager Blanchette admitted that if there was

"even one" compliance test failure, Graco would "not be able to ship" any seats.  (*Exhibit J*, pg. 37, L. 13-22).  In addition, nine (9) of the tests identified on plaintiffs' *Exhibit H* are specifically designated by Graco as "compliance" tests. (*Exhibit H*).   Yet Graco <u>never</u> stopped production to fix the problem, <u>never</u> notified NHTSA about the test failures, and <u>never</u> notified consumers about anything.  It just kept making and selling seats. (*Exhibit M*, Interrogatory No. 6).  Instead of doing what it knew it should have done, what it was obligated to do, Graco's compliance engineer stated he didn't disclose the dozens of test failures to NHTSA, including nine compliance test failures, because he "didn't want to argue the point" with NHTSA (*Exhibit A*, pg. 84, L. 3-23). This concealment was then followed by the false testimony of Graco's corporate representative Galambos in the *Scifres v. Graco* litigation (Compare, *Exhibit H* with *Exhibit K*).

Fact 6:  Disputed.  A summary of some of the more pertinent facts relating to the design history of the TurboBooster is set forth in the introductory section ("I. Background and Summary of Response") of this brief; those facts, and their cited references, are incorporated herein by reference.

Fact 7:  Disputed.  Graco's own manual for the TurboBooster establishes that use of a TurboBooster without the armrests can result in "serious injury or death" in an accident and that the seat should "**NEVER**" be used without the armrests. (*Exhibit G*). Plaintiffs' expert Gary Whitman agrees with Graco's owner's manual – his opinion is that the armrest is a crucial component of the TurboBooster and that its failure creates a number of very substantial hazards. (*Exhibit E*, Section H, pgs. 14-18; Section K, pgs. 21-26; Section P, pg. 34; Section Q, pgs. 34-35; Section T, pgs. 37-38, Section III, pgs. 39-41;  Section IV (¶¶ C, D, H, O, P), pgs. 41-43).

**Fact 8**:  Disputed. What Graco "felt" about the real consequences of armrests coming off is best summarized by what it says in the TurboBooster's owner's manual – that the seat should "**NEVER**" be used without the armrests and that violating this very express warning "increases the risk of serious injury or death . . . in a crash." (*Exhibit G*).  Moreover, of the 38 tests where armrests either changed position or ripped out (*Exhibit H*), no less than sixteen (16) had *no injury criteria at all reported*.  (Graco's Exhibit 2, tests numbered 132, 200, 213, 215, 231, 232, 234-236, 238, 245, 250, 253-256).  Further disputing this "fact" are the opinions of plaintiffs' expert Gary Whitman on the hazards of armrest separation.  (*Exhibit E*, Section H, pgs. 14-18; Section K, pgs. 21-26; Section P, pg. 34; Section Q, pgs. 34-35; Section T, pgs. 37-38, Section III, pgs. 39-41;  Section IV (¶¶ C, D, H, O, P), pgs. 41-43).

**Fact 9:** Disputed.  The armrest on the TurboBooster separated or changed position – both of which are prohibited under FMVSS 213 – in at least nine tests that were specifically and expressly designated by Graco as "compliance" tests.  (*Exhibit H*, Tests 8, 9, 22, 23, 24, 25, 26, 27 and 28).

**Facts 10-16:**  Undisputed.

## IV. Argument

### A.  Summary Judgment Standard

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  An issue is "material" where it involves a fact

that might affect the outcome of the case under the governing law.  *Burgos v. S.W. Bell Tel. Co.*, 20 F.3d 633, 635 (5th Cir. 1994).  Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Liberty Lobby*, 477 U.S. at 248.

Summary judgment is "a harsh remedy which should be granted only when the result is clear . . . ." *Marcus v. St. Paul Fire and Marine Ins. Co.*, 651 F.2d 379, 382 (5th Cir. 1981). "Summary judgment is a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use." *Tippens v. Celotex Corp.,* 805 F.2d 949, 952 (11th Cir. 1986)*, quoting*, *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967).  "Summary judgment is a lethal weapon, depriving a litigant of a trial on the issues, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment." *Id.* at 952-53.

