IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | |
|---|---|
| CHAD MCCUNE, et al. § | |
| § | |
| PLAINTIFFS, § | |
| § | |
| V. § | Case No 5:2009cv00107 |
| § | |
| GRACO CHILDREN'S PRODUCTS INC., § | |
| § | |
| DEFENDANT. § | |

**PLAINTIFFS' OPPOSED MOTION IN LIMINE (#1)
REGARDING (i) THE CAUSE OF THE ACCIDENT and (ii) THE "BELT BEHIND THE
BACK" DEFENSE AND MEMORANDUM IN SUPPORT**

Plaintiffs move the Court for an order *in limine* excluding any reference to the evidence described below, whether by testimony, exhibits, comments or argument. In the alternative, and in the event the Court does not grant this motion in limine before trial, then plaintiffs request that the Court enter an Order prohibiting any reference to the evidence in the presence of the jury unless and until Graco lays an adequate and proper foundation to make the evidence admissible.

Introduction

This case presents a rare glimpse into an international corporation that makes tens of millions of dollars annually selling specially designed safety products that are designed for the sole purpose of protecting children who are involved in automobile accidents. What the company did with the TurboBooster is simply amazing – the testimony of Graco's own engineers prove that Graco knew the TurboBooster armrests would break off in accidents, knew that without its armrests the seat could cause serious injury or death in an accident, and knew that the lack of structural integrity in the seat had to be fixed. Yet it did nothing, even ignoring the pleas of its own engineers, in a quest to capture a market worth more than $100 million dollars.

Finding it difficult to step up and defend the failure of its product on the merits, Graco has elected instead to blame Carmen McCune for everything. Even though the testimony is uncontroverted that the McCunes used safety seats to protect their children in the event of a car accident, and even though Graco cheerfully sold them a TurboBooster for that purpose, Graco seeks, by its "blame Carmen" defenses, to avoid responsibility for a safety product that undeniably broke and simply didn't do its job in this accident.

Graco's "blame Carmen" defense takes two principal tacks. First, it wants to offer lots of detailed "evidence" – such as cell phone records and an "expert" to talk about how distracting cell phones are to people driving cars – to "prove" that Carmen's negligence caused the collision. Plaintiffs, frankly, do not deny Carmen's fault in causing the collision – indeed, the actual admission as set forth in the Pretrial Order states as follows:

> Plaintiffs admit that Carmen McCune was distracted and that, as a result, her Ford struck the rear of Mr. Leonard's tractor. Carmen McCune accepts full responsibility for causing the collision between her truck and Mr. Leonard's tractor.

Graco's second attack on Carmen is based on its theory that J.M. had his shoulder belt behind his back at the moment of the collision and that all of his injuries resulted from that "misuse." Carmen, Graco says, allowed this conduct and she is therefore at "fault" for J.M.'s injuries. The problem with Graco's "behind the back" theory is that it ignores unrefuted evidence and relies, as it must, on tests that its experts deliberately, and admittedly, rigged so that the contrived result Graco wanted could be "verified." All of this evidence should be excluded.

No Reference Should Be Made To "Evidence"<br><u>As To The Cause Of The Accident</u>

Carmen McCune accepts full responsibility for causing the collision. Thus, any evidence regarding alleged cell phone use, who was being called and why, how distracting it is, how she

was driving in the minutes and hours prior to the crash, or the reasons or motivations that may have led to her being distracted, are irrelevant, cumulative, prejudicial and inadmissible. Fed.R.Evid. 402, 403.  This is especially true in this case, which focuses, under the jury instructions submitted by both parties, on whether or not the failure of the TurboBooster was "a producing cause" of J.M.'s *injuries* – not on the cause of the accident itself.  Moreover, and even under Graco's theory, Carmen's admission of fault for causing the collision will, if admissible evidence supports it, be allowed to argue that the collision itself was a "producing cause" of the injuries.  Evidence of driver "error" given Carmen's admission is irrelevant, cumulative and unfairly prejudicial.

