UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| CHAD MCCUNE AND CARMEN MCCUNE, | § | |
| INDIVIDUALLY AND AS NEXT FRIENDS | § | |
| OF J.M., A MINOR, | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | Case No. 5:09-cv-107 |
| | § | JURY DEMANDED |
| GRACO CHILDREN'S PRODUCTS, INC. | § | |
| | § | |
| DEFENDANT. | § | |

## FOURTH AMENDED COMPLAINT

Plaintiffs Chad and Carmen McCune, individually and as next friends of J.M., a minor,

("Plaintiffs") for their claims and causes of action against Defendant, state and allege as follows.

## PARTIES

1.     Plaintiff Chad McCune is an adult, a resident of Collin County, Texas, is the

natural father of J.M., and brings this suit individually and as next friend of J.M.

2.     Plaintiff Carmen McCune is an adult, a resident of Collin County, Texas, is the

natural mother of J.M., and brings this suit individually and as next friend of J.M.

3.     J.M. is the minor son of Chad and Carmen McCune and was born on September

17, 2002.

4.     Defendant Graco Children's Products, Inc. ("Graco") was, at all relevant times, a

foreign corporation organized and existing according to the laws of Delaware with its principal

place of business in Pennsylvania.  At all relevant times, Graco regularly did business in Texas,

has committed tortious acts in Texas and its products, including the child safety seat involved in

this case (the "TurboBooster"), are regularly sold and used by consumers in Texas.  Graco has,

therefore, submitted itself to the jurisdiction of this Court.

5.      The "TurboBooster" child safety seat that is the subject of this litigation was sold by Wal-Mart as a booster safety seat for the intended use and benefit of J.M.  The seat was purchased by J.M.'s grandmother, Tina McCune, within the Eastern District of Texas for the specific use and benefit of Chad and Carmen McCune, as well as J.M.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332.  Plaintiffs and Defendant to this action are of diverse citizenship.  The amount in controversy exceeds $75,000 exclusive of interests and costs.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## PROCEDURAL AND FACTUAL BACKGROUND

7.      J.M.'s grandmother, Tina McCune, purchased a "TurboBooster" safety seat for the specific use and benefit of Plaintiffs, including J.M., on or about December 10, 2006 at a Wal-Mart store within the judicial district of the Eastern District of Texas.

8.      The subject TurboBooster safety seat is identified as Model Number 8491RGB, Serial Number JJ0402050720415, Date of Manufacture April 2, 2005.

9.      The TurboBooster safety seat was designed, tested, molded, manufactured, packaged, labeled and marketed by Graco.  Graco is a "manufacturer" of the safety seat as defined in Chapter 82.001(4) of the Texas Civil Practices and Remedies Code.

10.     On or about July 29, 2007, J.M. was, according to the information provided by Defendant, the proper size and weight to use the TurboBooster – he was four (4) years old and weighed approximately forty (40) pounds.  On that date, J.M. was a right rear seat passenger in a 2006 Ford Explorer.  J.M. was using his "TurboBooster" in a reasonably anticipated, expected and foreseeable manner when the Explorer was involved in a frontal collision with offset to the

left.

11.     The subject TurboBooster safety seat was in the same condition just prior to and at the time of the collision as when it was sold by Defendant.

12.     J.M.'s occupant space inside the Explorer was preserved and intact throughout and after the collision – it was more than adequate to allow for an occupant of J.M.'s size to safely ride down the crash forces present in the collision without sustaining serious injury had J.M. been restrained in a properly designed child safety seat.

13.     The TurboBooster was defective and unreasonably dangerous in that it was not adequately designed, tested, molded, manufactured or labeled to minimize the risk of injury or death or to provide safe and effective restraint to children.   By way of example and without limitation, the safety seat was defective and unreasonably dangerous in the following ways:

   a.   The safety seat failed to prevent – and actually fostered – shoulder rollout, belt slippage and slack, and/or submarining;

   b.   The safety seat failed to provide adequate upper torso and pelvic restraint and/or to adequately distribute crash loads;

   c.   The safety seat failed structurally in several ways in the collision, including the failure of the base retention system, the failure of mechanical fastening devices designed to keep the left side arm rest attached to the base, and a complete separation of the left side armrest from the seat;

   d.   The safety seat failed to comply with the minimum federal standard, FMVSS 213, in at least the following way –it structurally failed in this collision (and in other accidents and tests);

   e.   The testing performed by Graco on the safety seat was woefully inadequate and insufficient to provide a reasonable assurance that the seat complied with the applicable federal standard or that it would provide safety to young children in foreseeable collisions or crashes;

   f.   The testing that Graco did perform or otherwise knew of made it clear that the design of the TurboBooster was flawed, that the seat violated Graco's own internal design standards and other standards that define a minimum level of

safety, and that a loss of restraint was inevitable in foreseeable crashes – yet Graco did nothing to investigate these test failures, determine their causes and eliminate the causes of the failures;

g.   The design of the safety seat failed to incorporate any margin of safety to allow for factors such as, for example, tolerances, variances, environmental effects and foreseeable loading conditions.

