UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | SA-10-CR-536(1)-FB |
| | § | SA-12-CR-666(1)-FB |
| ROBERT BROOKS | § | |

<u>DEFENDANT'S SENTENCING MEMORANDUM</u>

TO THE HONORABLE CHIEF UNITED STATES DISTRICT JUDGE FRED BIERY:

      COMES NOW Defendant Robert Brooks, and respectfully submits this Sentencing Memorandum, outlining "other matters relating to an appropriate sentence", pursuant to Rule 32(i)(1)(C), and (i)(4)(A)(i) of the Federal Rules of Criminal Procedure.

## I.      INTRODUCTION

      In this Memorandum, Counsel also outlines several reasons in favor of sentencing Defendant Brooks to a range of punishment outside the recommended guideline sentence. The guideline range in this case is anywhere from 46-57 months under the calculations performed by Counsel, up to a range of 262-327 months under the calculations performed by Probation Officer Margarita Garbalena. (For more information on this discrepancy, see Defendant's Objections to Pre-Sentence Investigation Report, wherein Counsel disputes most of the enhancements). In either case, Counsel argues that the court should assess a sentence of no more than the 46-57 months. In support of this position, counsel would show the following:

## II.      LEGAL BASIS FOR REQUEST OF SENTENCE BELOW THE GUIDELINES

      With the advent of decisions such as *Booker* and its progeny, it is clear that the Court is no longer bound to blindly follow the sentencing guidelines. *U.S. v. Booker*, 543 U.S. 220 (2005). Furthermore, although a guideline sentence will generally be presumed to be reasonable, a court should no longer reflexively rely only on the guideline factors alone when determining the appropriate sentence. *Rita v. United States*, 551 U.S. 338, 347-48 (2007). The guidelines range of sentence is now but one of several factors for the court to consider. *Rita*, 551 U.S. at

1

347-48.

As stated in *Kimbrough v. United States*, 552 U.S. 85, 91 (2007), "[a] judge must include the guidelines range in the array of factors warranting consideration. The Judge may determine, however, that in a particular case, a within-Guidelines range sentence is 'greater than necessary' to serve the objectives of sentencing. 18 U.S.C. 3553(a) (2012 ed.)." This inherent judicial discretion applies to all guideline sentences, including those involving fraud cases.

It is certainly still important to review the guidelines and make the appropriate calculations as a starting point. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007). But the court should then consider other factors that may have not been adequately taken into account by the guidelines, even if such factors that call for a sentence substantially different that what the guidelines would normally recommend. *Kimbrough*, 552 U.S. at 91. In doing so, the court should be careful to ensure that the sentence is in line with the principles enunciated in 18 U.S.C. §3553(a). *See Gall*, 552 U.S. at 49-50 (2007). The mandate of this statute is to sentence a defendant to the <u>minimum amount</u> of punishment possible to carry out the objectives of our criminal justice system. *See* 18 U.S.C. §3553(a) (emphasizing that court should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of the statute). Therefore, if the court finds that the guidelines sentence would be "greater than necessary" to achieve the objectives of §3553(a), it should not necessarily follow them. *Kimbrough*, 552 U.S. at 91.

The factors identified for the Court to consider are divided into 7 different categories:

(1) Offense and Offender Characteristics;

(2) The need for a sentence to reflect the basic aims of sentencing, namely:

(a) Just Punishment (Retribution),

(b) Deterrence,

(c) Incapacitation,

(d) Rehabilitation;

2

(3) The sentences legally available;

(4) The Sentencing Guidelines;

(5) Sentencing Commission policy statements;

(6) The need to avoid unwarranted disparities; and

(7) The need for restitution;

*Rita,* 551 U.S. at 347-48*; see also* 18 U.S.C. §3553(a)(1)..

As *Kimbrough* explains:

The statute, as modified by *Booker*, contains an over-arching provision instructing district courts to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing, including "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." 18 U.S.C. §3553(a) (2000 ed. and Supp. V). The statute further provides that, in determining the appropriate sentence, the court should consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the sentencing range established" by the Guidelines, "any pertinent policy statement" issued by the Sentencing Commission pursuant to its statutory authority, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Ibid. In sum, while the statute still requires a court to give respectful consideration to the Guidelines, see *Gall v. United States*, ante, at 7, 11, *Booker* "permits the court to tailor the sentence in light of other statutory concerns as well," 543 U. S., at 245–246.

*Kimbrough*, 552 U.S. at 101.

These principles have recently been affirmed again in *Pepper v. United States*, ___

U.S.___, 131 S. Ct. 1229 (March 2, 2011).  According to *Pepper*:

This Court has long recognized that sentencing judges "exercise a wide discretion" in the types of evidence they may consider when imposing sentence and that "[h]ighly relevant-if not essential-to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Williams v. New York*, 337 U.S. 241, 246-247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). Congress codified this principle at 18 U.S.C. §3661, which provides that "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct, " and at §3553(a), which sets forth certain factors that sentencing courts must consider, including "the history and characteristics of the defendant, " §3553(a)(1).

*Pepper*, 131 S. Ct. at 1235.

### III.  FACTUAL BASIS IN SUPPORT OF SENTENCE BELOW THE GUIDELINES

If these additional factors are carefully examined and applied to Defendant Brooks' case, Counsel argues that they weigh heavily in favor of assessing a sentence much lower than that called for by the United States Sentencing Guidelines.  The first of these factors concerns "the nature and circumstances of the offense, and the history and characteristics of the Defendant."  18 U.S.C. 3553(a)(1).

### A.    OFFENSE AND OFFENDER CHARACTERISTICS

Fraud is a serious offense, and can have serious consequences for its victims.  A person who commits fraud must be help responsible for their conduct.  However, there are some types of fraud cases which are more sinister than others, and there are varying degrees of culpability for each type of fraud.

### 1.    DIFFERENT TYPES OF FRAUD

Some fraud involves outright theft.  Embezzlement is one of the most common forms of this type of fraud.  The only difference between embezzlement fraud and the everyday common forms of street theft is that in an embezzlement case, the victim has voluntarily given the perpetrator access to his or her funds.  The victim has done so with the expectation that the perpetrator will actually help protect their funds.  Embezzlement is perhaps the worst type of theft committed by fraud, because the perpetrator takes advantage of a special position of trust placed in him by the victim.

Another common type of fraud is a promise to give someone something of value in exchange of money, and either never deliver the property, or deliver a phony document that purports to convey title to the property when in reality it does not.  This type of fraud is also particularly insidious because the person gets absolutely nothing of value in return for their services.  They may be in desperate need of the property, and end up with no place to live (in the

4

case of a home), or end up with no transportation (in the case of a vehicle).

A third type of fraud is to sell someone a product or service at an inflated price.  A common example of this type of conduct is the homeowner who neglects to tell the buyer that the home they are about to purchase has a bad water leak, or foundation problems.  In the case of a car dealer, it could be the failure to tell the buyer that the car was recently in an accident or flood.  In this type of fraud scenario, the victim is left with something of value but not as valuable as they had hoped.  If the seller has a legal duty to disclose these defects and fails to do so, then it is the seller's fault for misleading the buyer as to the condition of the property.  If the seller does <u>not</u> have a legal duty to reveal these facts, then he may be morally culpable, but not necessarily legally culpable.  If the buyer fails to inquire into these matters, they he or she also bears some responsibility for failing to perform their due diligence in investigating the condition of the product, and ultimately making an unwise investment.

Counsel would argue that the type of fraud Brooks committed was more akin to the 3rd example than the first two.  This does not mean that he should be completely absolved from his failure to adequately disclose to the banks that he was buying the property for much less than he was selling it for.  However, Counsel believes that there is still a legitimate debate about whether or not he had a moral or legal duty to do so.  Counsel asked many of the witnesses at trial if they could point to any specific statute that required Brooks to disclose his purchase price to the banks, and none of the witness could ever point to such a statute or regulation.

In either case, Counsel believes it is reasonable to argue that a person committing the 3rd type of fraud is not as inherently culpable as a person who commits the other types of fraud.  It is much easier for an otherwise good person to justify a failure to disclose relevant facts than to outright steal someone's money, or to take their money with the intent to never actually provide them with anything of value in return.  Brooks' failure to disclose his purchase price was at the heart of the Government case.  Although there were a few references to the preparation of

5

fraudulent documents, these were not done by Brooks, but other people instead.   Consequently, it is reasonable to view Brooks as a generally good person gone bad.  Brooks apparently took advantage of a number of legal loopholes, and arguably blinded himself to the fact that many of his associates were engaged in unlawful business practices which accrued primarily to his benefit.

This interpretation is consistent with the Defendant's lack of criminal history.  Brooks had gone for over 40 years of his life as a law abiding citizen with the exception of a few hot check cases some 20 years ago.  He ran a respectable eyeglass business in the Dallas/Fort Worth area.  He does not have a history of trying to make a living by ripping people off.  Counsel would argue that the reason Brooks is in this mess today is because he ended up listening to the wrong people about how to make a successful living buying and selling real estate.

## 2.      LACK OF INTENTION TO DO HARM

Counsel would argue that there is no evidence that Brooks ever intended, or even expected that anyone would be harmed as a result of his business practices.  It is true that Brooks sold the properties for a lot more than he was buying them.  His argument was that he got a great deal on them because he was a savvy investor and bought them in bulk.  The Government's argument was that he knew they were not actually worth as much as he sold them for, and therefore took advantage of the buyers by selling the properties at such an inflated price.  However, selling a product for much more than you paid for it is not a crime in itself.  If it were, then every movie theater would be guilty for taking a soda that costs .10 to produce and selling it for $4.00.  If a buyer really wants the product and is willing to pay a higher than average price for the product, then ordinarily there is no problem.  As long as they actually know what the price is, and how much their payments are going to be, they will generally have nothing to complain about.  The buyers knew both of these essential facts in the Brooks case.