### B.  Plaintiffs' Punitive Damages Claims

The evidence developed in this case establishes that Graco intended for the TurboBooster to be an enormously profitable product. Not only was the return on investment expected to reach nearly 400%, the market Graco was after was as much as $130 million dollars on an annual basis.  The seat was approved for production in "record" time.  It was pre-sold to big retailers, so even though there were numerous pre-production test failures, the seat went into production – "at risk." After production began, and rather than stop and fix the "problem," the needed "design fix" was assigned the lowest priority at Graco and the company devoted its resources to increasing production even more.

In the years that led up to the date of the McCune accident, Graco never once stopped production to get to the bottom of the armrest defect.  Instead, it made a few half-hearted design

changes, none of which even put a dent in the armrest failure rate (the failure rate actually increased), and it rejected the recommendations of its own engineers to stop production so that it could, instead, continue reaping a 400% return on investment.  Graco managers in charge of production even went so far as to argue that stopping to try and solve the problem would require a "long time study" that would adversely impact "capacity."   Clearly, filling orders and selling TurboBoosters was far more important to Graco then fixing a problem that its own manual for the seat said "increases the risk of serious injury or death . . . in a crash."

The law on what evidence is needed in Texas to make a submissible case on punitive damages – gross negligence – is quite clear.   "Gross negligence" requires a showing of two elements.  First, when viewed objectively from Graco's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Second, Graco must have had subjective awareness of the risk but nevertheless proceeded in conscious indifference to the safety of others. *Lee Lewis Constr., Inc. v. Harrison*, 70 SW3d 778, 785 (Tex. 2002); *Mobil Oil Co. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998).[9]

There is no requirement of "direct evidence" on either element – both can be established through circumstantial evidence.   The necessary findings can be inferred and must only transcend "mere suspicion."   *KPH Consol., Inc. v. Romero*, 102 S.W.3d 135, 145 (Tex.App. Houston 2003).  And "gross negligence" can exist even if the injury at issue is the first time the reckless conduct actually had severe consequences. *Phillips Oil Co. v. Linn*, 194 F.2d 903, 906 (5th Cir. 1952).  Finally, "some evidence of care" will <u>not</u> defeat a gross negligence finding –

---

[9]  A corporation is liable for gross negligence if it authorizes or ratifies the grossly negligent acts of its agents, or if it commits gross negligence through the acts or omissions of management level employees. *Ellender, supra*, 968 S.W.2d at 921-922.  Graco has not raised this issue in its Motion, so plaintiffs do not see a need to burden the Court at this time with the ample evidence they have developed for the specific purpose of proving the company's corporate liability.

and such "care" can include the defendant's alleged compliance with industry standards. *Harrison, supra*, 70 S.W.3d at 785; *Ellender, supra*, 968 S.W.2d at 923-924.

When these substantive principles are applied in light of the long-established rules governing summary judgment, plaintiffs have easily established a fact issue regarding gross negligence.  With respect to the objective test – that the conduct involved an extreme degree of risk and a showing that it increased the likelihood of serious injury – the record, detailed above, establishes the following:

- Before production even began, Graco *knew* that use of the TurboBooster with one or both armrests missing "increases the risk of serious injury or death . . . in a crash."

- Graco *knew* that if there was "even one" compliance test with an armrest failure, the seat could not be shipped to retailers or sold to consumers.

- Graco *knew* that each armrest was a "structural element" of the seat that had "load bearing" responsibilities and that the armrests could be torn out by crash forces; it *knew* that the seat had to be "strong enough to withstand" these crash forces.

- Graco *knew* that it went into production with the first generation seats "at risk."

- By the date of the accident, Graco *knew* of no less than 38 tests where TurboBooster armrests either ripped out or changed position in sled tests and that 31 of those failures occurred after the "at risk" production began; it knew this was a "problem" that required a "design fix" and its engineers believed that "we need to fix it."