A virtually identical issue was recently before Judge Davis in *Frazier v. Honeywell International, Inc.*, 518 F.Supp.2d 831 (E.D.Tex. 2007).  *Frazier*, like this case, was a crashworthiness case involving the failure of a safety device – in *Frazier*, the product at issue was a seatbelt.  The parties agreed that the collision at issue was 100% the fault of the driver which struck the Frazier vehicle, a driver that was using a cell phone and intoxicated.  Like the instant case, the Frazier's claim was that the injuries to their decedent were not the result of the collision, but were instead produced by the failure of the seat belt.  Judge Davis excluded all evidence relating to the cell phone use and the other driver's intoxication.  The contested issue at trial was whether the decedent was using her seatbelt and if that seatbelt was defective.

After a plaintiffs' verdict in which the drunk driver was apportioned 0% fault for the decedent's injuries (the jury found the seat belt had been worn by the decedent and was defective), defendant moved for a new trial claiming it should have been permitted to introduce evidence of the "at fault" driver's intoxication and cell phone use.  Judge Davis had no difficulty rejecting this claim, holding that because the jury "in fact had to take as true that Ms. White was

100% the cause of the accident," the proffered evidence was irrelevant and Honeywell's assertions were "without merit." 518 F.Supp.2d at 840.

In *Frazier*, the parties "stipulated" that the drunk was 100% at fault. Here – not surprisingly given the clarity of Judge Davis' holding – Graco refuses to enter into a similar stipulation. However, with or without a stipulation, the simple fact is that Carmen's fault for causing the collision is not contested. Graco may be entitled to argue that the forces from the collision itself were a producing cause of J.M.'s injuries, not the failure of its safety seat, but that does not equate to introducing cumulative, prejudicial evidence as to the facts which gave rise to the collision in the first place. The evidence should be excluded under Rules 402 and 403. *Id.*; *see also General Motors v. Burry*, 203 S.W.3d 514, 543-44 (Tex.App. 2006) (no error in refusing to admit facts underlying accident in crashworthiness case where driver fault was not disputed and evidence was cumulative of admissions).[1]

In addition, it is very important to understand that the Graco engineer who actually designed the TurboBooster and who received a patent for the seat has testified that, while the impact forces are important to him, he "doesn't care, as the designer, what *causes* the impact." He then agreed that the actual "cause" of any particular collision *is not relevant to him as a car seat designer*. The engineer's specific testimony in this case is as follows:

> Q: Did you anticipate, as a Graco engineer assigned to the TurboBooster project, that some of the cars that would be – that the TurboBooster would be involved in automobile accidents?
>
> A: Did we anticipate?

---

[1] The alleged "cell phone" evidence is, under any circumstances, inadmissible. Graco has *no* evidence as to the exact time of the accident and *no* evidence confirming that whatever time the accident did occur actually overlaps with the times identified in the cell phone billing records. In fact, the evidence in this case establishes, at best for Graco, that Carmen was on her cell phone at least one minute before the accident – and not at the time of the accident. The testimony of Graco's cell phone "expert" is inadmissible for the same reasons, and also because a jury doesn't need an expert to tell them that driving while talking on a phone can cause distractions. Fed.R.Evid. 702.

Q: Yes.

A: Yes.

Q: Did you anticipate that the TurboBooster would be in cars that would be involved in frontal collisions?

A: Yes.

Q: Did you anticipate that those cars would be involved in side impacts?

A: Yes.

Q: Did you anticipate that they would be involved in rear impacts?

A: Yes.

Q: Did you anticipate that they would be involved in roll-overs?

A: Yes.

Q: Did you anticipate that some of the accidents would be at higher speeds, like on highways?

A: Yeah.

Q: I don't want to stay on this forever, but the entire point of a safety seat, like the TurboBooster, is to get protection, as you just said, for your child in the event there is an accident, right?

A: Yes.

Q: You talked about, a minute ago, that – and would agree with me that the purpose of the safety seat is to minimize injury and maximize protection in a crash scenario, do you remember that?

A: Yes.

Q: So minimizing injury and maximizing protection in a crash scenario presumes, does it not, that a crash may occur?

A: A crash may occur, yes.

Q: Right. And that's why we're using car seats, that's why you're designing and selling them, because crashes may occur?

A:   Correct.

Q:   Accidents happen?

A:   Yes.

Q:   That's why Graco is in the business of selling safety seats?

A:   Yes.

Q:   And so a car seat, like the TurboBooster, it may have an expiration date on it that says it's good for six years, but as a design engineer, that TurboBooster has to work in the milliseconds it takes a crash to occur, fair statement?