14.     Because of the safety seat's defective and unreasonably dangerous condition, the TurboBooster failed to properly restrain J.M., the safety seat broke and failed, and J.M.'s body was not restrained in the crash.  J.M. was permanently and seriously injured as a proximate result of these failures and is now a quadriplegic who is on a ventilator for extended periods of time.

15.     Safer alternative designs existed at the time of the safety seat's design, manufacture, at the time of its sale and at the time of the accident, any one of which would, in reasonable probability, have prevented the injuries to J.M.  These alternative designs were both economically and technologically feasible at all relevant times by the application of existing scientific knowledge.

16.     In addition to the defects outlined above, Defendant also failed to provide adequate warnings and information regarding the unreasonably dangerous design of the TurboBooster safety seat.  Specifically, by early 2005, and unquestionably by the date of the accident, multiple tests had been run by Graco or on its behalf in which TurboBooster safety seats failed in a manner similar to that experienced by J.M.'s seat in the collision at issue; dozens of other tests run by Graco or on its behalf also revealed similar failures as well as a general loss of restraint even when no structural failure occurred.  Graco knew about these failures, knew that it had not determined why these failures were occurring, knew that a "fix" was necessary, and knew that parents and caregivers would never know about these failures unless it disclosed the information.

17.     All of the information contained in paragraph 16 was actually known to Graco, prior to the time J.M.'s "TurboBooster" was sold and by the date of the accident.  Nevertheless, when Graco sold the "TurboBooster," it failed to provide any of this information to the public or to the users and consumers of the safety seat, and it failed to warn the public and the users and consumers of the safety seat about the inherent dangers in using the seat with children who would be better protected in seats with full harnesses.

18.     Graco failed to provide any of the information contained in paragraph 16 above to Tina McCune or J.M.'s parents at any time prior to or after the purchase of the "TurboBooster," and it failed to warn or provide information to Tina McCune, or to J.M.'s parents.  Defendant's failures in this regard resulted in defects in the TurboBooster's labeling, instructions, warnings and other informational materials.

19.     Prior to July 29, 2007, Graco had actual knowledge that its "TurboBooster" safety seats were failing in tests, that loss of restraint was occurring, that the failures would result in the degradation or absence of restraint and that children who experienced these kinds of failures would be at substantially increased risk of death or serious injury in the event of a collision.

20.     Prior to July 29, 2007, Graco sold a "TurboBooster" safety booster seat to Tina McCune.  Tina McCune was induced to purchase the safety seat, and Chad and Carmen McCune were induced to use it with J.M., because of numerous express and implied promises, representations, assurances and/or affirmations that were given to them by Graco, including but not limited to the following:

a.     They believed that Graco was a trustworthy company with expertise in the design, testing, manufacturing, labeling and use of child safety seats, that they could confide in and rely upon these companies when selecting and using a safety seat

for J.M., and that if any information critical or material to the selection and safe use of the product was known to these companies, it would be provided;

b.      They believed the safety booster seat was a safety seat and that it would provide safety to J.M. in automobile crashes;

c.      They believed the safety booster seat would provide effective, optimal restraint for J.M. in foreseeable automobile crashes.

21.     Prior to July 29, 2007, Graco concealed and otherwise failed to disclose to Tina McCune, and to each of the Plaintiffs, numerous facts, including but not limited to the following:

a.      That they *knew* that testing had shown structural deficiencies in the seat that had resulted in the loss of restraint and that the loss of restraint could cause serious injuries that would have been prevented by the use of non-defective safety seats;

b.      That they *knew* that the TurboBooster performed poorly in testing, had repeatedly failed to comply with Graco's internal standards and needed to be "fixed," even when it did not break apart or suffer structural failure, and that shoulder rollout, belt slippage and slack, and/or submarining were likely results of certain foreseeable collisions;

c.      That they *knew* the "TurboBooster" would not adequately protect a child who could not yet utilize an automobile's seatbelt system during a collision and that it could actually enhance injuries to such children in that its design permitted and encouraged (i) excessive upper torso movement and head excursion, (ii) head impact with the interior of the automobile, (iii) spinal cord injuries, and (iv) partial ejection of the child from the seat.