Even in the context of buying a home, these rules generally apply.  If a buyer wants to pay

a lot of money for a house, or even overpay for a house, that is generally their decision to make. Some people deliberately agree to make an offer for more than the appraised value of a home because they just really want to own it.  They may not be making a wise business investment in the long run if they want to sell the home in the future, but it is their right to make such a bad decision.  If they are unable to make the payments in the future, they can blame themselves, or try and shift the blame to the person who sold them the home in the first place.  Clearly, that is what the buyers in the Brooks' case ending up doing when their houses went into foreclosure.

Counsel would argue that it is not fair to place all the blame on Brooks for the fact these properties went into foreclosure. There was really no evidence presented at trial to show that Brooks knew the properties were going to end up in foreclosure, or that he had any desire for them to go into foreclosure.  In fact, just the opposite is true.  Brooks had a strong interest in the homes not going into foreclosure so he could continue doing business with these buyers, and maybe even help them sell their homes again to other buyers further down the road.

If the price of real estate had continued to rise as dramatically as it had in the prior decade, Brooks' buyers may have been able to resell their homes instead of having them go into foreclosure. The vast majority of real estate analysts predicted that prices would continue to rise, so Brooks had good reason to think these properties would turn out to be good investments instead of ending up in foreclosure. Therefore, Brooks really had no reason to know that anyone was going to be hurt as a result of his conduct and the way he did business.

Obviously Brooks was wrong about property values continuing to rise.  However, he was not alone in this mistaken belief.  Many seasoned real estate professionals across the country shared this same belief.  They also made financial decision they are likely regretting based upon this mistaken assumption.  Millions of people who invested in the stock market lost money due to these mistaken beliefs.  Counsel asks the Court to make sure and not assess an overly harsh punishment against Brooks in this case because of mistaken assumptions he made, as opposed to

actual fraud committed.

Counsel also notes that there is also solid evidence to dispute that Brooks ever intended to cause any harm in regards to his tax case as well.  Although the Government proved that Brooks intended to reduce his personal tax liability by some $169,000, there is much more to the story than that.  The Government's case was that Brooks did not have enough money to pay his personal taxes, and so he tried to reduce his personal tax liability by taking a phony deduction. This deduction was listed as approximately $475,000 paid to Amadeus SF for "management fees."   The Government argued that no such management fee was ever paid, and on that point, they are correct.  However, Brooks did instruct his CPA to file a tax return on behalf of Amadeus SF acknowledging receipt of the $475,000, thereby making itself liable for the taxes owed on said income.  Said taxes would have been in the range of the same $169,000 if not higher.

This action clearly shows that Brooks did not intend to just sweep this tax liability under the rug.  Instead, he was going to slightly delay payment of the tax liability by shifting it to Amadeus instead of Upscale Realty.  His intention was to pay off the vast majority of this tax liability just a few months later, with a tax refund of $150,000 he was supposed to be getting back that same year.  (Exhibit 1).  That is why CPA Stephen Scheller wrote the IRS a letter specifically instructing them to apply Brooks' anticipated refund to the Amadeus SF tax liability. (Exhibit 2).

This letter is solid evidence that Brooks did intend to pay approximately $150,000 of this debt immediately, and asked for a payment plan to pay off the remaining $19,000. Unfortunately, CPA Scheller claims he was never able to find out what happened to this expected refund and the Amadeus SF tax liability.  Defendant Brooks is still in the process of trying to determine what happened, but he cannot rely on CPS Scheller, and is currently not in any position to hire a new CPA to investigate the whereabouts of his refund, given his current incarceration.

### 3.      RELIANCE ON PROFESSIONAL ADVICE

Part of Brooks' defense was that he relied on the advice of professionals in concluding his conduct was legal.  Obviously, he was not able to convince the Jury that this was 100% true.  However, there is no doubt that Brooks was surrounded by a number of legal professionals, and they either failed to warn him that his conduct was illegal, or worse, gave him bad advice by specifically telling his conduct was legal.  This lack of professional guidance, or mis-guidance should still be taken into account for sentencing purposes.

### 4.      COMPLEXITY OF THE LAW

Not only did Brooks receive bad advice, he was dealing with areas of the law that were very complex and confusing for the average person to navigate.  As Defendants' Expert Everett Ives' testimony indicated the rules for mortgage loans were like the "Wild West" at that time.  Brooks had no special training in the buying and selling of real estate, or in the process of obtaining real estate mortgages.  He generally received "on the job" training, relying on what other real estate professionals told him needed to be done to help get these loans approved..

Nowhere is the complexity of the law more obvious than in regards to the United States Tax Code.  As recent headlines have made clear, even the IRS' own officials sometimes have trouble distinguishing what conduct is legal and illegal.  They have even been accused of deliberately breaking the law themselves in reviewing the tax exempt status of certain political organizations.  Whether or not these officials acted out of sheer malice or just mis-guided ignorance, they will not likely be facing the type of punishment Brooks is facing for his tax fraud conviction.  Counsel wonders whether such officials will ever even be prosecuted for their conduct at all.  Brooks' pleas of ignorance or misunderstanding of the law should be given the same deference as their pleas of innocence as well.

### 5.      VICTIM IMPACT

Although fraud is a serious crime, it differs from other federal crimes in that it does not

involve any physical injury or threat of physical injury to another person.  The damage resulting from fraud cases is monetary in nature.  While monetary damages can be substantial, people can generally recover from such damages.  When analyzing the harm caused by the Defendant's conduct, an examination should be undertaken of the actual monetary losses that resulted from the fraud he was convicted of committing.

### a.    FINANCIAL INSTITUTIONS & LOSS CALCULATIONS

Counsel begins by noting that the official victims in this case were financial institutions as opposed to individuals.  The fact that losses were experienced by large corporate institutions rather than individuals does not mean that no harm was caused.  However, it does mean that the actual losses caused are generally absorbed by these institutions, resulting in lower profits. In some cases, these losses may be passed on to the consumer in the long run in the form of higher bank fees.  Some of the banks at issue in this case also received government bailout assistance. Consequently, these costs will likely be spread out across society at large in the form of taxes. However, Counsel would dispute that any specific bank needed any bailout due to Brooks conduct, because it does not appear that any of the properties he sold had gone into foreclosure prior to these bailouts being needed.  Furthermore, the values of the losses the lenders experienced in the foreclosure process on the Brooks' properties were just a drop in the bucket compared to the billions of dollars, or even trillions of dollars of revenue they make over time.

It is important to note at the outset of this section that the losses experienced by the lenders have not actually been clearly determined in this case.  Counsel directs the Court's attention to Paragraph 27 of the PSI Report which concedes that none of the lenders besides JP Morgan Chase have indicated that they ever intend to provide any proof of their losses.  (PSI Report - p. 17, para. 27).  The paragraph goes on to note that even JP Morgan Chase has yet provide any concrete information sufficient to substantiate the amount of their losses in this case. (PSI Report - p. 17, para. 27).  Counsel also draws the Court's attention to Paragraph 16 of the

report indicating that "many of the lenders provided questionable documents" to FBI agents who were investigating the losses they claim to have suffered.  (PSI Report - p. 16, para. 26).  Counsel also notes that Paragraph 16 indicates that "other lenders did not cooperate for fear of negative publicity."  (PSI Report - p. 16, para. 26).  Counsel posits that this fear was based in part on the exposure of their own complicity in the sloppy lending practices that they later publicly decried as fraudulent.

Since the Government is apparently not able to come up with hard evidence of actual loss amounts, it has proposed a hypothetical loss amount.  This amount is derived by looking at that the difference between the amount Defendant Brooks paid for the properties and how much the bank loaned out on those properties.  Under this calculation, they come up with a loss amount of approximately $15 million.

However, this is not the same as saying that the banks actually suffered a loss of $15 million in the process.  In order to know the amount of loss the lenders actually suffered, we would need to know exactly how much the property was worth when they issued the mortgage loans; how much they resold these loans for; or how much they recouped from the sale of the properties that went into foreclosure.  As of now, we do not know the answer to these questions, and consequently, Counsel has filed several Objections to the PSI Report regarding the official calculation of losses in this case.

In order to determine how much a property is worth at any given time, one would normally look to an official appraisal report.  The Government disputed the validity of the appraisals actually done on the property at the time of its purchase and resale.  However, they have never had any alternate appraisals prepared to prove up what the actual value of the properties were at the time Brooks sold them.  Therefore, there is really no way to know what the actual value of the homes were.  Furthermore, they have not provided specific details as to how many of the loans were resold prior to foreclosure, and how much of their losses the banks

11

recouped through the foreclosure process.

Counsel has also objected to the calculation of "loss" calculation formula proposed by the Government, because it fails to take into account a number of other relevant factors.  In this case, the Government is assuming that the proper fair market value of the property is the price that Robert Brooks paid for the property.  However, Brooks contends that he took some of the profits he made from some of the properties and used that money to renovate the condominiums.  The renovations resulted in an increase in the value of the property well above what Brooks paid for it.  Therefore, the fair market value was much more than what Brooks paid for the properties.

In addition, there has been testimony provided by the Government's own witnesses that Brooks was able to purchase these properties at a discount, and so the amount he paid was actually below fair market value.  Specifically, government witness Ron Lozoff testified that he gave Brooks a 5% discount on the properties.  (Exhibit 3).  Therefore, if Brooks is only given credit for the amount of money he paid for the property, he is being shortchanged by at least a 5% credit.

There is also evidence that many, if not most of these lenders sold their loans shortly after they purchased them.  They informed the buyers of their intention to resell the loans at the time of purchase.  (Exhibit 4).  If they were able to sell the loans for their full value before the homes were foreclosed upon, then they may not have experienced any type of loss at all.  It is also clear that the lenders typically required the buyers to purchase Mortgage Insurance Protection to protect them from any losses in the case of foreclosure.  (Exhibit 5).  If such is the case, then they may have been fully or partially reimbursed for the losses they experienced as a result of the properties going into foreclosure.