- By the date of the accident, Graco *knew* that at least one child had been killed when the armrest of his TurboBooster came off in an accident and he was ejected from his seat.

- By the date of the accident, Graco _knew_ that none of its three half-hearted design changes (the first screw, the second, bigger screw, and the widening/lengthening of the screw boss) had worked.  It _knew_ that its last design change, the thickening of the screw boss by nearly 400%, had been delayed for over eight months since it had first been recommended and that many TurboBoosters that did not have the benefit of this change – including J.M.'s – were already in use by consumers or were sitting on the shelves of big retailers like Wal-Mart, waiting for consumers to purchase them.

This summary isn't wishful thinking about what the evidence will show, or even evidence from plaintiffs' experts – these are all actual _admissions_ by Graco and its employees.  There is much more.  (*See, e.g.*, *Exhibit E*, pgs. 14-36, 39-41).  But Graco's admissions alone are easy enough to establish, under Texas law, that Graco "objectively" knew, before J.M. was hurt, that using a TurboBooster with weak, first generation armrests involved an extreme degree of risk that increased the chance of serious injury in an accident – especially when protecting against injuries in accidents was precisely what the TurboBooster was intended to do.  *Compare, Harrison, supra,* 70 S.W.3d at 785-786 (letting employee work on high building without a life-line was, by itself, enough to satisfy "objective" prong); *Ellender, supra*, 968 S.W.2d at 922 (letting employee work around benzene enough to satisfy "objective" prong); *KPH Consol., supra*, 102 S.W.3d at 147 (hospital's knowledge that a doctor was a drug abuser was enough to satisfy "objective" prong in malicious credentialing case).

The "subjective" prong – acting in conscious indifference to known risks – is just as easy to satisfy.  Again, the admissions of Graco and its employees, detailed above, establish the following:

- Graco _knew_ that it had decided to go into production "at risk" so it could sell the seat to its big retail customers.

- Graco _knew_ that it made fixing the problem its "lowest priority" and that its top priority was building more molds to produce more seats so it could make more money.

- Graco _knew_ that with "even one" compliance test failure, the seat could not be shipped or sold – yet Graco's own test reports prove that, prior to the date of J.M.'s accident, the seat failed at least nine self-described "compliance" tests.

- Graco _knew_ that production was never stopped to fix the armrest defect because it was choosing instead to fill "huge" orders for the seat from retailers like Wal-Mart.

- Graco _knew_ that its decision to fill orders instead of stopping production to fix the defect was motivated by a desire to avoid a "long time study" and to generate astonishing, 394%, profit margins.

- Graco _knew_ that in nearly half of its crash tests where armrests came off or changed position (16 out of 38), it had not even measured injury values – while at the same time its own manual for the seat warned of "serious injury or death" if the seat was used without the armrests.

- Graco _knew_ that, to keep production going full speed without any intervention by NHTSA, it had concealed test data from the agency under the guise that it "didn't want to argue the point" (of noncompliance with the standard) with NHTSA; in at least one civil case involving an armrest failure and a dead little boy, its corporate representative lied when asked in his deposition about armrest test failures the company had experienced, admitting to only 14% of the actual number (2 out of 14).

These facts, again from Graco's own employees, reveal that despite awareness of the known risks of armrest failures ("serious injury or death"), Graco consciously decided not to fix the defect so it could feed an apparently insatiable desire to generate a truly remarkable level of profits. It subjectively knew about the risk of armrests either detaching or changing position due to lack of structural integrity – more than a 10% failure rate overall – yet its acts demonstrate that it simply *did not care* who was hurt as a result.[10] Like the defendant in *Harrison, supra*, it did nothing to stop the failures and it overtly, and actively, decided that continuing with production was far more important than worrying about the safety of the children whose lives relied on the structural integrity of the TurboBooster. 70 S.W.3d at 786.[11]

As a final observation on the punitive damages issue, plaintiffs note their concern with Graco's strategy of keeping information from this Court and submitting what seems to be, at best, misleading information in an effort to obtain summary judgment. Among other things, Graco only produced a portion of the owner's manual, deliberately leaving out the section that warned about the consequences of using a TurboBooster without an armrest. Graco misrepresented, by a large margin, the number of armrest test failures. Graco misrepresented the number of tests that contained "injury values." Whether this conduct reveals a pattern of conscious indifference with respect to the TurboBooster is not for plaintiffs to decide; what it clearly does reveal, however, is that the credibility of Graco's defenses to the punitive damages claims should be decided by a jury. Graco's motion should be denied.