A:   It has to work the entire time it's in the vehicle.

Q:   And it has to work the entire time, but it's really called to work the way you designed it with the sled testing and the crash loads and all the stuff you considered, it's designed to take all those things into account during the milliseconds that it takes a crash or an accident to occur, is that right?

A:   It needs to work then, yes.

Q:   It's the most important time for it to work, isn't it Mr. Crane?

A:   It's certainly an important time, yes.

Q:   Is there anything more important for a car seat to do then provide protection in a crash?

A:   I think that's the most important.

Q:   As a designer of a child safety seat, does it matter to you if the cause of an accident is, say, an armadillo running out in the road? Does that make any difference to you?

A:   No, it makes no difference.

Q:   You don't care, as the designer, what causes the impact?

A:   Right.

Q:   There's an endless series of ways impacts can occur, right?

A:   Correct.

| | | |
|---|---|---|
| Q: | So back to kind of the earlier question, in a broad sense, as an engineer, those things aren't relevant to you, as a designer, when you're putting pencil to paper and sketching out, like you did here with the TurboBooster, right? | |
| A: | These things aren't relevant, that's what you're asking? | |
| Q: | Yes. The cause of the crash, not the impact forces that come from it, the cause of the crash? | |
| A: | Generally, yes. | |
| Q: | I mean, the point of the seat is to provide protection in the event an accident happens, as unfortunate as that might be, right? | |
| A: | Correct. | |

(*Exhibit A*, pgs. 80 – 106). If the designer of the TurboBooster concedes, as he must, that he "didn't care" about "what causes the impact," then what possible relevance can the "cause" of this particular collision have in this case? It has none, and blaming Carmen is not only contrary to the design intent of the TurboBooster, it raises a remote, false issue that is bound to confuse the jury and result in an enormous waste of time. It is, therefore, inadmissible under Fed.R.Evid. 402 and 403. *See* V.T.C.A. § 33.004(a); *Green v. Schutt Sports Mfg. Co.*, 369 Fed.Appx. 630, 635-36, 2010 WL 935440 (5th Cir. 2010).

The Fifth Circuit recently decided a product liability case involving a highly analogous situation in *Green*. The plaintiff in *Green*, a high-school football player, sustained devastating injuries resulting in quadriplegia when he tackled another player during a scrimmage with an opposing team. He later sued the helmet manufacturer and asserted several claims, including manufacturing defects, defective design, and negligence. Like Graco, the helmet manufacturer sought to compare responsibility with the plaintiff. But the manufacturer's arguments regarding the plaintiff's role in the causation of his injury were limited to contentions that the plaintiff *tackled* his opponent *improperly*. *Id*. at 636. In other words, the plaintiff's act of playing

football was *not* considered for comparative responsibility purposes. Only his allegedly improper *use* of his safety helmet was at issue. A virtually identical limitation is warranted here.

Just as the manufacturer in *Green* was limited to comparing responsibility based on plaintiff's *use* of the helmet (his tackling technique), Graco should be limited, assuming admissibility of the "behind the back" theory, to comparing responsibility based on Mrs. McCune's conduct in allegedly allowing J.M. to put his shoulder belt "behind his back."[2] Her role in the collision is akin to the *Green* plaintiff's act of playing football, in that the causal link to the injuries sustained in both cases is similarly remote. Consequently, Graco should be precluded at trial from offering any evidence suggesting that the collision itself was a cause of J.M.'s injuries. Furthermore, Graco should not be able to reference the conduct whatsoever, as it is not relevant for any other purpose, and its prejudicial effect highly outweighs any probative value it may have. *See* Fed. R. Evid. 403. At a minimum, the details behind the collision – especially given Carmen's admission – are simply not relevant.

Finally, under Texas law, the doctrine of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party. *Eckland Consultants v. Ryder, Stilwell*, 176 S.W.3d 80, 87 (Tex.App. 2004). Unlike equitable estoppel, quasi-estoppel requires no showing of misrepresentation or of detrimental reliance. *Id*. Based on Mr. Crane's unequivocal testimony, it is indisputable that the cause of a collision was not relevant to Graco for purposes of designing the TurboBooster child safety seat. The doctrine of quasi-estoppel therefore precludes Graco from asserting comparative responsibility claims against Mrs. McCune based on her conduct related to the cause of the collision – an assertion totally inconsistent with the position taken by the Graco engineer responsible for the design of the TurboBooster. If the cause of the collision in this case was not relevant to the designer of the

---

[2] As will be seen *infra*, the "behind the back" theory is not admissible either.