22.     At all relevant times, neither Tina McCune nor J.M.'s parents had any knowledge, actual or constructive, of any of the facts alleged above.  At the same time, Defendant knew or had reason to know that these and other similarly situated persons lacked such knowledge and that they would not realize the dangerous propensities of the TurboBooster, particularly in the face of attention grabbing point of purchase information that conveyed the message that the TurboBooster provided safety and was unquestionably suitable for children such as J.M.

**FOURTH AMENDED COMPLAINT** – Page 6

23.     On or about September 14, 1999, the Administrator of NHTSA, Ricardo Martinez, M.D., sent a letter to Graco which stated, among other things, the following:

a.      As a key protective device for our Nation's children, child restraints must be designed and constructed with the highest levels of safety in mind.

b.      Our review of NHTSA's compliance test results during the past few years indicates that many restraints have been engineered to barely comply with some of the most safety-critical requirements of the standard, rather than being designed with larger compliance margins.

c.      With the safety of our Nation's children at issue, mere compliance with the minimum requirements of the standard is not enough; minimum standards should not be the most in safety design that manufacturers provide.

d.      When products are engineered with narrow compliance margins, the level of safety risk increases, even if the product is in technical compliance with the minimum standard.

e.      I am urging each manufacturer of child restraints to ensure that these restraints perform well beyond the minimum requirements of our standard.  American families expect, and deserve, no less.

f.      It is up to the manufacturers of these critically important safety devices to take on the responsibility of maximizing child safety in all respects.

24.     Graco received and read the letter from Ricardo Martinez, M.D. referred to in the preceding paragraph.

25.     Despite the passage of about eight (8) years between the time Graco received and read the letter from Ricardo Martinez, M.D. referred to above (on or about September 14, 1999) and J.M.'s accident (July 29, 2007), Graco did nothing whatsoever to change either the design or labeling of the TurboBooster to ensure that it performed well beyond the minimum requirements of the standard, nor did it do anything to ensure that the seat had been designed and constructed with the highest levels of safety in mind or to maximize child safety in all respects.  In fact, Graco did the opposite and, among other things, rushed the seat into production without adequate

<u>**FOURTH AMENDED COMPLAINT**</u> – Page 7

testing and with full knowledge that the seat was continuing to suffer structural failures and loss of restraint in tests, and had several other problems that needed to be "fixed."  These problems continued, and were still not "fixed" by the time of J.M.'s accident.  Despite its knowledge, Graco did nothing to pass on to consumers what it knew about the failures of the TurboBooster or of the design defects in the TurboBooster and, in fact, it actively concealed all of this information.

## <u>Count I: Strict Liability</u>

26.     Plaintiffs incorporate and reallege the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

27.     Defendant was, at all relevant times, engaged in the business of labeling, packaging, , selling, , warning and otherwise distributing and placing in the stream of commerce the TurboBooster at issue in this lawsuit.   In addition, Graco was in the business of researching, developing, designing, testing, molding, producing, assembling and manufacturing TurboBooster safety seats.  These transactions were essentially commercial in nature.

28.     Tina McCune, on behalf of J.M. and for the direct benefit and use of the Plaintiffs, purchased the TurboBooster.

29.     The TurboBooster reached Plaintiffs and J.M., the ultimate users and consumers of the product, without any substantial change in its condition from the time it was sold by the Defendant.

30.     The TurboBooster, when it reached Plaintiffs and J.M., was in a condition that was unreasonably dangerous to the ultimate user or consumer, taking into consideration the utility of the seat and the risks involved in its use.  The TurboBooster was dangerous to an extent

beyond that which would be contemplated by the ordinary user or consumer who purchased it with the ordinary knowledge common to the community as to the product's characteristics.

31. The TurboBooster was defective and unsafe for its intended purposes at the time of its design, testing, molding, manufacture and sale by Defendant. The product was defectively designed, defectively tested, defectively manufactured, defectively labeled, and unreasonably dangerous to Plaintiffs in that the design, testing, manufacture and labeling of the safety seat made it unsafe and dangerous for numerous reasons, including but not limited to the reasons set forth above.

32. At the time the subject TurboBooster left the possession of Defendant, there were safer alternative designs to that used in the subject TurboBooster, any one of which would have significantly improved the safety seat's crashworthiness and thereby prevented or significantly reduced the risk of injury that resulted in Plaintiffs' damages, without substantially impairing the safety seat's utility. These alternative designs were both economically and technologically feasible by the application of existing or reasonably achievable scientific knowledge at the time the subject TurboBooster left the control of Defendant.