In this regard, Counsel notes that the definition of a victim is "any person who sustained any part of the *actual* loss determined under subsection (b)(1)".  U.S.S.G.  2B1.1, app. note 1 (emphasis added).  If a victim has been reimbursed for their potential losses, they are not

12

technically a "victim" under a plain reading of the guidelines. *See United States v. Conner*, 537 F.3d 480 (5th Cir. 2008) (holding that credit account holders whose account numbers were used to make fraudulent purchases, and who were promptly reimbursed for the charges by the credit card companies, did not suffer any pecuniary harm and thus were not victims).

If the lender has sold the property, then proper credit must be given to the Defendant for the amount of proceeds the lender received from the sale. If the lender received proceeds from any type of mortgage insurance in place, then a proper credit must also be given to the Defendant for those amounts as well. The United States Sentencing Guidelines explains the proper way to calculate "loss" and "credits against loss" amounts in mortgage fraud case is as follows:

> In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing. In the case of a fraud involving a mortgage loan in which the collateral has been disposed of at a foreclosure sale, use the amount recovered from the foreclosure sale.

U.S.S.G. 2B1.1, app. note 3(E)(ii).

The sentencing guidelines make clear that the amount of loss is determined by looking at the amount of money the loan was made for by the lender, and subtracting the "fair market value" of the property (if the lender still retains possession of the property). If the lender is no longer in possession of such property, then the Court is to subtract the amount of money received by the lender when they sold the property. Therefore, in order to competently evaluate the claim of potential losses, the Court would have to be provided proof of: exactly how much each loan was initially made for; whether or not the lenders still retained possession of the property; if the property was sold; if so, when that sale took place and what circumstances it took place; and the amount of money the lender recovered upon sale of the property.

As noted above, the Government has not provided sufficient documentation to determine the answers to all of these questions. There is clear documentation to show how much the

mortgage loans were made for, and there are allegations by the Government that all the properties went into foreclosure.  However, the details of the foreclosures have never been provided.  Nor is it clear who ultimately ended up owning the loans at the time of foreclosure; how much they ultimately recovered from said foreclosure sales; and whether the lenders were reimbursed for any losses by a Mortgage Insurance Protection program.

Based on the lack of sufficient information to make a clear determination of actual loss, Counsel would urge the Court not to automatically accept the Government's loss figures, and the resulting 20 level increase.  Until these issues are resolved, and the Government produces specific proof of how much each of these lenders actually lost in this case, Counsel asks the Court to give the Defendant the benefit of the doubt that the losses were much smaller than the $15 million figure promoted by the Government.  The Government must prove the amount of loss by a preponderance of the evidence. *United States v. Hartstein*, 500 F.3d 790, 796-97 (8th Cir. 2007).

It is also important to keep in mind that there was substantial trial evidence presented that these lenders were quite reckless in their lending practices.  Therefore, it is appropriate to hold them at least partially responsible for the losses they experienced.  Specifically, there was evidence presented that the lenders were offering so-called "no-doc" loans, which were commonly referred to in the industry as "liar's loans."  There was also evidence that many of the lenders encouraged applicants to leave off information, and in some cases had their agents put in downright false information to help get these loans approved by their own underwriting department.

There is also ample evidence that many of these lenders who claim to be "victims" in this case have been charged with committing fraud themselves, for promoting the exact same kinds of practices that they complained about in this case.  Counsel was not allowed to enter any of the documents to support this claim into evidence at trial.  However, since the PSI Report goes into

specific detail about news reports of the real estate mortgage crisis, Counsel asks the Court to review the attached documents to put the banks claims of being a "victim" in their proper context.

Lenders such as Bank of America/Countrywide, Wells Fargo, GMAC, and JP Morgan Chase have all been charged with commission of fraud (Exhibit 6-7).  As a result, they have all entered into consent decrees with the federal government, for knowingly promoting and participating in fraudulent mortgage loan practices. (Exhibit 8-11).  Other smaller lenders involved in this case have also been sanctioned because of fraudulent activity related to issuing mortgages.  AmericaHomekey, Taylor, Bean & Whittaker and Alethes Mortgage Compaies have all been banned from doing business with the Federal Housing Authority (FHA) for their failure to follow accepted business practices.  (Exhibit 12).

The bank's own complicity in, and promotion of fraud does not automatically excuse any of the Defendant's own fraudulent conduct.  However, it does help prove that the Defendant did not concoct this scheme on his own, but rather took advantage of a system that encouraged such behavior.  In doing so, Counsel believes these lenders gave non-professionals like Brooks the false impression that said conduct was completely legal, and approved by the lenders.  The fact that he may have suffered from this false impression should be taken into account in determining his culpability.

### b.    STRAW PURCHASERS

It is true that many of the "straw purchasers" in this case blame Defendant Brooks for the fact that their properties were foreclosed upon.  However, they do not technically fit the definition of "victims" in this case, under the criteria provided by the United States Sentencing Guidelines.  *See* U.S.S.G. 2B1.1.  Therefore, Counsel asks the Court not to consider any potential impact Brooks' conduct may have had upon them.

Furthermore, it is unclear what type of financial losses they actually experienced.  The

15

evidence presented at trial did seem to indicate that many of them suffered negative consequences of having their credit history damaged.  However, they also received the benefit of being given lump sum cash payments averaging $10,000 at a time.  Many of the government's witnesses seemed to downplay the benefit they received from this large infusion of cash, and only focused on how they were allegedly duped into participating in these real estate transactions by Defendant Brooks.  A colloquy between the Court and the Government indicated that it is highly questionable whether or not they ever reported these payments as income to the IRS.

It is also clear that all of the buyers knew that there was some risk involved in purchasing investment property,  Even one of the Government's star witnesses, Ms. Bettie Artis who fancied herself as "the female Donald Trump", conceded that she knew there was risk involved in these investments.   The fact that these people knew there was some risk involved does not absolve Defendant Brooks from any fraud he has been found guilty of committing.  However, it does help distinguish his case from others involving outright theft, where a person is deprived of their money without in any way giving the consent to the other person to take possession of their property.

Another important factor to keep in mind is that there is no evidence that Defendant Brooks specifically intend for any of the properties he sold to go into foreclosure.  In fact, it was in his interest that these properties not go into foreclosure.  If they did go into foreclosure, he would be left with a group of buyers who were very unhappy with his services.  If the buyers did have their properties foreclosed upon, he also knew it could lead to the buyers filing lawsuits against him. Unfortunately, that is exactly what happened in this case.  According to the Government's own theory of the case and the Pre-Sentence Investigation Report prepared in this case, Brooks was hoping to assist the buyers in reselling the properties at a later date.  (PSI Report - p. 10, para. 8).  If it was his intention or expectation that the homes would be foreclosed in the meantime, he would not be contemplating helping the buyers resell the property later.

16

It is also important to keep in mind that many of buyers who may want to portray themselves as victims in this case were actually charged with having knowledge of the details of Brooks' scheme in the first place.  That is why they ended being charged as Co-Defendants in this case.  It is wholly inconsistent for the Government to claim these individuals knowingly engaged in this illegal scheme, and then for the Court to turn around and treat them as victims when calculating Brooks' sentence.

**c..       TAX CASE**

The victims in the tax fraud case are the general public, namely other taxpayers.  These individuals have to pick up the tab for those who illegally avoid paying their fair share of taxes. However, as noted above, there is substantial evidence that Brooks has a $150,000 refund coming his way, which should have offset most of the $169,000 he has been found guilty of evading.  This would leave a remaining balance of only $19,000 left to pay. When this loss is spread out across the whole tax base, the average taxpayer would likely only have to pay a fraction of a cent to make up for such a loss.

**B.      THE NEED FOR A SENTENCE TO REFLECT THE BASIC AIMS OF SENTENCING**

**1.      "JUST PUNISHMENT" THEORY**

One of the most important aims of the sentencing process is for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. 3553.  There are a myriad of ways of determining what a "just punishment" is for any particular offense. One of these oldest theories of just punishment is the biblical theory of "an eye for an eye."  In this case, that would mean depriving Defendant Brooks of the benefit of any ill-gotten gains he has received through his commission of fraud.  It is clear from the Government's forfeiture of Brooks' property, and the fact that Brooks is still in the middle of a bankruptcy proceeding, that he has already been deprived of such ill-gotten gains.

Of course, there is also the issue of restitution.  Under the just punishment theory, he would also have to reimburse the victims for their monetary loss.  Assuming the losses really do amount to millions of dollars, Brooks would have to work for the rest of his life and make a pretty high income to repay an amount that large.  Unfortunately, he will not be able to pay back a single dime while locked up in prison.  Assuming he is released in a few years, instead of the 20 plus years called for in the PSI calculations, he would still have a realistic chance of putting a significant dent in that debt during the remainder of his lifetime.  Although he will likely struggle financially at first, he has shown himself capable of running a eyeglass business that produced a respectable profit.  Counsel believes that even the Government would concede that Brooks is an intelligent and hard-working individual, even though they clearly also see him as a person who used this intelligence for ill instead of good.  In either case, the quicker he gets out of prison, the quicker he can start making restitution on the case.

### 2.   "DETERRENCE" THEORY

In regards to the "deterrence" theory, it is a very subjective determination as to what degree of punishment will be sufficient to prevent a defendant from engaging in future wrongdoing.  Some defendants will learn their lesson quickly with the proverbial "slap on the wrist."  Some need more than a slap on the wrist.  They actually need a short period of time in jail to see how it really feels to lose their liberty and be separated from their family and friends.  Others will become repeat offenders time and time again now matter how many prison sentences they are forced to endure.