---

[10] Graco's motion suggests the failure rate was a "tiny fraction" of the total tests. (Dkt. No. 86, pg. 4). Plaintiffs submit that a 10% failure rate – in a critical load-bearing component of a product specifically designed and intended to provide safety to children during the split-second it takes a car accident to occur – is not a "tiny fraction" at all but is, instead, absolutely, positively, unacceptable. Graco's "tiny fraction" argument is, in and of itself, simply more evidence of the company's conscious indifference to this defect – it just *does not care*.

[11] Graco's professed belief, now, that none of the tests were really failures, that none of the tests were really compliance tests, and that it was only aware of a "loose object" risk, are hardly dispositive. *KPH Consol., supra*, 102 S.W.3d at 153. Were this not true, the rule allowing plaintiffs to prove entitlement to punitive damages based on circumstantial evidence and "reasonable inferences" would be wholly negated.

## C.  Plaintiffs' Causation Claims

Although it sits at the core of the issue raised in Graco's motion on the causation issue, Graco does not even pay lip service to Texas law on causation in a case such as this.  In this diversity case, of course, the Court must apply Texas substantive law regarding plaintiffs' burden of proof on causation.  To satisfy their causation burden, plaintiffs need only establish that the failure of the armrest on J.M.'s TurboBooster was a "substantial factor" in causing his injuries. *Flock v. Scripto-Tokai Corp*., 319 F.3d 231, 237 (5th Cir. 2003).   Plaintiffs need not prove that the failure was the sole cause or that other causes were not involved.

Moreover, proof of causation may be supported by circumstantial evidence and reasonable inferences derived therefrom. *Id*.   Under Texas law, "causation is generally an issue of fact," *McNeil v. Wyeth*, 462 F.3d 364, 371 (5th Cir. 2006), and "expert opinion is legally sufficient to establish a causal relationship between the condition and the event." *Id*.   Indeed, establishing causation only requires "facts sufficient for a jury to reasonably infer that the defendant's acts were a substantial factor in bringing about the injury." *Flock, supra,* 319 F.3d at 237.

Applied here, plaintiffs respectfully submit that they have produced far more evidence than is needed under Texas law to make a submissible case of causation.  As seen in the response to Graco's *Daubert* attack on plaintiffs' experts Gary Whitman and Wayne Ross, M.D., the experts, both very well qualified, considered a vast amount of evidence and have offered extensive, thorough, fact based opinions on causation.  Even without the experts, the reasonable inferences from the actual facts here – especially when the standards for summary judgment are considered – make a submissible case on the causation question.  Those facts include these:

- Eyewitness Jackson testified that J.M. had the shoulder belt in its proper location just seconds prior to the collision. (*Exhibit N*, pg. 13, L. 9 – pg. 14, L. 16).

- Eyewitness Jackson testified that within seconds of the accident, he was at the McCune vehicle, saw that the booster seat armrest was broken and saw that J.M. still had the shoulder belt in front of him – yet he was slumped over.  (*Exhibit N*, pg. 18, L. 21 – pg. 19, L. 3; pg. 25, L. 1 – pg. 26, L. 2; pg. 30, L. 14 – 25).

- Eyewitness Lipsmeyer testified that within seconds of the accident, he too was at the McCune vehicle and that J.M.'s shoulder strap was "coming up from his abdomen," it was "in front of him."  The shoulder strap was not behind J.M.'s back.  (*Exhibit O*, pg. 22, L. 21 – pg. 26, L. 4).