TurboBooster, it should not be relevant to the jury in assessing fault. Therefore, Graco should be precluded from introducing any evidence purporting to apportion responsibility to Mrs. McCune based on her conduct related to the collision.

### No Reference Should Be Made That J.M.'s Shoulder Belt Was "Behind His Back" At The Time Of The Collision

Plaintiffs anticipate that Graco will heavily rely on the unsupported assertion that J.M. had his seat belt's shoulder strap behind his back at the time of the collision – a "theory" created out of thin air by Graco's experts that is contradicted by unrefuted fact witness testimony. Graco's experts ignored this fact testimony, assumed that the shoulder belt was behind the back, and then admitted to having to rig several tests to concoct "evidence" to support the claim. Since the rigged tests ignore the fact witness testimony, and had to be rigged to get the results Graco sought, none of this evidence is admissible. Fed.R.Evid. 402, 403, 702, 703.

Under the Federal Rules of Evidence, expert opinions lack adequate indicia of reliability and validity when they are based on assumptions that are contradicted by undisputed evidence in the record. *See Houston-Hines v. Houston Independent School Dist.*, 2006 WL 897209 at *3 (S.D. Tex. April 4, 2006) (expert opinions criticizing a police officer for failing to call for backup were excluded when the uncontroverted evidence established that the officer did call for backup); *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (when indisputable record facts contradict or otherwise render an expert's opinion unreasonable, it cannot support a jury's verdict). Furthermore, Texas law similarly recognizes that "[w]hen an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment." *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995).

In this case, plaintiffs anticipate that Graco's experts will seek to offer the opinion that J.M.'s shoulder strap was behind his back at the time of the collision. But this opinion is directly contrary to the undisputed eyewitness testimony. One eyewitness, driving a vehicle that was passed by the McCune Ford literally seconds *before* the collision, looked through the window at J.M. as the McCunes passed him and saw the shoulder belt in *front* of J.M.'s chest. Bobby Jackson testified as follows:

> Q: Now, sir, as the (McCune) car went past you, did you – were you able to see the seat belt on the little boy who was sitting closest to you?
>
> A: Like I say, they all had seat belts.
>
> Q: And I want to be real specific about the little boy's seat belt. Were you able to see the shoulder strap that he was wearing?
>
> A: He had a shoulder strap on.
>
> Q: All right. And was that shoulder strap in front of his body?
>
> A: Of course.
>
> Q: So just so we're very clear, I want to be sure I understand. That shoulder strap was in front of his chest and in front of his shoulder and going across his body like you just demonstrated?
>
> A: Yes.
>
> Q: Was it – did you at all think it could have been behind his back?
>
> A: Of course not.

(*Exhibit B*, pgs. 13–14). Mr. Jackson saw the collision – it happened right in front of him – and he immediately stopped his car and ran to the driver's side of the McCune vehicle. He described how he found J.M. in the backseat after the collision:

> Q: Now, when you first saw J.M. in the backseat of his mom's car, was he unconscious or was he moving around?
>
> A: He was – he was out. He was unconscious.

> Q: Now, I just want to make sure the record is real clear. Are you sure that when you first looked in and saw J.M. still in his booster seat that he had his shoulder strap on and his seat belt on like what we see in plaintiffs' Exhibit 5?
>
> A: Yes.[3]
>
> Q: And you're 100 percent sure about that?
>
> A: I'm 100 percent sure.
>
> Q: That he still had his shoulder harness in front of him?
>
> A: Yes.
>
> Q: Are you sure that you remember seeing J.M. in the back seat with his seat belt on and his shoulder strap in front of him just like you've described to us today after this wreck?
>
> A: Yes.
>
> Q: Are you 100 percent certain that after this crash, when you first came to that driver's side door . . . that J.M. had his shoulder strap still in front of his body after the crash?
>
> A: Yes, I am sure.
>
> Q: Sir, if Graco or any of its hired experts told this judge or the jury in this case that J.M. had his shoulder strap behind his back at the time of this wreck, would that be true or false?
>
> A: That'd be false.