33. Plaintiffs' injuries were a direct and proximate result of, and were produced by, the product's defective and unreasonably dangerous condition as more fully described above. Absent the defects in the TurboBooster, J.M. would not have sustained any permanent injuries in the accident.

34. As a direct and proximate result of the Defendant's designing, testing, molding, manufacturing, labeling, selling, warning and otherwise distributing and placing in the stream of commerce the TurboBooster at issue in this lawsuit, J.M. suffered severe and disabling injuries.

35.     Plaintiffs further allege that such defects in the design, testing, manufacture and labeling of the TurboBooster, singularly or in combination, were a producing cause of Plaintiffs' injuries and damages.

36.     J.M. has suffered severe physical, emotional and financial injuries that will be permanent. J.M.'s mental and physical conditions will continue to deteriorate, and in all reasonable probability, will cause him to suffer the consequences and ill effects of those injuries for the balance of his natural life.

37.     More specifically, Plaintiffs are entitled to the recovery of damages in this case, including but not limited to the following:

    a.     The physical pain and mental anguish experienced by J.M. in the past associated with J.M.'s severe injuries;

    b.     The physical pain and mental anguish experienced by J.M. which will, in all reasonable probability, continue in the future;

    c.     The loss of mental and intellectual function, which has occurred in the past, associated with J.M.'s injuries;

    d.     The loss of mental and intellectual function, which will, in all reasonable probability, continue in the future;

    e.     The physical impairment experienced by J.M. in the past;

    f.     The physical impairment which will, in all reasonable probability, continue in the future;

    g.     The loss or reduction in earning capacity which, in reasonable probability, J.M. will sustain in the future;

h.   The reasonable and necessary medical expenses that, in reasonable probability, will be sustained in the future after J.M. reaches the age of eighteen;

i.   The reasonable and necessary funds for special education associated with J.M.'s injuries that will, in reasonable probability, be necessary after J.M. reaches the age of eighteen;

j.   Reasonable and necessary medical expenses incurred by Plaintiffs on behalf of J.M. in the past that were incurred for necessary care and treatment of J.M.'s injuries, all of which were reasonable and were the usual and customary charges made for such services in the communities in which the services were rendered;

k.   Reasonable and necessary medical expenses which, in reasonable probability, will be incurred by Plaintiffs on behalf of J.M. in the future until J.M. reaches the age of eighteen;

l.   Reasonable and necessary, and increased, costs of education incurred by Plaintiffs on behalf of J.M.. in the past associated with J.M.'s injuries; and

m.   Reasonable and necessary, and increased, costs of education incurred by Plaintiffs on behalf of J.M. that, in reasonable probability, will be incurred in the future until J.M. reaches the age of eighteen.

38.   The conduct of the Defendant, as set forth herein, was so outrageous and improper as to constitute willful, wanton and reckless disregard for the safety of J.M.

39.   The Defendant showed a reckless disregard for the public safety due to its acts and omissions as set forth in this Complaint. The Defendant knew, or should have known, that

there was a substantial and unnecessary risk of injury to the children who used its product and it failed to either determine the seriousness of the danger or reduce the risk to an acceptable minimal level.  By way of example and without limitation, long prior to July 29, 2007 (the accident date), Graco was objectively and subjectively aware that (i) the safety seat had structurally failed in dozens of tests and that, even when it did not fail, it allowed excessive head excursion, the loss of optimal shoulder belt restraint, and shoulder rollout; (ii) it had failed to properly investigate the reasons for the structural failures or the loss of restraint and could not explain these failures; (iii) because it failed to understand the reasons for the failures, it made inadequate and poorly conceived design changes in its efforts to eliminate the hazards to children that were created by the structural failures and the seat's inherently defective design; (iv) it had done nothing to eliminate shoulder belt slippage and rollout even when the safety seats did not structurally fail, despite knowing that slippage and rollout resulted in excessive head excursion and the potential for catastrophic injuries; (v) it had ignored and would continue to ignore the strong urging from the Administrator of NHTSA that safety seats should be designed with the highest levels of safety in mind, that the minimum government standards should not be the most in safety design that manufacturers provide, and that it is up to the manufacturers to take on the responsibility of maximizing child safety in all respects; and (vi) it knew that technologically and economically feasible alternative designs were available that were far superior to the design Graco used with the TurboBooster, designs that Graco had access to – yet it chose to ignore these alternative designs in their entirety in the design of the TurboBooster.  These omissions by Graco, when viewed objectively from Graco's standpoint at the time it built and sold the TurboBooster at issue, and at the time of the accident, involved an extreme degree of risk to the Plaintiffs and young children considering both the probability and magnitude of the potential

harm.  Moreover, Graco had actual subjective awareness of the risks involved, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of the Plaintiffs. These acts and omissions constitute gross negligence and malice (as defined in Chapter 41, Section 41.001(7)(B), Tex. Civ. Prac. & Rem. Code) and entitle Plaintiffs to the recovery of exemplary damages.