In regards to the issue of deterrence, it is important to note that prior to the commission of this offense, the Defendant had experienced only a few brief encounters with the criminal justice system.  As a result, he comes before this Court with 0 Criminal History points.  (PSI Report, p. 24, para. 54).  Perhaps more significantly, he comes before this Court having never spent any time in jail before this offense.  This brief period of incarceration he has already experienced has

already had quite an impact on him.  He has sat side by side in the GEO Correctional Facility with drug dealers, rapists, and murderers, most of whom have been in an out of the penal system for a great deal of their lives.

According to the PSI Report, "medical records received from the GEO Detention Center reflect the Defendant is experiencing anxiety and stress due to his inability to cope with his incarceration following his trial.  He was diagnosed with an adjustment disorder and was administered Vistaril, 25 mg."  (PSI Report - p. 27, para. 57).  Although Counsel did warn Defendant that he could be taken into custody immediately if there was a "guilty" verdict in this case, it still seem to come as quite as a shock to him when it actually happened.  The several months he will have experienced behind bars may actually be plenty of time to serve the deterrent effect prison is supposed to have on criminals.

That being said, Counsel would like to argue to the Court that probation is a perfectly appropriate sentence for a Defendant like Brooks.  As a 45 year old person who has never been convicted of anything but a couple of hot check cases more than 20 years ago, he would ordinarily be the perfect candidate for probation.  Counsel believes that probation is also generally justified by the fact that this is not a case involving violence or any type of dangerous behavior.  Unfortunately, Counsel knows that the Court has most likely taken consideration of probation off the table because of the complexity of the case, the guidelines calculations, and the fact that other members of the conspiracy who have pled guilty are generally facing sentences of between 18-24 months.

Knowing that probation is most likely not an option for Brooks, Counsel asserts in the alternative that a few years in jail could easily be enough to fulfill the "deterrent" function of the criminal justice system in Brooks' case.   More importantly, Counsel believes that imposing a sentence greater than a few years is clearly more than is necessary to achieve the objectives of the sentencing guidelines. S*ee*  18 U.S.C. §3553(a) (emphasizing that court should "impose a

sentence sufficient, <u>but not greater than necessary</u>, to comply with the purposes" of the statute").
(emphasis added).   There is simply no concrete evidence that Brooks is the type of person who
would need more than a few years in prison to learn his lesson.

In this regard, Counsel asks the Court to keep in mind that although Brooks pled not
guilty, and still maintains his innocence today, he is adamant that he would never again engage in
any of the type of conduct that got him into trouble in this case.  Regardless of whether he truly
knew the conduct was wrong at the time, he knows now that the Government considers the way
he personally conducted business to be outside the bounds of the law.  Counsel asks the court not
to hold his right to maintain his innocence against him when assessing punishment.  He has
already lost the benefit of a reduction in his sentence for acceptance of responsibility, and that
should be sufficient punishment enough for refusing to admit guilt.

### 3.    "INCAPACITATION" THEORY

Some Defendants are such a danger to society that they need to be  "incapacitated", i.e.
put in prison to prohibit them from having any contact with the general public where they can
inflict further harm.  Robert Brooks is not that type of Defendant.  He is not an inherently violent
individual who has shown himself to be high risk repeat offender.  At the heart of his crime was
making false statements.  A repeat of such conduct on his part could be prevented by imposing
probation and keeping a close watch on him for the next several years.  The ability of federal
supervision to sufficiently deter him from future criminal conduct without the need for
"incapacitation" is evidenced by the fact that he had been in full compliance with all the terms of
his pretrial release for almost 3 years with no violation reports.  Of course, he would never be
allowed to engage in the type of large scale financial transactions he did before with a federal
felony conviction on his record anyway.

Since Counsel knows that the idea of probation is not a likely possibility, Counsel would
re-emphasize that the Court impose the shortest period of "incapacitation" possible to fulfill the

overall mission of the guidelines.  Such mission includes inflicting sufficient punishment to deter and prevent a reoccurrence of the criminal behavior; encourage reimbursement of the victims to help make them whole; and promote an environment that allows for rehabilitation of the Defendant.

### 4.    "REHABILITATION" THEORY

The issue of "rehabilitation" is difficult to address in this case because of the Defendant's continued decision to maintain his innocence.  Counsel does not really know if it would be more beneficial for the Defendant to admit guilt at this point even if he really was prepared to do so.  On the one hand, doing so might help convice to the Court that he is on the road to rehabilitation.  On the other hand, admitting that he was guilty after making all the parties go through the time and expense of a full-blown trial might lead the Court to be a bit frustrated at him for making all the parties go through this trouble knowing he was guilty the whole time.  In either case, Brooks does still maintain his innocence.

Nevertheless, Counsel would argue that the Defendant is already on the road to rehabilitation because he is adamant that he would never do business the same way he did even if afforded the opportunity to do so.  In addition, he has confirmed that he would much more careful in regards to any business dealing he may ever have in the future.  He would always go out of his way to make sure that he was completely forthright in all his dealings with other parties, and go out of his way to disclose any pertinent details, regardless of whether he is legally required to do so or not.  He understands that even if a professional tells him that certain conduct is legal, they might not be telling him the truth like CPA Stephen Scheller, or may just be plain incompetent like Attorney Richard Howard.  His philosophy will be to err on the side of caution, and immediately cease doing business with anyone who does not share this philosophy.

If the Court believes that Defendant Brooks needs more time to reflect on his crimes in order to be fully rehabilitated, Counsel would still argue that no more than a few years would be

necessary to accomplish this goal.

**C.    THE SENTENCES LEGALLY AVAILABLE**

Neither the fraud nor tax charges carry a mandatory minimum range of punishment. Therefore, this Court has the legal authority to impose a sentence of probation on Defendant Robert Brooks, or the 3-5 years Counsel believes is enough to fulfill the goal of the sentencing guidelines.

**D.    THE GUIDELINES SENTENCE**

As noted above, the guideline range in this case is anywhere from 46-57 months under the calculations performed by Counsel, up to a range of 262-327 months under the calculations performed by Probation Officer Margarita Garbalena.  (For more information on this discrepancy, see Defendant's Objections to Pre-Sentence Investigation Report, wherein Counsel disputes most of the enhancements).  In either case, Counsel argues that the Court should assess a sentence of probation against Brooks, or in the alternative a sentence of no more than the 46-57 month guideline calculation previously outlined by Counsel.

Counsel realizes that he is asking for a sentence that is much less than what is called for in the guideline sentence calculated by Officer Garbalena.  Assuming the Court accepts her calculations over Counsel's calculations, Counsel still believes that a serious downward departure is warranted for the factors listed above and below.

**E.    SENTENCING COMMISSION POLICY STATEMENTS**

There are numerous policy statements the Court can consider when trying to determine the appropriate sentence in any given case.  There is one policy statement in particular that Counsel would like to call the Court's attention to dealing with "Grounds for Departure." According to the guidelines policy statements, "A Departure may be warranted in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines, but that nevertheless is relevant to determining the appropriate sentence."  U.S.S.G.

5K2.0(a)(2)(B).

### 1.      RELIANCE ON ADVICE OF PROFESSIONALS

Counsel would argue that there are several factors in the Brooks' case that are significantly different that the average criminal case that warrant a more lenient sentence than the one called for in the guidelines.  The first factor Counsel believes the Court should take into account is Defendant Brooks' claims that he relied on lawyers, real estate professionals and a CPA during the course of his business dealings.  The testimony appears to be undisputed that none of these professionals ever spoke up and told Robert that what he was doing was illegal.

Counsel understands that the Government argued successfully to the Jury that Brooks should have known that the way he was doing business was illegal anyway.  Counsel knows he cannot re-litigate this issue in terms of Brooks' guilt/innocence, but it should still be considered by the Court in terms of sentencing.  Counsel believes that it is much easier for an otherwise good person to go bad under these circumstances.  In fact, Counsel would argue that the main reason we hold professionals to a higher standard in their dealings with individuals is because we know that other people are relying on their advice and counsel.  It is much easier for them to help convince people to engage in questionable conduct.  In the same way that we hold professionals to a higher standard in terms of culpability, we should hold uneducated professionals somewhat less responsible when they rely on those professionals for bad advice.

### 2.      RELIANCE OF THE ACQUIESCENCE OF THE BANKS

There was also a great deal of trial testimony indicating that all the lenders at issue in this case were issuing so-called "liar's loans."  These loans did not require the borrowers to provide and documentation to support their claims of income and assets.  Counsel believes this led a great number of people to the mistaken conclusion that the information they put on their applications didn't really need to be 100% accurate.  Many also believed that if the lenders were not going to bother to confirm this information, if must not be that important to them.  In doing

so, the banks enticed people like the buyers in Brooks' case to exaggerate on these documents in order to help their loans get approved.  They "lured" Brooks and these individuals into a system of getting cheap and easy loans, just as the PSI Reports that Brooks "lured" in his co-conspirators to make easy money. (PSI Report - p. 14, para. 20).

During trial, the Prosecution made a compelling argument to counter this assertion.  In essence, he said that if someone leaves their front door unlocked everyday, that does not give you the right to walk into their home and steal from them.  Counsel agrees with this statement.  However, Counsel believes a more correct analogy to the Brooks case can be stated as follows: If someone leaves their front door open all the time; invites you in; tells you to help yourself; and then you see other individuals helping themselves and walking out with household goods without paying for them right in front of the homeowner; then it might be understandable for you to think the homeowner is giving away his belongings for free.

In addition, if the lenders in this case were really just harmless victims, one has to wonder why the same federal government that prosecuted Brooks would have gone after them for commission of fraud as well.  (Exhibits 4-10).