These facts alone make a submissible case on causation – a properly positioned shoulder belt pre-crash, a broken armrest, and the shoulder belt still in front of J.M. post-crash but now terribly out of position.  Causation, even without expert testimony, is clearly a disputed issue given this fact testimony because Graco *admits* in its owner's manual for the TurboBooster, and has since the first TurboBooster rolled off the assembly line, that use of the seat without an armrest "INCREASES THE RISK OF SEROUS INJURY DEATH IN A . . . CRASH."  (*Exhibit G*).   Thus the foreseeability of J.M.'s injury – an integral element to the question of submissibility on causation – is plainly met by Graco's own manual for the TurboBooster.

If that isn't enough, and while the experts may disagree on what many of the test videotapes actually show in terms of dummy kinematics, there is at least one Graco sled test where no expert testimony is needed to see what happens when an armrest fails to manage crash loads.  In test number 7062206, the inboard armrest flexed up during the crash and was found to have been displaced by as much as 3 inches.  In other words, the armrest failed to do what Graco

engineer Shiva Menon testified it was supposed to do: distribute crash loads. (*Exhibit F*, pg. 58, L. 21 – pg. 59, L. 13).  This "screen grab" from the Graco test shows the inboard armrest failing to manage the loads – it has moved from horizontal to nearly vertical under loading from the shoulder belt:



Visibly displaced armrest under load from the shoulder belt

A screen grab from the other side of this same test shows what happens just milliseconds later when the armrest fails to do its job – the shoulder belt moves off the shoulder, all the way to the dummy's abdomen:



The shoulder belt has moved completely off the dummy's shoulder and slid to the abdomen, allowing the dummy to "rollout" from under the shoulder belt, jackknife over the belts and hit his knees with his head – just as J.M. did

The location of the shoulder belt in Test 7062206 as seen above, cutting nearly straight across the dummy's abdomen, is _precisely_ where J.M. received a visible, obvious belt mark during the crash after he rolled out from under his shoulder belt:



Test 7062206 is "missing" from the video compilation Graco submitted to the Court in support of its _Daubert_ motion attacking the opinions of plaintiffs' experts Whitman and Ross (Graco Exhibit F, Dkt. No. 90) – just like the pages that are "missing" from the owner's manual Graco submitted to the Court (Exhibit 1, Dkt. No. 87-1) and the eleven armrest test failures that are "missing" from the test summary Graco submitted to the Court (Exhibit 2, Dkt. No. 87-2).

Plaintiffs are disturbed with what appears to be Graco's pattern of only giving the Court a very limited and misleading picture of the evidence in this case in an effort to receive summary judgment. Nevertheless, at the end of the day and as the above discussion shows, plaintiffs respectfully submit that they have fulfilled their burden of showing that disputed facts are unquestionably in play here and that summary judgment on the hotly contested issue of causation would be inappropriate.

## V.  Conclusion

For the reasons set forth above, Graco's motion for summary judgment should be denied in all respects.

Respectfully submitted,

/s/ R. Douglas Gentile
Evan A. Douthit (admitted pro hac vice)
R. Douglas Gentile(admitted pro hac vice)
Douthit Frets Rouse Gentile & Rhodes, LLC
903 E. 104th Street, Suite 610
Kansas City, Missouri 64131
(816) 941-7600
(816)941-6666 Facsimile

Alan S. Loewinsohn
Loewinsohn Flegle Deary, L.L.P.
12377 Merit Drive, Suite 900
Dallas, Texas 75251-2224
(214) 572-1700
(214) 572-1717 Facsimile

Darby Doan
Haltom & Doan
6500 Summerhill Road, Suite 100
Texarkana, Texas 75503
(903) 255-1000
(903) 255-0800 Facsimile

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6th day of June, 2011, a true and correct copy of the foregoing has been served via ECF filing all counsel of record.

/s/ R. Douglas Gentile
Counsel for Plaintiffs