(*Exhibit B*, pgs. 30–32, 41–42). Mr. Jackson's testimony is corroborated by the testimony of Robert Lipsmeyer, a professional truck driver who also saw the collision occur and was at the passenger side of the McCune vehicle within seconds:

> Q: Did the – did the little boy, J.M., did he appear to be conscious to you at all?
>
> A: No, none.

---

[3] A copy of the "Exhibit 5" referred to by Mr. Jackson is attached hereto as *Exhibit C*. The photograph depicts a surrogate child who has lost the restraint of a shoulder belt but still has the shoulder belt in front of his body.

| | | |
|---|---|---|
| Q: | | Did you see him moving or anything? |
| A: | | None. |
| Q: | | Now, when you saw J.M. in the backseat just shortly after the wreck . . . did you see a shoulder strap behind J.M.'s back like what is pictured in plaintiffs' exhibit 6? |
| A: | | No, no.[4] |
| Q: | | It (the shoulder belt) was coming up from his abdomen, like in plaintiffs' exhibit 9 that we looked at earlier? |
| A: | | Yeah, yeah, yes. |
| Q: | | And when you saw him then, the shoulder strap was in front of him and coming up from his stomach somewhat or very much like we see in plaintiffs' exhibit number 9? |
| A: | | Yes, I would say so. Yeah.[5] |
| Q: | | So, sir, if somebody tried to say that J.M. had his shoulder strap behind him after this wreck, that would not be consistent with what you know and what you saw, is that a fair statement? |
| A: | | Yes. |
| Q: | | If somebody said that the shoulder strap was behind him, would that be true or would that be false based on what you know? |
| A: | | That would be false. |
| Q: | | (By Graco's counsel) Do you think it's possible that the shoulder portion of the belt was behind him? |
| A: | | No. |

(*Exhibit D*, pgs. 20–26; 33). This testimony cannot be ignored by Graco or its experts. *Houston-Hines v. Houston Independent School District*, 2006 WL 897209 at *2-3 (S.D.Tex. 2006); *Fail-*

---

[4] A copy of the "Exhibit 6" referred to by Mr. Lipsmeyer is attached hereto as *Exhibit E*.

[5] A copy of the "Exhibit 9" referred to by Mr. Lipsmeyer is attached hereto as *Exhibit F*. This surrogate child has lost the restraint of his shoulder belt but it is still in front of him.

*Safe, L.L.C. v. A.O. Smith Corp.*, 744 F.Supp.2d 870, 889 (E.D.Wis. 2010) ("cherry picking" facts while ignoring others destroys admissibility of expert opinion); *In Re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation*, 524 F.Supp.2d 1166, 1176 (N.D.Cal. 2007) (same); *LeClercq v. The Lockformer Co.*, 2005 WL 1162979 at *4 (N.D.Ill. 2005) (Same). Yet that is precisely what Graco's experts did. Absent a proper factual foundation, the "behind the back" opinions of Graco's experts are inadmissible under Fed.R.Evid. 702 and 703. *Houston-Hines, supra*.

The necessary "facts" are not supplied by any testing performed by Graco either. In this regard, Van Arsdell ran *no* test proving that the armrest can physically be pulled off the seat with the shoulder belt *behind* the crash dummy's back. In the one test he did run with a properly installed armrest and the shoulder belt behind the back (Test #3), the armrest *did not fail*. This is consistent with Graco's non-litigation testing – *no* test has *ever* shown that a properly installed armrest can be pulled off by a shoulder belt that is *behind* the child dummy. In fact, in the dozens of instances where armrests were ripped off in Graco's testing, the shoulder belt was *always*, 100% of the time, in its optimal, as-designed position: in front of the dummy. This is because the dummy moving into the shoulder belt is what causes the load that pulls the armrest off, and that load is literally non-existent when the shoulder belt is behind the dummy's back.

Having failed to get an armrest pull-out/failure with the shoulder belt behind the back using a properly installed armrest, Van Arsdell elected to rig his last two tests (Tests 5 and 6). In fact, he did more than rig the tests – he modified the armrest installation to a point where it substantially and materially differed from the condition that the parties have *stipulated* it was in at the time of the collision.[6] Specifically, Van Arsdell's tests were run *without* snapping the

---

[6] Graco has stipulated that the armrest on J.M.'s seat was properly snapped into place and installed, using the Graco provided screw, in full compliance with all of Graco's assembly instructions. (Joint Pretrial Order, ¶ E(5)).