### Count II: Negligence

40.     Plaintiffs incorporate and reallege the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

41.     Defendant had a duty to exercise reasonable care in designing, testing, molding, developing, manufacturing, labeling, supplying, selling, warning and otherwise distributing and placing in the stream of commerce the TurboBooster at issue in this lawsuit.

42.     Defendant failed to exercise reasonable care in designing, testing, molding, developing, manufacturing, labeling, supplying, selling, warning, and otherwise distributing and placing in the stream of commerce the TurboBooster at issue in this lawsuit given the seat's defective and unreasonably dangerous conditions as described above.

43.     Defendant had a duty, once they learned of any potential problems with the TurboBooster, to perform an adequate inquiry and to ensure that other TurboBoosters, including J.M.'s, were not designed, tested, molded, developed, manufactured, labeled, supplied, sold, contained warnings, or were otherwise distributed and placed in the stream of commerce in the same way.

44.     Defendant had a duty, once it learned of any potential problems with the TurboBooster, to adequately notify users and consumers of the hazards and risks associated with the TurboBooster.

45.     Defendant knew, or should have known, that the defects associated with the TurboBooster created an unreasonable risk of bodily harm to anyone using the product.

46.     Despite the fact that Defendant knew, or should have known, that the TurboBooster could cause serious and life threatening injuries to anyone who used it, Defendant took inadequate steps to notify consumers of this danger and to prevent the safety seat from being used by children like J.M.

47.     Defendant knew, or should have known, that it was foreseeable that children, such as J.M., would suffer injuries as a result of Defendant's failures to exercise ordinary care as set forth herein.

48.     Defendant's acts and omissions as described above constitute negligence, as that term is defined in the law, which proximately caused injuries to Plaintiffs, as well as other injuries and damages set forth herein.

49.     Defendant's acts and omissions as described above also constitute gross negligence, as that term is defined in the law, which proximately caused the injuries to Plaintiffs, as well as other injuries and damages set forth herein.

50.     The negligence of the Defendant was a contributing cause of the injuries of Plaintiffs.

51.     The negligent conduct of the Defendant was a proximate cause of the injuries of Plaintiffs.

52.     Defendant's wrongful conduct, individually or collectively, was a producing cause of Plaintiffs' injuries as more fully set forth above.

## PRAYER FOR RELIEF

53.     Plaintiffs seek judgment against Defendant for damages as set forth above in the complaint.

54.     Plaintiffs ask for judgment against Defendant for:

    a.   Actual damages in the past and reasonably likely to be incurred in the future;

    b.   Punitive or exemplary damages in a fair and reasonable amount;

    c.   Pre-judgment and post judgment interest on their damages, as allowed by law, at the maximum legal rate, until paid;

    d.   Costs of Suit; and

    e.   All other relief the Court deems proper.

55.     As detailed above, Plaintiffs seek the recovery of unliquidated damages within the jurisdictional limits of this Court, as well as all statutory damages to which they are entitled.

## JURY DEMAND

56.      Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 27, 2011                    Respectfully submitted,


/s/ Morgan D. Vaughan
Darby V. Doan
State Bar No: 00793622
Morgan D. Vaughan
State Bar No.: 24060769
Haltom & Doan
6500 Summerhill Road, Suite 100
Texarkana, Texas 75503
(903) 255-1000
(903) 255-0800 Facsimile
E: ddoan@haltomdoan.com
E: mvaughan@haltomdoan.com

Evan A. Douthit     (admitted pro hac vice)
R. Douglas Gentile   (admitted pro hac vice)
Christopher J. Stucky (admitted pro hac vice)
Douthit Frets Rouse Gentile & Rhodes, LLC
903 E. 104th Street, Suite 610
Kansas City, Missouri 64131
(816) 941-7600
(816)941-6666 Facsimile

Alan S. Loewinsohn
State Bar No.: 12481600
Loewinsohn Flegle Deary, L.L.P.
12377 Merit Drive, Suite 900
Dallas, Texas 75251-2224
(214) 572-1700
(214) 572-1717 Facsimile

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 27th day of July, 2011, a true and correct copy of the foregoing has been served via ECF filing all counsel of record.


/s/ Morgan D. Vaughan
Counsel for Plaintiffs


**FOURTH AMENDED COMPLAINT** – Page 16