### 3.    LOSS OF CARE-TAKING OR FINANCIAL SUPPORT

The Court is allowed to consider whether the sentence imposed upon the Defendant will create an undue hardship on his family.  Specifically, the Commission notes that:

(B) Departures Based on Loss of Caretaking or Financial Support.—A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires, in addition to the court's consideration of the non-exhaustive list of circumstances in subdivision (A), the presence of the following circumstances:

(i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such

hardship or suffering is of a sort ordinarily incident to incarceration.

(iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv) The departure effectively will address the loss of caretaking or financial support.

(U.S.S.G. - 5H1.6, n. 1(B)).

Consideration of these factors weighs in favor of a shorter sentence than that called for by the guidelines.  As noted in his PSI Report, Defendant pays $600.00 a month to support his first child Chantenysa Bertrand ("Nysa").  (PSI Report - p. 25-26, para. 61).  The mother if the child is Shanelle Richardson, and she desperately relies on this money coming in every month to take care of Nysa. (Exhibit 13).  As the attached payment history records indicate, Brooks has been consistently making these child support payments for a number of years.  (Exhibit 14).  Now that he has been incarcerated, such payments have ceased.  (Exhibits 13 & 14).

Furthermore, Brooks has another young child named Blake Brooks.  Blake's mother had her rights to the child terminated several years ago.  Cheryl Brooks has played a role in helping to raise Blake over the past few years.  However, given the fact that a divorce is pending between Mr. and Mrs. Brooks, and the fact that Mrs. Brooks testified against Robert at trial, it should be understandable that Brooks has serious concerns about letting her raise his child.  The child has no other family member who could step up and take charge of raising him like his father can.

### F.   THE NEED TO AVOID UNWARRANTED DISPARITIES BETWEEN BROOKS AND OTHER DEFENDANTS CONVICTED OF FRAUD

The Court filed a Advisory Regarding Sentencing Issues on February 8, 2013.  In said Advisory, the Court drew attention to several other fraud cases and suggested Counsel review these cases in an effort to compare and contrast them to the Brooks' case.  Counsel has done so, and will now address each case separately.

1.      **UNITED STATES v. MADOFF**

Bernie Madoff was the architect of perhaps the largest financial fraud scheme in the last

100 years.  His scheme to defraud is outlined in the Information filed against him as follows:

> From at least as early as the 1980's through on or about December 11, 2008,
> BERNARD L. MADOFF, the defendant, perpetrated a scheme to defraud the
> clients of BLMIS by soliciting <u>billions of dollars</u> of funds under false pretenses,
> failing to invest investors' funds as promised, and misappropriating and
> converting investors funds to MADOFF's own benefit and the benefit of others
> without the knowledge or authorization of the investors.

(Exhibit 15 - p. 2) (emphasis added).

The Indictment goes on to state that Madoff made false representations on "tens of

thousands of account statements and documents sent through the U.S. mail."  (Exhibit 15 - p. 3).

He also diverted at least $250 million from investor accounts to the accounts of various

companies he had set up, instead of investing them in stocks and bonds as promised.  (Exhibit 15

- p. 6).  The company he had set up to manage the investor funds had approximately 4,800 client

accounts.   (Exhibit 15 - p. 7).  The company issued phony account statements for all those

clients claiming to hold a total of $64.8 billion in their funds.  (Exhibit 15 - p. 8).

In addition to mail fraud and wire fraud, Madoff was charged with committing "fraud in

the sale of securities . . . and theft from an employee benefit plan [and] perjury"  (Exhibit 15 -

12, 17).   Madoff was also charged with causing "a false and misleading certified BLMIS audit

report to be filed with the SEC" and the Information goes on to say that he "embezzled, stole,

abstracted and converted to his own use . . . moneys, funds, securities, premiums, credits,

properties, and other assets of employer welfare benefit plans and employee pension benefit

plans."  Madoff was found guilty of 11 counts in all, and sentenced to 1800 months

imprisonment.  (Exhibit 16 - p. 1-2).

There is no comparison between the fraudulent conduct in the Madoff scheme and the

Brooks scheme.  If Brooks had been acting as Madoff did, then he would have taken the buyers'

money and not actually given them anything of value in return.  Instead of giving them a piece of real estate in exchange for the money they provided, he would have simply given them a phony Deed to a property that did not even exist.  This was not what Brooks did.  He gave the buyers a valuable investment property.  The only argument concerns whether or not the property he sold to them was actually worth the price they paid for it.

At trial, there was conflicting testimony in this regard.  The Government argued that the properties were not worth as much as the buyers paid for them because the appraisals had been inflated.  The Defense put up Dallas real estate expert Lisa Richardson who testified that it was conceivable that the Condos were worth the $400,000 that Brooks was selling them for.  In support of this position, she noted that there was a brand new condominium project being built right across the street from the Topaz Townhomes condos Brooks was selling, and that the condos in the new development were starting at $450,000.

There is also no comparison between the breadth and scope of the Madoff scheme and the Brooks scheme.  The Madoff scheme continued for some 30 years.  In the course of that time period, Madoff duped tens of thousands of people into his scheme.  The Brooks scheme continued for a period of approximately 3 years.  At worst, Brooks is said to have involved 150 or so people in his scheme.  If you look at who the victims technically were in the Brooks case it is even less.  No more than a dozen or so lending institutions were defrauded by Brooks.  Since Brooks only defrauded a tiny fraction of the people and companies that Madoff did, Brooks should only receive a tiny fraction of the type of sentence Madoff received.

The comparison can be analyzed as follows.  150 is .015% of  10,000.  If one multiplies the 1800 months Madoff received by .015 the result is 27 months.  If one uses the figure of 12 as the number of lenders Brooks defrauded, then the contrast is even more evident.  12 is .0012% of 10,000.   If one multiplies the 1800 months Madoff received by .0012 the result is 2.16 months.

The Madoff scheme was also much more sinister than Brooks' scheme, as Madoff even

ended stealing money from his own employees pension benefit plans. Brooks never engaged in such practices. In fact, one of the main complaints against Brooks is that he paid his employees and associates too much money. Out of all the allegations against Brooks, no one ever said he stole money from his employees.

Finally, there is no comparison between the amount of money at issue of the Madoff scheme and the Brooks scheme. Madoff's scheme involved directly diverting account funds of over $250 million, and making false representations in the amount of $64.8 billion. Brooks is accused of depriving the banks of $15 million at most. (Counsel believes the actual amount of loss the banks suffered is much lower, as outlined elsewhere in this Memorandum, and the Objections to PSI Report).

Since Brooks is accused of stealing money through false representations instead of the direct diversion of other people's money, the correct comparison of loss amounts is the $64.8 billion, rather than the $250 million figure. $15 million is .00023% of $64.8 billion. If Brooks' sentence were a mere .00023% of Madoff's he would be facing about 30 days in jail. (.00023 x 1800 months = .41 months). If one compares the $250 million that was directly diverted from investors funds into Madoff's own company to the $15 million loss the Government claims the banks suffered, there is still a drastic disparity. $15 million is .06% of $250 million. If you multiply .06 times the 1800 months Madoff received, it comes out to 104 months.

## 2.     UNITED STATES v. DIVINS

Rosario Divins was charged in an 14 Count Indictment with the crimes of Criminal Contempt and Mail Fraud. (Exhibit 17). She had set up a business that was ostensibly designed to help people who were behind in their house payments to avoid foreclosure. (Exhibit 17 - p. 1). Unfortunately, she was not legally authorized to engage in this business, and was not able to prevent these foreclosures. (Exhibit 17 - p. 1). Instead, she took money from consumers and used it for her personal benefit, as opposed to putting it towards the homeowner's delinquent

mortgage payments.  (Exhibit 17 - p. 3-7).

She was ultimately convicted on all 14 Counts, and sentenced to 6 months in prison on some of the Counts, and 50 months on the other Counts.  (Exhibit 18 - p. 1-2).  However, because the Court decided to run several of her sentences consecutively, she ended up with a cumulative sentence of 350 months in jail.  (Exhibit 18 - p. 1-2).

Many of the people who gave Divins money ended up filing for bankruptcy.  (Exhibit 17 - p. 1).  When the bankruptcy court got wind of her unlawful activities, they issued an order preventing her from engaging in these type of activities in 1994.  (Exhibit 17 - p. 2).  Apparently this order did not dissuade her from continuing her unlawful scheme.  She continued to solicit further business, and make similar claims of being able to help people prevent foreclosure of their homes.   (Exhibit 17 - p. 2).  Subsequently in 2000, the bankruptcy court issued another cease and desist order against Divins.  An agreed order was actually prepared which Divins specifically signed off on, promising not to engage in this business practices ever again.  (Exhibit 17 - p. 2-3).  Nevertheless, she still continued to conduct business as usual.  Finally she was hauled in front of the bankruptcy court again in 2003.  (Exhibit 17 - p. 3).  She was sanctioned by the court for her misconduct and ordered to pay a fine in the amount of $1800.00.  (Exhibit 17 - p. 3).

Divins and Brooks case appear to have some similarities in that both were engaging in business ventures for which they had not received adequate training.  However, Divins apparently made false promises that she was going to provide something of value to her clients, and apparently provided nothing of value.  Instead, she just pocketed the money given to her by the clients.  Brooks did not promise to sell someone a property and then fail to actually deliver on that promise.  He did not just take their money and give them nothing in return.  He gave them a valuable piece of real estate.  Of course, as noted above there is a legitimate debate as to whether the properties were worth as much as they paid for the property.

29

Another key difference is the properties at issue in both cases.  In the Divins case, people were losing their homestead, as a result of her misconduct.  They were going to be kicked out of their own home, and if they had given than money to a legitimate attorney to negotiate a mortgage modification perhaps they could have saved their homes instead.  In contrast, almost all the properties Brooks sold were investment properties.  The buyers' damages were generally limited to a drop in their credit ratings, and some cases loss of their savings.  They were not deprived of their homestead as a result.