13

armrest into place and *without* using a screw. Basically he just "set" the armrest on the base *without attaching it in any way*.[7] The armrest then popped off during the tests – proof, Graco says, that a shoulder belt behind the back can pull off an armrest and that this is what happened to J.M. Yet Van Arsdell's tests have no relationship, even arguably, to the *stipulated* condition of J.M.'s TurboBooster *as it existed at the moment of the collision*. The tests are plainly inadmissible as being completely without foundation and carrying no probative value. They are truly the epitome of junk science at its worst.

Moreover, testing, to be even theoretically admissible, must bear a substantial similarity to the facts of the case – particular when they are relied upon by experts as the foundation for their opinions and purport to "recreate" the incident. *General Motors v. Gayle*, 951 S.W.2d 469, 475 (Tex. 1997) ("A party may not 'rig' a test by unilaterally selecting parameters which are dissimilar from those surrounding the underlying accident."); *Barnes v. General Motors Corp.*, 547 F.2d 275, 276-278 (5th Cir. 1977) (reversible error to allow dissimilar testing); *Shipp v. General Motors Corp.*, 750 F.2d 418, 427 (5th Cir. 1985) (test properly excluded where conditions not substantially similar); *Muth v. Ford Motor Company*, 461 F.3d 557, 565-67 (5th Cir. 2006) (same); *Hafstienn v. BMW of North America*, 194 Fed.Appx. 209, 212-213 (5th Cir. 2006) (same). Here, it is undisputed, indeed it has been stipulated, that the armrest of J.M.'s TurboBooster was, at the time of the accident, snapped in place with the retention screw correctly installed. The two tests without properly installed armrests are clearly inadmissible and would, if admitted, be unfairly prejudicial and very confusing and misleading to the jury. It would be reversible error to admit these tests and any opinions based thereon.

---

[7] Van Arsdell's report states at page 9 that "in Tests 5 & 6, the left armrest was inserted into the base of the CRS, *but was not snapped into place and was not secured with the supplied screw*." (Emphasis added).

Without these "tests," Graco has no evidence – none – to support its specious affirmative defense that Carmen McCune is at "fault" for allowing J.M. to put his shoulder belt behind his back.[8]  The "behind the back" defense is entirely contrived and based on bogus, rigged tests that are inadmissible under Fed.R.Evid. 402, 403, 702 and 703.  As such, the "behind the back" theory should not be referenced, argued, or discussed in front of the jury, and no evidence on the subject should be admitted.

Respectfully submitted,

/s/ R. Douglas Gentile
Evan A. Douthit (admitted pro hac vice)
R. Douglas Gentile (admitted pro hac vice)
Douthit Frets Rouse Gentile & Rhodes, LLC
903 E. 104th Street, Suite 610
Kansas City, Missouri 64131
(816) 941-7600
(816) 941-6666 Facsimile
Alan S. Loewinsohn
Loewinsohn Flegle Deary, L.L.P.
12377 Merit Drive, Suite 900
Dallas, Texas 75251-2224
(214) 572-1700
(214) 572-1717 Facsimile

Darby Doan
Haltom & Doan
6500 Summerhill Road, Suite 100
Texarkana, Texas 75503
(903) 255-1000
(903) 255-0800 Facsimile

ATTORNEYS FOR PLAINTIFFS

---

[8] Specifically, plaintiffs seek to exclude test #3 (shoulder belt behind the back with proper armrest installation), test #5 (armrest not installed per the stipulated fact in this case), and test #6 (armrest not installed per the stipulated fact in this case) and all opinions and evidence based thereon.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 22nd day of July, 2011, a true and correct copy of the foregoing has been served via ECF filing on all counsel of record.

/s/ R. Douglas Gentile
Counsel for Plaintiffs

## **CERTIFICATE OF CONFERENCE**

On July 15, 2011, the undersigned conferred with counsel for defendant, Joseph Krasovec, regarding the relief requested herein. The parties were unable to agree to this motion.

/s/ R. Douglas Gentile
Counsel for Plaintiffs