Another even more important difference in these two cases is the relative degree of culpability of the parties.  Brooks maintained throughout his trial that he was not aware that any of the business practices he engaged in amounted to fraud.  The Jury obviously believed that he had enough knowledge to realize his conduct was wrong and accordingly convicted him.  However, Counsel believes that there is a still a legitimate argument to be made as to how much Brooks knew about which parts of his business were legitimate and which parts were not.

Divins cannot make any such claims in her defense.  She was specifically warned by the bankruptcy court not once, but twice that her anti-foreclosure business was not legitimate.  She was specifically ordered to cease and desist from engaging in this business, but she defiantly continued to take people's money and give them nothing in exchange to help them avoid foreclosure.  Given these facts, it is understandable why she should be held much more culpable than Brooks.

As noted above, Divins received a total sentence of 6 months on each of her Criminal Contempt Counts and 50 months on each of the Mail Fraud Counts.  However, because the Court ordered the Mail Fraud Counts to run consecutively, she was given a total sentence of 350 months.  In truth, it seems to Counsel that a 350 month sentence for Divins was extremely harsh.  However, Counsel is not aware of all the details of her case and why the Court decided to run her sentences concurrently.  Counsel suspects it was because of her repeated violations of the court

orders to cease and desist her activities.

Given the relative knowledge of culpability of the parties, Counsel believes it would not be appropriate for the Court to sentence Brooks to a term greater than the 50 months Divins received for each Count.  Counsel certainly sees no reason to run any of Brooks' cases consecutively either.  Given that he has 0 criminal history points, and he was on model behavior for the 3 years he spent out on pre-trial release, he has shown himself capable of learning his lesson the first time around.  He does not need sentence as harsh as the one Divins received to prevent him from ever engaging in similar activities again, as Divins apparently did.

### 3.     UNITED STATES v. SKILLING

Jeffrey Skilling worked for the Enron corporation.  (Exhibit 19 - p. 1, para. 1).  Enron was at one point the 7th largest corporation in the entire country.  (Exhibit 19 - p. 1, para. 1).  It was one of the largest companies to ever file for bankruptcy in 2001.  (Exhibit 19 - p. 1, para. 1).   It was discovered to have been engaging in widespread spread fraud to cover up the mounting losses it had experienced prior to filing for bankruptcy.  (Exhibit 19 - p. 1, para. 1).  Skilling was a key player in helping to cover-up these losses.  (Exhibit 19 - p. 3, para. 5-6).

Skilling began his relationship with Enron by acting as a financial consultant in the 1990's.  (Exhibit 19 - p. 3, para. 5).  He had an M.B.A. from Harvard Business School and held "various executive and management positions with the company in 1997."  (Exhibit 19 - p. 3).  He eventually came to serve as Chief Operating Officer (COO) of the company, and then later President and Chief Executive Office and President in 2001.  (Exhibit 17 - p. 3, para. 5-6).  A few months later, he sold $60 million worth of Enron stock, and unexpectedly resigned from the company.  (Exhibit 19 - p. 3, para. 6).

Skilling was deeply involved in the day to day activities of the company and keenly aware of its financial condition.  (Exhibit 19 - p. 5-8).  Along with his co-conspirators, he participated in conference calls and question and answer sessions where he consistently reassured the public

and Enron's investors that the company was on sound financial footing, knowing that was not the case. (Exhibit 19 - p. 4, para. 8). He also approved the signing of SEC disclosure forms and audit reports indicating that the company's financial position was solid, despite knowing that the company was instead on the verge of collapse. (Exhibit 19 - p. 4, para. 8).

Skilling was subsequently charged with 40 Counts of frauds in a 60 page Indictment. (Exhibit 19). He was convicted on 19 Counts and sentenced to 292 months imprisonment on May 25, 2006. (Exhibit 20 - p. 1-2). One of his convictions was later overturned in *United States v. Skilling*, 130 S.Ct. 2896 (2010). He is now scheduled to receive a reduction in his sentence down to 168-210 months, as a result of an agreement with the prosecution. (Exhibit 21). Interestingly, the Fifth Circuit Court of Appeals found that his conduct did not warrant a 4 level increase for "significantly affecting the soundness of a financial institution." *United States v. Skilling*, 554 F. 3d 529, 534-35 (5th Cir. 2009). It would be hard-pressed for Counsel to understand how the billions of dollars the Enron collapse did not "significantly affect" these institutions, but Brooks' conduct did.

Part of Skilling's scheme involved fraudulently accounting for funds ranging from hundreds of millions up to $1 billion at one point. (Exhibit 19 - p. 12, para. 24). As part of his scheme, Skilling falsely appraised the value of one of Enron's subsidiary companies by literally billions of dollars. (Exhibit 19 - p. 16, para. 32). In another case, they fraudulently represented the value of another company to be worth $100 million more than it actually was. (Exhibit 19 - p. 13-14, para. 27). As part of another project called "Project Grayhawk", they ended up misrepresenting earnings of $85 million. (Exhibit 19 - p. 17, para. 33).

Skilling and his associates used a variety of complex and sophisticated procedures to falsely account for these funds, and to hide the mounting losses of the company. Many of these methods involved fraudulent property transactions from as far away as Brazil and Nigeria (Exhibit 19 - p. 22-24, para. 43-46). These methods included, but were not limited to:

32

a.   manufacturing and manipulating earnings through fraudulent use of reserve accounts to mask volatility in Enron's wholesale energy trading earnings and conceal and retain large amounts of those trading earnings for later use in order to achieve desired earnings results;

b.   manufacturing earnings and artificially improving Enron's balance sheet through fraudulent over-valuation or assets in Enron's merchant investment portfolio;

c.   concealing large losses and failures in Enron's two highly touted new businesses, EES and Enron Broadband Services ("EBS"), by manipulating Enron's "segment reporting" and using its reserved energy trading earnings to hide EES's losses, and by manipulating expense accounting to hide the extent of EBS 's losses;

d.   manufacturing earnings by falsely touting Enron's EBS business in order to drive up Enron's stock price, then misleadingly presenting earnings from the resulting increase in Enron's share price as recurring earnings from energy operations;

e.   structuring financial transactions in a misleading manner in order to achieve earnings objectives, avoid booking of large losses in asset values, and conceal debt, including through the fraudulent use of a purportedly third-party investment entity that in fact was not truly independent from Enron and which was used to achieve Enron's financial reporting objective and to enrich Enron executives and senior managers; and

f.   structuring financial transactions in a misleading manner in order to conceal the amount of Enron's debt and to create the false appearance of greater cash flows.

(Exhibit 19 - p. 10-11, para. 21).

Skilling personally benefitted by pocketing approximately $200 million in Enron stock, and $14 million in bonuses during his tenure at Enron.  (Exhibit 19 - p. 9, para. 19).  In contrast, the investors in the company lost billions of dollars.  (Exhibit 19 - p. 9, para. 19).  When the company filed bankruptcy its stock price dropped from $80 in 2000 to virtually $0 in 2001.  (Exhibit 19 - p. 10, para. 20).  Not only did the investors suffer a tremendous loss, thousands of people lost their jobs when Enron collapsed.  (Exhibit 19 - p. 9-10).

The magnitude of  Skillings' scheme and Enron's failure are so much greater than in

Brooks' case, it is difficult to compare the two.  First, Skilling had an accounting degree and therefore there is no doubt that he actually understood all the details of the financial transactions at issue in his scheme.  He had also worked for Enron in one capacity or another for a decade.  This background and training put him in a position where he had a whole support team around him who could help ensure that all the accounting practices followed the proper guidelines.

In contrast, Brooks had no formal real estate training.  He generally learned how to conduct the transactions from other people he came into contact with, and through trial and error.  He also relied on other professionals to help guide him through the process, and did not necessarily have the independent expertise to verify whether or not they were telling him was true or not.  He did not have the benefit of a group of highly trained and well paid professionals at his disposal who could help him learn how to be a successful real estate investor without running afoul of the law.  Accordingly, Brooks should be held to a much lower standard than someone like Skilling for his actions.

There is also no comparison between the breadth and scope of the Skilling scheme and the Brooks business enterprise.  Skilling was the head of a multi-billion dollar company that conducted business all across the country, and in several other parts of the world as well.  Enron was involved in the trading of various energy resources; construction of pipelines, power companies, and energy related businesses; provision of telecommunication services; as well as the trading of other valuable commodities.  Enron was also a publicly traded company with investors all across the country relying on it to provide accurate information as to its financial stability.

In contrast, Defendant Brooks ran a relatively small time real estate operation which bought and sold properties exclusively in the Dallas/Fort Worth area.  Most of the companies he set up were nothing more than names of a piece of paper.  Only a few were ever incorporated, and none ever became a publicly traded company.

The Skilling scheme was also much more sophisticated than Brooks' scheme. As noted above, the Skilling scheme involved complex financial transactions that a layman like Brooks could never even begin to understand. The scheme Brooks was convicted of basically involved artificial inflating the price of real estate, and hiding the fact that he was buying and selling the properties at issue. The Skilling scheme involved shifting millions of dollars around on a regular basis from one account to another to try and hide losses from the company. In contrast, Brooks' case involved temporarily lending borrowers merely tens of thousands of dollars to help them qualify for loans.

Finally, there is no comparison between the amount of money lost, and number of victims at issue of the Skilling scheme and the Brooks scheme. As noted above, the Skilling and Enron case involved fraudulent transactions in the hundreds of million to billion dollar range. The Brooks scheme at worst caused a loss of $15 million to a dozen or so lending institutions. These lenders also played a large role in their own losses for their own recklessness in the lending of loan proceeds. The investors and victims in the Enron case were never charged with participating in the fraud as well, in contrast to the Brooks' case.

The collapse of Enron cost thousands of people their jobs, and tens or hundreds of thousands of more investors their savings. The Brooks case involved a dozen or so lending institutions, and arguably 50 or so buyers who feel that they were misled by Brooks. The investors in Enron were ultimately left with stock that was worthless. In Brooks case, the buyers were left with property that is said to be worth at least 50-75% of the value they actually paid for it.

As noted above, Skilling is set to receive a reduction in his sentence to 168-210 months. The fact that Brooks is potentially facing a sentence that is much worse than Jeffrey Skilling points out some serious flaws in the federal sentencing guidelines system. Under these facts, Counsel finds it hard to understand why anyone would put Skilling and Brooks in the same

category. The financial damage and loss of jobs caused by Brooks is not even 1/100th of the

damage caused by Skilling.  With that in mind, it would certainly be reasonable for Brooks to get

a sentence that is only 4-5 years in prison, or roughly 20-25% as severe as the punishment

inflicted on Skilling.

### 4.     UNITED STATES v. MORALES

Daniel Morales was the former Attorney General for the State of Texas.  He was charged

in a 12 Count Indictment with engaging in a conspiracy to commit fraud, abusing his official

position and capacity as Attorney General, and making false tax returns.  (Exhibit 22).  First, he

was accused of transferring campaign funds to himself for his personal use.  (Exhibit 22 - p. 3-7).

Second, he also devised a scheme to enrich friends of his, with the expectation that they would

reward him with substantial campaign donations.  (Exhibit 22 - p. 8-28).  Specifically, he made

an agreement with some fellow attorneys to hire them to work on a large tobacco settlement case

the State was pursuing.   (Exhibit 22 - p. 8-28).  The agreement allowed them to reap huge sums

of money in exchange for performing little or actual work on the case.  (Exhibit 22 - p. 8-28).

When asked about the substance of this agreement later, he lied about the circumstances

surrounding the creation of the agreement, and his position as to whether or not he thought the

agreement should be approved or not.  (Exhibit 22 - p. 20-28).

The value of the campaign funds he was accused of transferring for his own benefit was

several hundred of thousands of dollars.  (Exhibit 22 - p. 3).  The overall value of the tobacco

settlement he was trying to manipulate was $15.3 billion dollars.  (Exhibit 22 - p. 14, para 23).

The amount of money that was tentatively awarded to the fellow lawyer he tried to unlawfully

enrich was $260 million dollars.  (Exhibit 22 - p. 16-17, para. 28).  The amount that the bogus

contract Morales prepared called for the lawyer to receive was actually double this amount, or

$520 million.  (Exhibit 22 - p. 17, para. 30).  The amount by which Morales under-reported his

tax liability was not specified, although presumably it was in the hundreds of thousands of

dollars due to the campaign funds he had converted to personal use.  (Exhibit 22 - p. 5, para 12).

Morales pled guilty to 2 Counts.  He was sentenced to 48 months in prison on the main fraud Count, and 36 months on the tax Count, to run concurrently.  (Exhibit 23 - p. 1-2).

Morales's case does bear some similarity to the Brooks case in regards to the tax fraud elements.  They were both charged and convicted of engaging in Mail Fraud and conspiracy to devise a fraudulent scheme.  The sophistication level was relatively similar in that they both engaged in the creation of business transactions that might give the appearance of being reached at arms length, but in fact were not.  However, there are some significant differences in their cases as well.

Morales held a position of unique public trust as Attorney General of the State of Texas.  Furthermore, as a lawyer and professional politician, he unquestionably understood that his actions were illegal.  His scheme was to deprive the taxpayers of this state $520 million dollars in potential revenue from the tobacco settlement by steering that money into the pockets of one of his personal associates.  In doing so, he hoped to personally benefit himself by obtaining part of the proceeds being transferred to him in campaign donations.  In turn, he would then divert the campaign contributions for his own personal benefit, as he had already done previously with other donations.

Brooks never held any such position of public trust.  He was just an average private citizen, who did not have the background, training and experience to understand how unlawful his conduct was to the same degree Morales did.  The $520 million Morales' scheme involved is roughly 35 times as large as the $15 million loss Brooks potentially is responsible for causing.  Not only did Morales derive his original scheme, he also sought to cover it up for some time by giving numerous false statements to government investigators and regulators (Exhibit 22 - p. 20-25).  By contrast, Brooks sat down with FBI agents investigating the case on numerous occasions and provided them truthful information about his activities.  (Exhibit 24).  In fact,

37

according to the trial testimony provided by FBI Agent David Rawlings, Brooks actually "confessed" to him at one point.  (Defendant actually still disputes this last point, but Counsel believes that if such a statement can be used in Court to convict him, it might as well be used to his advantage to help him in the sentencing process as well).

Based upon this comparison, it does not seem that there is sufficient reason for Brooks to receive a sentence any worse that Morales.  Certainly, a solid argument could be made that Brooks should receive a much lower sentence instead.

### 5.   UNITED STATES v. MAY

Fred Luther May was a financial account manager with a company called Planto, Roe & Associates.  (Exhibit 25 - p. 1).  He was convicted of 1 Count of Wire Fraud.  (Exhibit 26). According to the Indictment, he engaged in the following acts:

a.  Deceived and cheated his client friend, his employer Planto, and Securiao;

b.  Corrupted the books, records, and accounts of his client friend, Planto, and Securian by making false entries;

c. Violated fiduciary duties owed to his client friend, Planto, and Securian; and

d. Embezzled, stole, and converted to personal use, money belonging to his client friend and intrusted to Defendant May, Planto, and Securian.

(Exhibit 25- p. 2). May ended up embezzling over $473,000.  (Exhibit 25 - p. 3).  He was sentenced to 41 months imprisonment.  (Exhibit 26- p. 2).

There are really not many similarities between the Brooks case and the May case.  May's actions are more similar to Madoff's actions, but on a much smaller scale.  Both cases involve examples of flat out stealing of money that belonged to their clients.  Although all 3 cases fall under the general rubric of "fraud", there are varying degrees of fraud, and varying degrees of culpability.  Counsel would argue that May and Madoff should be help more culpable because their fraud was much more blatant and without potential legitimate defense.

### G.   THE NEED TO AVOID DISPARITIES BETWEEN BROOKS AND OTHER DEFENDANTS CONVICTED IN THIS CASE

It is expected that Brooks will be given a sentence that is greater than any of the other Co-Defendants since he is viewed as the "ring-leader" in this case.  Nevertheless Counsel still believes it is relevant to point out that Brooks lacked the formal education, training and license certification that many of his Co-Defendants had.  As such, these Co-Defendants should be held to a higher standard than Brooks.  Counsel would argue that it is not appropriate to give Brooks a sentence that is disproportionately greater than any of these individuals, or any of the other Co-Defendants.

### 1.   ATTORNEY RICHARD HOWARD

One such licensed individual is Richard Howard.  Not only was he a lawyer, but according to his resume, he claimed to have experience in the field of "white collar crime" and "corporate" law.  (Exhibit 27).  There is absolutely no excuse for his failure to advise Brooks to discontinue his activities, especially considering that he accepted checks totaling $200, 000 from Brooks in the beginning of their relationship, where "attorney's fees" was written in the memo section of the check..  (Exhibit 28).   In exchange for this money, he stated he "was with Brooks everyday" and "followed him around and answered his legal questions."  (Exhibit 28 - p. 2).

Not only did he fail to do warn Brooks of the illegal nature of his activities, he became an active participant in the Brooks enterprise, at one point becoming co-owner of Progressive Title & Abstract.  (Exhibit 29).  Towards the end of this enterprise, he started writing checks from the company account to pay himself and his creditors directly, a complete abuse of his fiduciary duties.  (Exhibit 30).  Such checks totaled over $100,000.

This is the type of flagrant misappropriation of funds that Brooks himself never even engaged in.  Yet Brooks will likely face a sentence that is between 2- 10 times higher than the 36 months Howard is promised in his plea bargain agreement.  (Howard Plea Bargain - p. 6).  Even

factoring in that Howard is entitled to a reduction for acceptance of responsibility, his sentence is still significantly less than that called for in the calculations mentioned in the Brooks PSI Report. This type of disparity is not warranted.

## 2.    MORTGAGE BROKER LEDALE COLES

Another one of the individuals who held a professional license was LeDale Coles.  She was licensed mortgage broker who was not only a key player in the commission of mortgage fraud before she ever even met Brooks, but also after she and Brooks ceased doing business together.  Although she is not technically a Co-Defendant in this case, she was alleged to be one of the co-conspirators in the Indictment.

Various witnesses like Yvonne Quintanilla gave statements and testified that Coles was intricately involved in the commission of fraud at her company "Supreme Mortgage."  (Exhibit 31).  She specifically forged signatures and altered documents and directed others to due the same.  (Exhibit 31 - p. 1-3).  She was also involved in the sale of many of the properties in the Brooks Indictment.  Some of the people who worked for her and who were presumably trained in the commission of fraud on her watch went on to work for Brooks, such as Quintanilla.

Coles later went on to perpetrate a separate mortgage fraud case involving the sale of her own home to one of her own employees.  (Exhibit 32 - p. 1-3).  In doing so, she enlisted the help of another individual to help her prepare a phony income tax return for the buyers.  (Exhibit 32 - p. 2-3).  In fact it is believed that the Government was investigating her activities before she pointed them in Brooks' direction to help save her own skin.  Coles already had some significant criminal history at that point.

Despite the multiple instances of fraud committed by Coles; despite the fact that she took a "hands-on" role in the commission of said fraud; despite the fact that she did so while a licensed broker; and despite the fact that she already had a significant criminal history, she will be facing a sentence much lower then Brooks.  Because she was allowed to plead guilty to only 1

Count, a violation of 18 U.S.C. 1957, she is facing a maximum sentence of no more than 10 years in prison, as opposed to the potential 30 years Brooks is facing.  (Coles Plea Bargain - p. 1). This type of disparity is unwarranted.

### 3. REAL ESTATE AGENT JOSEPH COOPER

Joseph Cooper was a licensed real estate agent.  He was the main person actively involved in recruiting buyers to purchase properties from Brooks.  (Exhibit 33).  He "provided advice on which properties had sufficient equity to make flips profitable [and] located properties for Robert Brooks to purchase."  (Exhibit 33).  In addition, Cooper actually purchased several properties and resold them on behalf of Brooks' company.  As such he was intricately involved in the Brooks enterprise and familiar with all the facets of his business structure.  Yet there is no evidence that he ever spoke up and told Brooks that based upon his experience and training he knew Brooks should not be buying and selling property this way.

Under the current terms of his plea bargain agreement, he is set to receive a sentence as low as 15 months.  (Cooper Plea Bargain - p. 5).  As noted above, Brooks is facing a potential sentence of 30 years, which is over 20 times as severe.  This type of disparity is unwarranted.

### 4. PROCESSING AGENT DEBBIE ALLEN

Debbie Allen was a mortgage loan processor who originally worked for Hector Adkins. (Exhibit 34 - p. 1).  Adkins was one of the main mortgage brokers involved in securing many of the loan packages in the Brooks case.  While working for Adkins, Allen "completed mortgage applications, verified income and deposit documents, and submitted mortgage files to underwriters."  (Exhibit 34 - p. 1).  She later went on to work for a title company for a few months.  (Exhibit 34 - p. 1).

Eventually, she went to work for Cheryl Brooks.  Her work included assisting Cheryl "with the daily management of the condos, to include, making mortgage payments, receiving the rental payments, keeping up with insurance premiums and other related charges."  (Exhibit 34 -

p. 3).  She also "assisted Robert Brooks' investors in San Antonio with signing disclosure forms and sometimes closing documents to purchase Robert Brooks' condos."  (Exhibit 34 - p. 2).  As such, he was intricately involved in the Brooks enterprise and familiar with all the facets of his business structure.

In addition to assisting Cheryl with managing the properties, Allen also bought several condos from Brooks.  (Exhibit 34 - p. 2-3).  She even recruited her then fiancé, Jeff Schroeder, to purchase the condos as well.   (Exhibit 34 - p. 2).  She admitted that the income listed on her applications was false, and that other information that was sent to the lenders was false.  (Exhibit 34 - p. 2-3).  As with all of the other buyers, she pocketed tens of thousands of dollars after each purchase.  (Exhibit 34 - p. 2).

Despite the depth of her involvement in this case, Allen is potentially facing one of the lightest sentences of all the Defendants.  According to the terms of her plea bargain, the Government will recommend a sentence of no greater than 16 months for her.  (Allen Plea Bargain - p. 5).  Therefore, Brooks is facing a sentence up to 20 times higher than hers.  This type of disparity is unwarranted.

### 5.    APPRAISER CEDRIC LESTER

Cedric Lester was also a professionally licensed individual who abused a special position of trust.  Not only did he say he participated in the inflating of appraisals, he admitted that it was his idea to demand the $10,000 finder's fee from Brooks to do so.  Of course, he also stated that Brooks never actually asked him to inflate any of his appraisals, but claims that there was an unspoken understanding between him and Brooks that he would do so anyway.

Lester is scheduled to receive a sentence of no more than 24 months if the Court approves the terms of his plea bargain agreement with the Government.  (Lester Plea Bargain - p. 5).  Therefore, his sentence will likely be a small fraction of what Brooks could receive.  Counsel would argue that if Lester truly did inflate the appraisals, then he is equally if not more culpable

than Brooks.  After all, the appraisals were more important to the bank than the amount of money the buyer was making or the amount of assets they owned.  His assistance was arguably more critical to convincing the banks to make the kind of loans they agreed to than anything Brooks himself did.

According to Lester's own testimony, he knowingly committed fraud in preparing the one document he was trained to accurately complete.  This revelation should also make him somewhat more culpable than Brooks, because there was scant testimony that Brooks himself ever personally created a phony document.  The main complaint about Brooks personally committing fraud himself was in regards to him signing the numerous HUD-1 Settlement Statements that were presented at trial.  However, these were not documents that he personally prepared.  There was not a single witness who testified that they ever heard Brooks specifically acknowledge that he understood the information in the buyer's side of the HUD-1 was inaccurate.  All of the other examples of forging or altering documents were done by other individuals.  Of course, the Government argued that these other individuals did so at Brooks' behest, so he has been held liable for these acts as well.  But Counsel would argue that he is not 10 times more guilty than the people who actually put in the phony numbers or whited out true information and replaced it with false information.

### 6.      PROCESSING AGENT YVONNE QUINTANILLA

Multiple witnesses testified that Yvonne Quintanilla ran Pro Processing.  She claimed that Brooks was really the one pulling the strings, but there is no denying she was there at the office day in and day out supervising the work of several other Co-Defendants.  By her own admission, she personally oversaw the alteration of documents, and the insertion of false information into mortgage applications happening right in front of her.

Counsel understands the general concept that a person directing someone to commit fraud will generally be held more culpable than the person actually committing fraud.  However, the

person directing the fraud should not necessarily receive a sentence that is more than double or triple the other person's sentence. Under the terms of her plea bargain agreement, Quintanilla is set to receive a punishment of 24 months in prison. (Quintanilla Plea Bargain - p. 5). In contrast, Brooks is facing a sentence of potentially 262-360. This means that Brooks's sentence could be more than 10 times the amount of Quintanilla's. This type of sentencing disparity is unwarranted.

### 7.      MORTGAGE BROKER & BOOK-KEEPER CHERYL BROOKS

Perhaps no one knew the details of the Brooks operation as intimately as Cheryl Brooks herself. Not only was she in charge of directing the operations of his business, she was also involved in the day to day running of the enterprise. She has specifically admitted to personally preparing phone verification of employment forms for some of the buyers. (Exhibit 35 - p. 4). She also admitted that she was in charge of keeping the books for the couple. (Exhibit 35 - p. 2-3). She eventually became a licensed mortgage broker in 2007. (Exhibit 35 - p. 2). In addition, she profited from the enterprise to the same degree Robert Brooks did, as his primary business partner and wife.

Despite the fact that she was just as involved in the business, and profited just as much, Cheryl Brooks is now facing a potential sentence of no more than 48 months under the terms of her plea bargain with the Government. (Cheryl Brooks Plea Bargain - p. 6). Counsel suspects that the Court may be even inclined to show her more leniency and allow her to avoid prison altogether, so that at least one of the Brooks will be able to continue raising their children. In either case, she is facing a sentence that but a small fraction of what Robert Brooks os facing.

While the fact that she pled guilty and has agreed to cooperate with the Government provides some justification for her getting a lighter sentence than her husband, the disparity should not be so disproportionate as to go beyond the bounds of basic fairness. Were Robert Brooks to receive a sentence in the 20-30 year range called for in the Brooks PSI Report, Counsel

believes that disparity would be disproportionate.

###8.      BUYERS

As of this date, 2 of the buyers have pled guilty.  The terms of Anthony Lorek's plea bargain do not call for a specific sentence.  (Lorek Plea Bargain - p. 5).  The terms of George Autobee's plea agreement call for a non-binding recommendation of 24 months.  (Autobee Plea Bargain - p. 5).  Counsel would not expect Brooks' sentence to be any less than that of the buyers, but on the other hand Brooks' sentence should not be overly more severe than their sentence.

Although many of the buyers have tried to paint themselves as innocent victims in this case, they share any culpability assigned to Brooks for providing false information to the lenders. They had the their primary duty to fill out the loan applications correctly, and double-check the information provided within for accuracy.  They also had their own independent duty to correct false information such as: fabricated employment information; inflated income; inflated assets; and missing liabilities.  It appears likely that none of  the buyers reported their lump sum $10,000 payments on their income taxes either.  If true, this also moves their culpability level closer to Brooks' as well.

###9.      OTHER CO-DEFENDANTS AWAITING TRIAL

The majority of Defendants have not pled guilty and are still awaiting trial.  Therefore, Counsel is not in a position to comment much on their potential sentences.  Suffice it to say that Counsel would not expect the majority of them to receive a sentence anywhere in the 20-30 year range Brooks is facing.

###H.      THE NEED FOR RESTITUTION

As noted in the above paragraphs, the quicker Defendant Brooks gets out of prison, the quicker he can start making restitution on the case.  Also, the sooner he is released, the sooner taxpayers can stop being charged the monthly $2,407.78 it currently costs to incarcerate each

person in the Bureau of Prisons.  (PSI Report, p. 35, para. 99).  Also, the sooner he can resume the $600.00 month in child support payments for his daughter Nysa.

**VI.     PRAYER**

Bearing all these factors and principles in mind, Counsel would respectfully request that the Court assess a punishment of probation, or in the alternative no more than 46-57 months imprisonment for Defendant Robert Brooks.

Respectfully submitted,


**/s/**
STEPHEN H. GORDON
*Attorney for Defendant*

The Gordon Law Firm., P.C.
5820 IH-10 West, Suite 400
San Antonio, Texas  78201
Ph: (210) 531-9700
Fx: (210) 732-0158
State Bar No. 24007252


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 17, 2013, a true copy of the foregoing Defendant's Sentencing Memorandum was transmitted to Assistant United States Attorney Bill Harris at the United States Attorney's Office, 601 N.W. Loop 410, Suite 600, San Antonio, Texas, 78216-5512, and to U.S. Probation Officer Margarita Garbalena, 727 E. Cesar Chavez Blvd., Suite 310, San Antonio, Texas 78206-1200, through the ECF system.

/s/
STEPHEN H. GORDON
*Attorney for Defendant*

46